# Exhibit A

Plaintiffs' Summons and Complaint

Los Angeles County Superior Court, No. 25STCV15972

**Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
06/05/2025
CT Log Number 549303053

## Service of Process Transmittal Summary

**TO:**     Joseph Mullins, Us Corporate Counsel Secretary
            ILUKA Resources Inc.
            4701 OWENS WAY STE 500
            PRINCE GEORGE, VA 23875-2369

**RE:**     **Process Served in Florida**

**FOR:**    Iluka Resources Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | LAURENCE J. GRAHAM AND BETTY PATRICK GRAHAM vs. DuPont de Nemours, Inc. |
| **CASE #:** | 25STCV15972 |
| **PROCESS SERVED ON:** | C T Corporation System, Plantation, FL |
| **DATE/METHOD OF SERVICE:** | By Process Server on 06/05/2025 at 15:34 |
| **JURISDICTION SERVED:** | Florida |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air |
| | Image SOP |
| | Email Notification,  Joseph Mullins  joe.mullins@iluka.com |
| | Email Notification,  Donna Huff  donna.huff@iluka.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 1200 South Pine Island Road |
| | Plantation, FL 33324 |
| | 877-467-3525 |
| | SmallBusinessTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 1 of  1



## PROCESS SERVER DELIVERY DETAILS

**Date:**                              Thu, Jun 5, 2025
**Server Name:**                       luzeneida gonzalez

| Entity Served | ILUKA RESOURCES INC. |
|---|---|
| Case Number | 25STCV15972 |
| Jurisdiction | FL |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* ~~123~~ BPД

DuPont de Nemours, Inc. et al. (see attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Laurence J. Graham and Betty Patrick Graham

**FILED**
Superior Court of California
County of Los Angeles

**JUN 02 2025**

David W. Slayton, Executive Officer/Clerk of Court

By: G. Robinson, Deputy

---

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Los Angeles Superior Court<br><br>111 North Hill Street Los Angeles, CA 90012 | CASE NUMBER<br>*(Número del Caso):* **25STCV15972** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Laurence J. Graham and Betty Patrick Graham
4647 Kingswell Ave ste 105 Los Angeles, CA 90027

| DATE:<br>*(Fecha)* JUN 02 2025 | David W. Slayton | Clerk, by<br>*(Secretario)* | G. Robinson | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Iluka Resources Inc., a Delaware Corporation
   under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
      ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
      ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
      ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 06/05/2025

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]
For your protection and privacy, please press the Clear This Form button after you have printed the form.

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*



**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc., et al. | 25STCV15972 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[ ] Plaintiff    [x] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

~~DuPont de Nemours, Inc.~~, a Delaware Corporation; and, The Dow Chemical Company; a Delaware Corporation; and, Dow Inc., a Delaware Corporation; and, Corteva, Inc., a Delaware Corporation; and, The Chemours Company, a Delaware Corporation; and, Occidental Petroleum Corporation, a Delaware Corporation; and, Iluka Resources Inc., a Delaware Corporation; and, Iluka Resources Limited, an Australian public company; and, Tronox, LLC, a US limited liability company; and, Tronox Holdings plc, an Australian company; and, Tronox Limited, an Australian public company; and, Huntsman Corporation, a Delaware Corporation; and, Kronos (US), Inc., a Delaware Corporation; and, Kronos Worldwide, Inc., a Delaware Corporation; and, National Industrialization Company, a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia; and, Venator Materials, LLC, a US limited liability corporation; and, Venator Materials, plc, a United Kingdom company; and, Ineos Group Limited, a private limited company organized under the laws of the United Kingdom; and, Titanium Metals Corporation, a Delaware Corporation; and, Precision Castparts Corp., an Oregon Corporation; and, Berkshire Hathaway Inc., a Delaware Corporation; and, Ineos Pigments USA Inc, a Delaware Corporation.; and, INEOS Enterprises US Holdco LLC, a limited liability corporation organized in Delaware; and, Kinder Morgan, Inc., a Delaware Corporation; and, Charles O. Holliday, Jr., an individual person and resident of Washington, DC; and, Hunton Andrews Kurth LLP, a Limited Liability Partnership with offices in California and Florida and a citizen of both California and Florida; and, Kenneth Reed Mayo, an individual person and resident of Virginia; and, Reed Mayo Law Firm, P.C., a Virginia professional corporation; and, J-M Manufacturing Company, Inc., a Delaware Corporation; and, DOES 1-25, Inclusive,
Defendants.

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

For your protection and privacy, please press the Clear This Form button after you have printed the form.

     

1
2
3
4
5
6
7
8

Laurence J. Graham
4647 Kingswell Ave Ste 105
Los Angeles, CA 90027
Telephone: (510) 435-5707
E-mail: lg.legal25@gmail.com
Betty Patrick Graham
c/o Laurence J. Graham
4647 Kingswell Ave Ste 105
Los Angeles, CA 90027
Telephone: (510) 435-5707
E-mail: lg.legal25@gmail.com
Pro se,

**FILED**
Superior Court of California
County of Los Angeles

**JUN 02 2025**

David W. Slayton, Executive Officer/Clerk of Court

By: G. Robinson, Deputy

9
10
11
12
13
14

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

15
16
17

VERIFIED COMPLAINT FOR RELIEF BASED UPON RESCISSION OF CONTRACTS
AND DEMAND FOR JURY TRIAL

18
19
20
21
22
23
24
25
26
27
28

LAURENCE J. GRAHAM AND BETTY
PATRICK GRAHAM

      Plaintiffs,

vs.

DuPont de Nemours, Inc., a Delaware
Corporation; and, The Dow Chemical
Company; a Delaware Corporation; and,
Dow Inc., a Delaware Corporation; and,
Corteva, Inc., a Delaware Corporation; and,
The Chemours Company, a Delaware
Corporation; and, Occidental Petroleum
Corporation, a Delaware Corporation; and, Iluka
Resources Inc., a Delaware Corporation; and,

Case No.: Case No:    **25STCV15972**

VERIFIED COMPLAINT FOR RELIEF
UNDER CAL. CIVIL CODE SEC. 1692
BASED UPON RESCISSION OF
CONTRACTS BASED ON BREACH OF
FIDUCIARY DUTIES; FRAUD (CAL. CIVIL
CODE SECTION 1572); CONSPIRACY
CACI NO. 3600; AND, ONGOING
CONSPIRACY CACI 3601

1

19

1   Iluka Resources Limited, an Australian public
    company; and, Tronox, LLC, a US limited
2   liability company; and, Tronox Holdings plc, an
    Australian company; and, Tronox Limited, an
3   Australian public company; and, Huntsman
    Corporation, a Delaware Corporation; and,
4   Kronos (US), Inc., a Delaware Corporation;
5   and, Kronos Worldwide, Inc., a Delaware
    Corporation; and, National Industrialization
6   Company, a limited company organized,
7   existing, and doing business under, and by
    virtue of, the laws of the Kingdom of Saudi
8   Arabia; and, Venator Materials, LLC, a US
9   limited liability corporation; and, Venator
    Materials, plc, a United Kingdom company;
10  and, Ineos Group Limited, a private limited
    company organized under the laws of the United
11  Kingdom; and, Titanium Metals Corporation, a
12  Delaware Corporation; and, Precision Castparts
    Corp., an Oregon Corporation; and, Berkshire
13  Hathaway Inc., a Delaware Corporation; and,
    Ineos Pigments USA Inc, a Delaware
14  Corporation.; and, INEOS Enterprises US
15  Holdco LLC, a limited liability corporation
    organized in Delaware; and, Kinder Morgan,
16  Inc., a Delaware Corporation; and, Charles O.
    Holliday, Jr., an individual person and resident
17  of Washington, DC; and, Hunton Andrews
18  Kurth LLP, a Limited Liability Partnership with
    offices in California and Florida and a citizen of
19  both California and Florida; and, Kenneth Reed
    Mayo, an individual person and resident of
20  Virginia; and, Reed Mayo Law Firm, P.C., a
21  Virginia professional corporation; and, J-M
    Manufacturing Company, Inc., a Delaware
22  Corporation; and, DOES 1-25, inclusive,

23                  Defendants.

24

25

26

27

28                              2

                              20

1

2

<u>VERIFIED COMPLAINT FOR RELIEF UNDER CALIFORNIA CIVIL CODE
SECTION 1692 BASED ON RESCISSION OF CONTRACTS; AND, DEMAND FOR JURY
TRIAL</u>

3

4
Verified complaint for relief under Cal. Civil code Sec. 1692 based on rescission of ten mining

5
leases based on breach of fiduciary duties; fraud (Cal. Civil Code Sec. 1572); Conspiracy CACI

6
No. 3600; Ongoing Conspiracy CACI 3601

7

8
Laurence J. Graham (also known as: Laurence John Graham, Laurence Graham, and Larry

9
Graham) on behalf of himself, and as attorney-in-fact for Betty P. Graham (also known as: Betty

10
Patrick Graham, Betty Graham), and Laurence John Graham as Agent and attorney-in-fact for

11
Betty P. Graham); and, Betty Patrick Graham (also known as: Betty P. Graham).
Pro Se,

12

13
Plaintiffs,

14

15
vs.

16

17
DuPont de Nemours, Inc., a Delaware Corporation ("Dupont"); and, The Dow Chemical

18
Company; a Delaware Corporation ("Dow"); and, Dow Inc., a Delaware Corporation ("Dow

19
Chemical"); and, Corteva, Inc., a Delaware Corporation ("Corteva, Inc."); and, The Chemours

20
Company, a Delaware Corporation ("Chemours"); and, Iluka Resources Inc., a Delaware

21
Corporation ("Iluka"); and, Iluka Resources Limited, an Australian public company ("Iluka

22
AUS"); and, Tronox Limited is a public company organized, existing, and doing business under,

23
and by virtue of the laws of Western Australia, with its executive offices located in, Stamford,

24
Connecticut ("Tronox Limited"); and, Tronox, LLC, a US limited liability corporation ("Tronox

25
LLC"); and, Tronox Holdings plc, a public company organized, existing, and doing business

26
under, and by virtue of the laws of Western Australia, with its executive offices located in,

27
Stamford, Connecticut ("Tronox Holdings plc"); and, Huntsman Corporation, a Delaware

28
Corporation ("Huntsman"); and, Kronos (US), Inc., a Delaware Corporation ("Kronos US"); and,

Kronos Worldwide, Inc., a Delaware Corporation ("Kronos Worldwide"); and, Titanium Metals

3

Corporation, a Delaware Corporation ("Timet"); and, Precision Castparts Corp., an Oregon Corporation ("Precision Castparts Corp."); and, Berkshire Hathaway Inc., a Delaware Corporation ("BH"); and, Venator Materials, LLC, a limited liability company organized in Delaware ("Venator LLC"); and; Venator Materials, plc, an entity organized and existing under the laws of the United Kingdom ("Venator plc"); and, Occidental Petroleum Corporation, a Delaware Corporation ("OXY"); and, Ineos Group Limited, a private limited company organized under the laws of the United Kingdom ("Ineos Group Limited"); and, Ineos Pigments USA Inc., a Delaware Corporation ("Ineos Pigments USA Inc"); and, Ineos Enterprises US Holdco LLC, a limited liability company organized in Delaware ("Ineos Enterprises, LLC"); and, Kinder Morgan, Inc., a Delaware Corporation ("KM"); Charles O. Holliday, Jr., an individual person and resident of Washington, DC ("Mr. Holliday"); and, Kenneth Reed Mayo, an individual person and resident of Virginia ("Reed Mayo"); and, Reed Mayo Law Firm, P.C., a Virginia professional corporation (" Reed Mayo Law Firm"); and, Hunton & Williams, a Virginia company ("H&W"); and, Hunton & Williams LLP, a limited liability partnership ("Hunton"); and,  Hunton Andrews Kurth LLP, a limited liability partnership ("HAK"); and, National Industrialization Company, a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia ("TASNEE"); and, J-M Manufacturing Company, Inc., a Delaware Corporation ("J-M"); and, JM Eagle, a Delaware Corporation ("JM"); and,

DOES 1-25, inclusive,

Defendants.

_____/

Verified complaint for relief under Cal. Civil code Sec. 1692 based on rescission of ten mining leases based on breach of fiduciary duties; fraud (Cal. Civil Code Sec. 1572); and, Conspiracy (CACI No. 3600)

Plaintiffs Laurence J. Graham (also known as Laurence John Graham), Betty Patrick Graham (also known as Betty P. Graham), Laurence J. Graham as Agent for Betty P. Graham (also known as: attorney-in-fact for Betty P. Graham), and Laurence J. Graham as attorney-in-

fact for Betty P. Graham ("Plaintiffs") are informed and believe and on that basis allege as follows:

1. Iluka, AKA Iluka Resources, Inc. ("Iluka") is already in receipt of a copy of Betty P. Graham's durable power of attorney titled: FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I, Laurence J. Graham, have the powers to bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham may be referred to as ("Betty") herein. I may be referred to as ("Laurence") herein. The 9/29/03 Settlement Agreement attached hereto as ("Exhibit A") is also written authorization for Laurence to act on Betty's behalf which he does in this amended complaint.

## GENERAL ALLEGATIONS

2. Whenever reference is made in this VERIFIED COMPLAINT FOR RELIEF BASED ON RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL to any act of any corporate or other business defendant, such allegation shall mean that said defendant and its officers, directors, agents, employees, representatives, or aider or abettor did or authorized such acts while engaged in the management, operation, direction, or control of the affairs of such defendant and while acting within the scope and course of their duties.

3. Whenever reference is made in this VERIFIED COMPLAINT FOR RELIEF BASED ON RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL to concealing the quantity of sales of any product or concealing the volume of sales of any product, the term "quantity" is interchangeable with the term "volume" and both refer to the amount of sales by weight.

## NATURE OF ACTION AND BACKGROUND

4. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres by a certain Deed of Gift dated the 19th Day of May 1997

5

which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") attached as ("Exhibit B")  which, by its written language, is said to be drafted by one attorney who, although we did not know it at the time, had a history of performing work for RGC (USA) Minerals Inc., AKA RGC (USA) Minerals, Inc. (hereinafter, "RGC"); but, we did know that he was working on the 97 Deed with RGC and that the McGuire Woods law firm was involved.

5.  With the conveyance of title to more than 1,150 acres of subsurface minerals located below ten parcels of land, without limitation, the physical, tangible, real property, subsurface mineral estate was conveyed by the 97 Deed with the inherent right of priority use over the surface estate including the rights of (ingress and egress), and possession at all times for the purpose of mining[1], drilling, and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October 13, 1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases") attached as ("Exhibit C"). The 97 Deed severed the 1,169.86 acre lease from the 1,196.61 acre lease that Betty's parents and RGC entered into. At the time Betty's parents executed the 97 Deed, they owned all

---

[1] Mining is the process of extracting the subsurface minerals conveyed by the 97 Deed.

6

24

right, title and interest in and to the minerals within and underlying the ten parcels of land listed in the 97 Deed which total more than 1,150 acres although said minerals were subject to the Leases.   E.I. Du Pont De Nemours and Company ("DuPont") drilled into the subsurface minerals located below the ten parcels of land listed in the 97 Deed and tested the quality of the minerals therefrom and made representations about the tonnage of minerals contained below the surface of those acres of land to Betty's father George L. Parson, Jr. which he relied upon while signing the Leases that RGC prepared. DuPont and RGC were separate companies; therefore, they were not affiliates.

6.   Accordingly, Betty P. Graham, Julia P. Boyd, and Ann P. Everett were each conveyed title to a separate one-third share of the physical tangible real property minerals located below the surface of the ten parcels of land listed in the 97 Deed together with the inherent right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals, and each of them also received one-third of the royalties due under the Leases by the 97 Deed except for the next two annual advance royalty payments, and each of them also received one-third of the Parsons lessor rights, also known as lessor standing, by the 97 Deed.

<u>Action for relief under Cal. Civil Code Sec. 1692</u>

7.   This is an action for relief, by jury trial, based on the rescission of the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed based on Iluka's breaches of fiduciary duties one of which is the failure of consideration for said saleable minerals in California another is the failure to deliver reporting about the minerals that were extracted from the ten parcels of land listed in the 97 Deed and the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 **Deed. Iluka did the extracting of the minerals and the other Defendants aided**

7

**and abetted Iluka's breaches of fiduciary duties by providing encouragement**
**and substantial assistance to Iluka while knowing that it would not deliver fair**
**and equitable consideration to us for the one-third share** of the minerals conveyed
to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that
was extracted from the ten parcels of land listed in the 97 Deed. The California
Superior Court has general jurisdiction for an action for relief under Cal. Civil Code.
Sec. 1692 based on recession of contracts. Cal. Civil Code Sec. 1646 provides, *"A*
*contract is to be interpreted according to the law and usage of the place where it is to*
*be performed; or, if it does not indicate a place of performance, according to the law*
*and usage of the place where it is made."* We noticed 481 N Santa Cruz Ave #178
Los Gatos, CA 95030 as the place of performance pursuant to section 33 of the
Leases which provides for notices.

<u>Offer to Restore Iluka</u>

Plaintiffs have already offered to restore Iluka 28.2 million dollars and contend that
they have rescinded the Leases based on Iluka's breaches of fiduciary duties, one of
which is the failure of consideration, for the one-third share of the minerals conveyed
to Betty by the 97 Deed that were recovered from the ore that was extracted from the
ten parcels of land listed in the 97 Deed.

8.  The Leases provide that the Lessor shall name the place of performance and
    California law governs torts when the place of performance is California per Cal.
    Civil Code Section 1646.

9.  Plaintiffs named California as the place of performance per the attached letters
    "EXHIBIT D"

10. With California being the place of performance, Cal. Civil Code Sec. 1692 governs
    rescission.

11. Cal. Civil Code Sec. 1692 controls rescission of the Leases based on torts when the
    place of performance is California.

8

12. The failure of consideration happened in California by Iluka's 2/12/2023 letter mailed to Los Gatos, see "EXHIBIT E" at page 1.

13. Arbitration is an unavailable forum for the relief sought because, among other reasons, the American Arbitration Association rules in place at the time the Leases were entered in 1989 did not allow the arbitrator to award punitive damages and legal fees and punitive damages are available for the relief sought under Cal. Civil Code Sec. 1692. Legal fees are also available under Cal. Civil Code Sed. 1692 which is another reason that arbitration is an unavailable forum.

14. None of the defendants were parties to the Leases in 1989; therefore, none of the defendants have a right to compel arbitration nor seek the protections of it.

15. Betty executed a 2000 Deed of Gift in Florida that assigned 60% of her royalties to Laurence. Betty's 2000 Deed of Gift also assigned lessor standing in the Leases to Laurence.

16. As agreed in the 9/29/03 Settlement Agreement, Laurence controls the one-third share of tangible subsurface minerals conveyed to Betty by the 97 Deed together with the royalties and lessor rights assigned to Betty by the 97 Deed.

17. Laurence and has lessor standing to rescind the portion of the Leases pertaining to the entire one-third share of the minerals conveyed to Betty by the 97 Deed.

18. Betty retained the one-third share of the tangible real property minerals conveyed to her by the 97 Deed.

19. Betty is the owner of the one-third share of the tangible real property minerals conveyed to her by the 97 Deed.

20. In 2006 there were Palm Beach County, FL guardianship and incapacity cases, Case Nos. 502006GA000650XXXXSB & 502006MH002068XXXXSB, which were effectively ended by orders from the DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA FORTH DISCRICT, see
https://4dca.flcourts.gov/content/download/164619/opinion/Opinion_07-996.pdf

9

27

which we request that the Court take judicial notice of which is also attached as
("EXHIBIT G")], with which the Court determined that the appointment of Betty's
other son Luke P. Graham as temporary guardian was invalid and that no authority to
act for Betty was given to any person nor entity by the orders of the Palm Beach
County Florida Court and the Court determined that the trial court did not find any
valid reason to revoke Betty's advance care directives by which Betty gave Laurence
broad and sweeping powers to make health care and financial decisions for Betty
which determination is also binding in California courts and prevails over any case
law precedent in California that forbids an attorney-in-fact also known as "Agent"
from representing a person in a California court with an advance care directive if that
person cannot represent themselves without regard to any conflict of laws. As
provided by said order, Florida law dictates that representing an infirm person with
the powers granted by that person's advance care directive is a less restrictive
alternative to guardianship and we argue that the California courts must respect
Betty's right to have Laurence represent her in court as her Agent and attorney-in-fact
because Betty's advance care directives, by which Laurence has the powers to
represent her interests in Court, are a less restrictive alternative to guardianship and
that such powers are valid in this Court. Also, the Court did determine that Betty is
the owner of the minerals located below the ten parcels of land listed in the 97 Deed
and the inherent right to rents therefrom. Furthermore, the defendants alleged in the
San Francisco litigation that Betty has been intellectually incapacitated since 2006.

21. Iluka Resources Inc. claims to be successor to RGC (USA) Minerals Inc. by merger
as evidenced in the 6/12/2023 Notice of Termination of Mining Leases sent to Los
Gatos, CA, see attached "EXHIBIT F" at page 1, which is fraud directed at us in
California that purposefully availed Iluka Resources Inc. and Iluka Resources
Limited, and HAK, and Reed Mayo, and Reed Mayo Law Firm and the other
defendants that aided and abetted Iluka of the jurisdiction of the California Superior
Court because RGC (USA) Minerals Inc. filed an annual report in Florida in 2012,
see "EXHIBIT H", after Iluka Resources Limited defined the process by which it
changed the name of its subsidiaries when it changed the name of RGC (USA)

10

28

Mineral Sands Inc. to Iluka Resources Inc., see EXHIBIT H, at pages 1-4; therefore, Iluka Resources Limited became successor to RGC (USA) Minerals Inc. by merger and Iluka's claim that it became successor by said merger, can't be true which is all further evidence that neither Iluka Resources Limited nor Iluka Resources Inc. nor the other defendants has clean hands, that neither entity is a signatory to the Leases, that neither entity entered the Leases in 1989, that neither entity has the right to compel arbitration, that both entities engaged in undue influence, and that any statute of limitations is tolled by this conduct; however, Iluka Resources Inc. claims to be successor to RGC (USA) Minerals Inc. and we served it a **copy of the complaint thereby rescinding the Leases.  Furthermore, the 06/12/2023 Notice of Termination of Mining Lease is a fraud because CHRISTOPHER LANCE EVERETT AND LEE RANDOLPH EVERETT do not have any interest in the minerals that were below Sussex County Virginia Tax Map Parcels 101-A-17 and 101-A-17A and it does not identify any lessor for the one-third portion of the lessor rights also known as lessor standing assigned to Betty.**

22. Plaintiffs rescinded the Leases by previously serving a copy of a verified complaint for relief under Cal Civil Code Sec. 1692 to Iluka.

## VENUE IS PROPER IN CALIFORNIA

23. Venue is proper in California because defendant Iluka breached a fiduciary duty to deliver fair and equitable consideration for the one-third share of the saleable minerals recovered form the ore that was extracted from the ten parcels of land listed in the 97 Deed in California thereby subjecting Iluka to California jurisdiction and venue for relief based on rescission of the Leases and because each of the other defendants intended to assist Iluka in its breach of fiduciary duty to deliver fair and equitable consideration to us for said one-third share of the saleable minerals wherever and whenever it occurred and it occurred in California; therefore, each of the defendants intended to harm us in California and purposefully availed itself of the jurisdiction of the California Superior Court which has general jurisdiction for the relief sought. Furthermore each of the defendants acted with actual knowledge of the

11

the plan to cause a failure of consideration to us for said one-third share of the saleable minerals and intended to cause a failure of consideration to us for said one-third share of the saleable minerals and provided substantial encouragement and assistance with some of such conduct occurring in California. When the defendants aided and abetted Iluka's breach of fiduciary duty to deliver fair and equitable consideration to us for the one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, the defendants purposefully availed themselves of the jurisdiction of the state court wherever that failure of consideration occurred and it occurred in California; and, leading up to said failure of consideration, each of the defendants committed intentional acts to aid and abet said failure of consideration that were expressly aimed at California and caused us harm and contributed to the brunt of the harm which was the failure of consideration for said one-third share of the saleable minerals in California. Each of the Defendants, except for BH, Kinder Morgan, Inc. ("KM") and Hunton Andrews Kruth LLP ("HAK"), Kenneth Reed Mayo, Reed Mayo Law Firm, and Corteva, Inc. separately shipped products to and sold products in Los Angeles County California and elsewhere in California containing saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. Iluka sold some of the saleable minerals in Los Angeles and elsewhere in California which is purposeful availment and conduct intended to harm us in California. The other defendants except for BH, KM, HAK, Kenneth Reed Mayo, Reed Mayo Law Firm, and Corteva, Inc. each separately sold products in California that included, but are not limited to, titanium dioxide pigment and things that were made with titanium dioxide pigment such as paint, PVC pipe, plastics, etc. and each such defendant underreported the sales of those products to assist Iluka in its breaches of fiduciary duties to us which is also conduct directed to harm us in California and which caused substantial harm to us. We allege that both DuPont and Chemours operated large distributorships in Alameda County California for products containing the saleable minerals and that, after Chemours was spun off from DuPont, Chemours started using third party distributorships to conceal such conduct in an effort to reduce contacts

12

within California but has purposefully availed itself of jurisdiction in California as have all of the defendants with their conduct directed at us. The defendants that did not ship products to and sell products in California that contained said saleable minerals were aware of that conduct and the underreported production price-fixing scheme and participated in the scheme in various ways, some of which conduct occurred in California and some of which conduct was directed at us in California. The defendants that are not in contractual privity with us also intended to aid and abet Iluka's failure of consideration to us in California which is purposeful availment, and all the defendants benefited financially from participation in the underreported production price-fixing scheme and caused us substantial harm. "The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff. (Judicial Council of Cal., Civ. Jury Instns. (CACI) (2014) No. 36:0 . . .)." (Nasrawi v. Buck Consultants LLC (2014) 231 Cal.App.4th 328, 343 [179 Cal.Rptr.3d 813].) A defendant who acts with actual knowledge of the intentional wrong to be committed and provides substantial assistance to the primary wrongdoer is not an accidental participant in the enterprise." (Upasani v. State Farm General Ins. Co. (2014) 227 Cal.App.4th 509, 519 [173 Cal.Rptr.3d 784], original italics, internal citations omitted.) Huntsman Corporation mixed coatings in Los Angeles County with titanium dioxide pigment that it knew was produced with the saleable minerals. Titanium Metals Corporation ("Timet") used the saleable minerals at its plant in Vallejo, CA through calendar year 2020 although it claims to have ceased production at that plant. Furthermore, it is highly probable that there are witnesses living in California that were employed by some of the defendants including, but not limited to, private investigators and former employees of E.I. du Pont de Nemours & Company's Antioch, CA titanium dioxide pigment plant and Timet's Vallejo, CA plant and current employees of Huntsman Advanced Materials in Los Angeles County California. Furthermore venue is proper in California because in-state

13

defendant J-M is a citizen of California with its principal place of business in Los Angeles and HAK has partners in San Francisco and Los Angeles. Jurisdiction exists over each of the defendants because they each engaged in the underreported production price-fixing scheme alleged in the paragraphs below that resulted in Iluka's failure to deliver fair and equitable consideration to us for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed in California. Venue in Los Angeles County, CA is also proper because the market for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed was suppressed within Los Angeles, CA and San Francisco, CA. Each of the defendants participated in the underreported production price-fixing scheme alleged in the paragraphs below and each defendant's conduct was a substantial factor in causing Iluka's failure to deliver fair and equitable consideration to us in California for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed. For all these reasons, the Defendants purposefully availed themselves of California jurisdiction and venue and are subject to California law for the relief that we seek based on rescission of the Leases pertaining to at least a share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and a jury trial for a bare money judgement and the punitive damages and the California Superior Court at the Stanley Mosk courthouse has general jurisdiction for the relief sought when the place of performance is California per Cal. Civil Code Sections 1646 and 1692. Furthermore, Laurence and Betty are residents of Los Angeles California.

24. I, Laurence John Graham, allege that I spoke with the head geologist employed by Iluka who explained that there were 30 to 35 million tons of heavy minerals left to be mined in the Old Hickory Heavy Mineral Reserve and that 80% to 85% of those tons would be recovered as saleable minerals and confirmed that 24 million tons of saleable minerals would be sold and I questioned Iluka's officer about Iluka's

14

geologist's representations and Iluka's officer denied them and he also represented Iluka to notify me that the owners of minerals and royalties were not allowed to know such information at that time and not allowed to know it until the end of Iluka's undertaking of extracting and receiving payment for the minerals conveyed to Betty P. Graham, Julia P. Boyd, and Ann P. Everett by the 97 Deed and not allowed to know it before Iluka determined who was to receive all of Betty P. Graham's royalty payments; Iluka's officer explained to me that the minerals conveyed to Betty P. Graham, Julia P. Boyd, and Ann P. Everett by the 97 Deed would be mined from the ten parcels with simultaneous mining and that the minerals from those parcels would be comingled.

25. We allege that by letters served and sent to Iluka by certified mail in December of 2022 and in 2023 we demanded that Iluka disclose to us how many tons of each kind of mineral that it had extracted from the acres of land described in the 97 Deed and the location of each of those tons; and, those letters include, but are not limited to the ("Exhibit D").

26. We allege that by demanding that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the location of each of those tons that we thereby demanded that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and the location of each of those tons.

27. We allege that by demanding that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the location of each of those tons and the per ton fair market value of each kind of mineral that was extracted from the acres of land described in the 97 Deed that we thereby demanded that Iluka disclose to us how many tons of each type of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and the location of each of those tons and the per ton fair market value of each type of mineral that was extracted from the ten parcels of land listed in the 97 Deed.

15

28. In response to our demands for Iluka to disclose to us how many tons of each kind of mineral it has extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral extracted from the acres of land described in the 97 Deed, Iluka concealed all the information that we demanded it disclose to us but delivered its royalty statement into California.

29. RGC wrote the royalty rate into the Leases at 8% and there were also land lease payments to be disbursed that RGC wrote into the Leases.

30. With Iluka concealing the number of tons of each kind of mineral that was extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral extracted from the acres of land described in the 97 Deed and the with the failure of consideration by Iluka with the representation of slightly over 2.5 million dollars of royalties delivered by Iluka into California, Laurence John Graham calculated that ore containing a sum total of 28.125 million short tons (2000 pounds per ton) of zircon mineral tons and titanium mineral tons was extracted from the ten parcels of land listed in the 97 Deed and that a sum total of 22.5 million saleable short tons of minerals were recovered from that ore including, and limited to, tons of saleable zircon and titanium minerals and he calculated the value of those 22.5 million short tons of saleable minerals at $67,275,000,000.00 (67.275 billion dollars).

31. We allege that Iluka's 02/12/2023 letter to Los Gatos, California, see "EXHIBIT E" at page 1, represented the royalties as over 2.5 million rather than the exact amount of royalties in an effort to obstruct rescission of the Leases and that such conduct tolled any statute of limitations that may apply to rescission although we allege that no statute of limitations applies to rescission because of Iluka's undue influence and ongoing tortious and duress causing treatment of us.

32. Iluka also concealed the dollar amount disbursed for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from

16

the ten parcels of land listed in the 97 Deed in an effort to obstruct rescission of the Leases which also tolls any statute of limitations.

33. With Iluka concealing information to obstruct rescission of the Leases, Laurence John Graham calculated that the sum total amount in dollars disbursed to Betty's parents, their three daughters, and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is less than 28.2 million dollars and now clarifies that less than 27 million dollars of royalties were disbursed for the minerals conveyed by the 97 deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that less than 1.2 million dollars of land lease payments were disbursed which adds up to less than 28.2 million dollars that has been disbursed; accordingly, less than 27 million dollars of consideration was disbursed for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

34. Laurence John Graham also calculated that the value of a one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is $22,425,000,000.00 (22.425 billion dollars).

35. Plaintiffs further allege that the number of allegations in this complaint exceeds the number of paragraphs in this complaint and that each of the allegations stands individually as legal basis for rescission of the Leases under California law.

36. We allege that within close proximity to but prior to October 13, 1989, DuPont drilled into the subsurface minerals located below the ten parcels of land listed in the 97 Deed and tested the quality of the minerals therefrom and knowingly made fraudulent and misleading representations to Betty P. Graham's father regarding the number of tons of minerals located below the surface of the ten parcels of land listed in the 97 Deed.

17

37. Laurence spoke with the geologist that was DuPont's head geologist for heavy minerals exploration in Virginia in 1989 and drilled the property with a team of several geologists for months in 1989 and did testing of the drill samples and other samples gathered by excavation. Betty's parents informed Laurence that DuPont's geologists spent several months on the ten parcels of land listed in the 97 Deed and made representations to them about the quality of the heavy minerals and tons of heavy minerals located below the ten parcels of land listed in the 97 Deed which they relied upon when entering the Leases because DuPont's geologists had spent so much time making reserve calculations on the ten parcels of land.

38. We allege that DuPont had a long history of mining the heavy minerals in the US that it used in its titanium dioxide pigment production and was was wary of entering into leases to mine the ten parcels of land listed in the 97 Deed because of the size and high heavy mineral percentage of the reserves below them and concluded that concealing the fraud would require a mining company with operations in other countries to conceal the production by claiming that the production came from other mining operations in other countries and encouraged RGC to enter the leases to facilitate the underreported production price-fixing scheme that DuPont designed.

39. We further allege that DuPont was prosecuted by the Federal Trade Commission ("FTC") in 1979 for monopolistic conduct in the titanium dioxide pigment production industry.

40. We allege that E.I. Du Pont De Nemours and Company merged with The Dow Chemical Company ("Dow") to form DowDuPont.

41. We allege that Corteva, Inc. ("Corteva, Inc.") was formed by a spinoff from DowDuPont and is a Delaware corporation with its principal place of business in Indiana.

42. We allege that The Chemours Company is a Delaware Corporation with its principal place of business in Delaware.

18

43. We allege that Iluka Resources Inc. is a Delaware Corporation with its principal place of business in Virginia.

44. We allege that Dow Inc. ("Dow Chemical") was formed by a spinoff from DowDuPont and is a Delaware Corporation with its principal place of business in Michigan.

45. We allege that DowDuPont changed its name to DuPont de Nemours, Inc. "Dupont" after the Dow Chemical spinoff and that Dupont is a Delaware Corporation with its principal place of business in Delaware.

46. We allege that Occidental Petroleum Corporation "OXY" is a Delaware corporation with its principal place of business in Texas.

47. We allege that Huntsman Corporation is a Delaware corporation with its principal place of business in Texas.

48. We allege that J-M Manufacturing Company, Inc. "J-M" is a Delaware corporation with its principal place of business in Los Angeles, California.

49. We allege Kerr-McGee Corporation ("Kerr-McGee") spun off its titanium dioxide manufacturing business into Tronox, plc and then sold its remaining business to Anadarko Petroleum Corporation with the assumption of liabilities related to its business and we allege that Anadarko Petroleum Corporation was acquired by Occidental Petroleum Corporation ("OXY") with the assumption of liabilities related to its business.

50. We allege that the National Industrialization Company ("TANSEE") is a citizen of Saudi Arabia with its principal place of business in Saudi Arabia and that it obtained Millennium Inorganic Chemicals, Inc. and Millennium Chemicals, Inc. (collectively "Millennium") with the assumption of liabilities related to its business.

51. We allege that Tronox Holdings, plc is also known at Tronox Limited and Tronox plc and that it owns and controls multiple entities, one of which is Tronox, LLC and that they are all collectively and hereinafter referred to as ("Tronox"). The original entity

19

of Tronox was formed by spinoff from Kerr-McGee Corporation and remained a closely related entity to Kerr-McGee Corporation after its spinoff.

52. We allege that Tronox and TANSEE are closely related entities by the Tronox-Tansee Settlement Agreement and that TANSEE owns more than 10% of Tronox and exerts significant control over Tronox and is a member of Tronox and that service of TASEE can be made c/o Tronox.

53. Tronox Limited is a public company organized, existing, and doing business under, and by virtue of the laws of Western Australia, with its executive offices located at 263 Tresser Blvd, #1100, Stamford, Connecticut. We allege that its principal place of business is in Stamford Connecticut by virtue of the "nerve center" test, see Hertz Corp. v. Friend, 559 U.S. 77 (2010); and, by information provided in a settlement agreement found at: https://www.ftc.gov/system/files/documents/cases/171_0085_tronox_cristal_do.pdf., which it agreed to.

54. We allege that Ineos Group Limited acquired the Ashtabula, OH titanium dioxide pigment plants, (with its subsidiaries, one of which is INEOS Joliet US Holdco, LLC and a research facility in Glenn Burnie, MD by a settlement agreement found at: https://www.ftc.gov/system/files/documents/cases/171_0085_tronox_cristal_do.pdf ("Tronox-Tansee ") and the FTC entered an order found at: https://www.ftc.gov/system/files/documents/cases/d09377_tronox_decision_and_order.pdf and we request that the Court take judicial notice of the settlement agreement, order, and the docket. INEOS Joliet US Holdco, LLC changed its name to INEOS Enterprises US Holdco LLC, which comprised of The National Titanium Dioxide Company's Cristal USA, Inc. plants in Ashtabula, Ohio and its administrative research center in Glen Burnie, Maryland. Ineos Group Limited is a private limited company organized under the laws of the United Kingdom with its principal place of business in the UK. Following the acquisition, Ineos Enterprises changed the name of Cristal USA Inc. to Ineos Pigments USA, Inc. INEOS Enterprises US Holdco LLC, and Ineos Group Limited are collectively referred to as ("Ineos"). We allege

20

that both Tronox and Ineos were aware of TANSEE's participation in the underreported production price-fixing scheme prior said settlement agreement and provided substantial assistance to TANSEE to conceal it while carrying out the terms of said settlement agreement which is ongoing. We further allege that Ineos has been aware of the minerals located below the ten parcels of land listed in the 97 Deed before it acquired Cristal USA, Inc. and that Ineos was also aware of the minerals located below the ten parcels of land listed in the 97 Deed from Cristal USA, Inc.'s employees that became Ineos employees.

55. We allege that Iluka Resources Limited ("Iluka AUS") is an Australian public company and has is principal place of business in Australia and that it is the owner of Iluka and conducts business in Los Angeles County California and is at home in California, see attached bills of lading ("Exhibit I") at pages 1-15. We also allege that Iluka AUS owns Iluka Resources (TN) LLC which is a business authorized to conduct business in California which is another reason that it is at home in California. We further allege that neither RGC (USA) Minerals Inc. nor Iluka Resources Limited nor Iluka notified Betty of the 1998 merger that formed Iluka Resources, Inc. and have been concealing the particulars of that merger and the sequence of successor to obstruct rescission which tolls any statute of limitations; however, Iluka claims to be successor.

56. We allege that Precision Castparts Corp. is an Oregon corporation with its principal place of business in Oregon and the owner of Titanium Metals Corporation, a Delaware Corporation which maintains its principal place of business in Oregon by virtue of the "nerve center" test, see Hertz Corp. v. Friend, 559 U.S. 77 (2010).

57. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove, involving the ten parcels of land listed in the 97 Deed, are intertwined; therefore, they are one contract.

21

58. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove are intertwined; therefore, they are one contract and we allege that performance is not divisible.

59. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove are intertwined; therefore, they are one contract and we allege that the royalty payments are not divisible.

60. We allege that we demanded that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and that Iluka is concealing all of this information from us.

61. We allege that Reed Mayo, Esq., as attorney for Iluka, sent several letters containing Iluka's representation of royalties due under the Leases into California, see attached (2/12/2023, 4/12/2023, and 4/26/2023 letters ("Exhibit E")), which notified of slightly over 2.5 million dollars of royalties thereby subjecting Iluka to California law for rescission of the Leases.

62. We allege that the slightly over 2.5 million dollars of royalties reported by Iluka into California was a final royalty calculation.

63. We allege that Iluka was the extractor of the ore from the ten parcels of land listed in the 97 Deed from which the sum total of 22.5 million saleable short tons of zircon and titanium minerals were recovered.

64. We allege that less than 27 million dollars of royalties was disbursed for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed which is severely insufficient consideration and therefore is a failure of consideration to us by Iluka.

65. We allege that the land lease payments were consideration for the right to have priority use over the surface of the land in preparation for extracting minerals and

22

priority use while extracting minerals; therefore, payment of land lease payments was not consideration for the saleable minerals recovered from the ore that was extracted from the ten parcels of land 97 Deed; however, we had included the land lease payments with 27 million dollars of royalties into our offers to restore Iluka with 28.2 million dollars because Iluka's failure of consideration for the minerals conveyed by the 97 Deed and later recovered as 22.5 million short tons of saleable minerals from the ten parcels of land listed in the 97 Deed is so severe, that 28.2 million dollars is not fair and equitable consideration for said saleable minerals either; therefore, returning money to Iluka is not applicable. Iluka is also concealing the amount of royalties disbursed for the saleable minerals recovered from the ore extracted from ten parcels of land listed in the 97 Deed to obstruct rescission which tolls any statute of limitations for the relief sought under Cal. Civil Code Sec. 1692 and bars any defenses to the relief sought under Cal. Civil Code Sec. 1692 and we allege that a jury must determine any such defenses.

56. We allege that we relied on the production information that Iluka reported to the Virginia Department of Mines Minerals and Energy ("DMME").

57. We allege that Iluka breached a fiduciary duty by not delivering fair and equitable consideration to us **for a share of** 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. *The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. (Knox v. Dean (2012) 205 Cal.App.4th 417, 432–433 [140 Cal.Rptr.3d 569].) No fraudulent intent is required. (See Civ. Code, § 1573 (defining "constructive fraud").) (" "Whether a fiduciary duty exists is generally a question of law. "[E]xamples of relationships that impose a fiduciary obligation to act on behalf of and for the benefit of another are 'a joint venture, a partnership, or an agency.' But, '[t]hose categories are merely illustrative of fiduciary relationships in which fiduciary duties are imposed by law.' " (Cleveland, supra, 209 Cal.App.4th at p. 1339, internal citation omitted.)* Whether the defendant breached that duty towards

23

the plaintiff is a question of fact." (Marzec v. Cal. Public Employees' Retirement System (2015) 236 Cal.App.4th 889, 915 [187Cal.Rptr.3d 452], internal citation omitted.)""). Under California state law, because of the complexity of the transaction, the Leases necessarily imply a fiduciary duty. RGC was expert in the mineral sands mining business and the unsophisticated party, Betty's Parents, were not expert in the mineral sands mining business and had no way to discover the fraud. The maintaining and operation of a stock account by RGC as provided by the Leases also necessarily implies a fiduciary duty.

68. Iluka We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

69. We also allege that DuPont, Dow, Chemours, Dupont, and Dow Chemical aided and abetted Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed by knowingly receiving tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting the number of tons of saleable minerals recovered from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME, while knowing that this underreported production price-fixing scheme designed by DuPont would cause Iluka to not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and by giving encouragement and substantial assistance to Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and we allege that financial gain motivated DuPont, Dow, Chemours, Dupont, and Dow Chemical to aid and abet Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that each entity benefited financially from aiding and abetting Iuka's breach of a fiduciary

24

42

duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that each entitie's contribution caused us substantial harm. The substantial assistance that DuPont provided Iluka includes, but is not limited to, DuPont knowingly receiving many more tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed than the number of tons of saleable minerals that Iluka reported producing from the entire Old Hickory Heavy Mineral Reserve to the DMME and concealing the receipt of these tons from the DMME and its other US regulators including, but not limited to the Environmental Protection Agency ("EPA"), as part of the underreported production price-fixing scheme after DuPont encouraged and designed said underreported production price-fixing scheme to obtain saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed by false pretenses, as the architect of it, and DuPont converted said tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed into titanium dioxide pigment some of which DuPont sold as titanium dioxide pigment and some of which DuPont sold in products containing titanium dioxide pigment while DuPont underreported the production of titanium dioxide pigment to its regulators including, but not limited to, the EPA and we allege that this underreported production of titanium dioxide pigment was part of the underreported production price-fixing scheme for saleable minerals recovered from the ten parcels of land listed in the 97 Deed and also thwarted competition and that both financial gain and the exclusion and elimination of competition motivated DuPont's conduct. We allege that DuPont did a spinoff of its titanium dioxide pigment manufacturing business into Chemours in an effort to conceal this conduct and after said spinoff continued to receive large quantities of titanium dioxide pigment and titanium dioxide pigment containing products from Chemours while encouraging Chemours to underreport production of titanium dioxide pigment to its regulators including, but not limited to, the EPA to conceal Iluka's failure of consideration to us for the saleable minerals while knowing that said titanium dioxide pigment and titanium dioxide

25

pigment containing products were made with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME as part of the underreported production price-fixing scheme that it designed and while knowing that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. We allege that Chemours knew about the massive reserves listed below the ten parcels of land listed in the 97 Deed because it was a formed by a spinoff of DuPont's titanium dioxide pigment manufacturing business and that officers and other employees from DuPont became Chemours officers and employees and knew that the spinoff was done to conceal the underreported production price-fixing scheme for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. We further allege that DuPont disguised and concealed payment to Chemours for said titanium dioxide pigment to aid and abet Iluka's failure of consideration to us for the salable minerals used to make it; and, we allege that Dow was the largest purchaser of titanium dioxide pigment from DuPont and Chemours and knew that DuPont and Chemours were underreporting production of titanium dioxide pigment to the EPA and other regulators that regulated their titanium dioxide pigment plants and receiving the tons of saleable minerals to make said titanium dioxide pigment from the Old Hickory Heavy Mineral Reserve and that Iluka was underreporting the production of saleable minerals from the Old Hickory Heavy Mineral Reserve to the DMME and that Iluka would breach its fiduciary duty to pay fair and equitable consideration for said saleable minerals; and, we allege that Dow provided substantial assistance to Iluka by receiving millions of tons of titanium dioxide pigment and products containing titanium dioxide pigment from DuPont and Chemours that they did not report producing while concealing receipt of those tons and the tons of products it sold containing said tons of titanium dioxide pigment from its regulators including but not limited to the IRS to aid and abet Iluka's failure of

26

consideration to us for said saleable minerals and benefit financially and that it did benefit financially and that its conduct caused us substantial harm. By knowingly concealing the number of tons of said titanium dioxide pigment and products containing titanium dioxide pigment that it received from DuPont and Chemours, Dow knowingly participated in the concealment of the number of tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and Dow engaged in accounting practices to disguise and conceal payment to DuPont and Chemours for titanium dioxide pigment and titanium dioxide pigment containing products in the furtherance of this underreported production price-fixing scheme, and we allege that Dow benefited financially by receiving said tons of titanium dioxide pigment and titanium dioxide pigment containing products at extremely low prices and later merged with DuPont thereby forming DowDuPont to conceal the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and we allege that DowDuPont aided and abetted Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed by conduct that includes, but is not limited to, providing substantial assistance to Chemours by receiving more tons of titanium dioxide pigment and products containing titanium dioxide pigment from Chemours than Chemours was reporting that it produced to its regulators including, but not limited to, the EPA while receiving said tons of titanium dioxide pigment from Chemours at below market prices while knowing that Chemours was making those tons of titanium dioxide pigment with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, while knowing that Iluka was underreporting the number of tons of saleable minerals that it was recovering from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME while knowing that this conduct was part of a price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97

27

Deed, and while knowing that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, and we allege that the payment from DuPont and Chemours to Iluka for the tons of said saleable minerals that they received was a small percentage of the fair market value of said tons of saleable minerals and that they obtained them by false pretenses and that it was their intention to cause loss and damage to us by said underreported production price-fixing scheme and that they knowingly and maliciously caused us loss and harm and we allege that the succeeding entities of Dupont, Dow Chemical, and Corteva, Inc. each have liability to us for it.

70. We also allege that the officers in the seed and crop protection businesses within DuPont and Dow were aware of the underreported production price-fixing scheme alleged herein and participated in it and that revenues from the titanium dioxide pigment manufacturing business, PVC plastics business, and other products that used large amounts of titanium dioxide pigment were being disguised and concealed within the seed and crop protection business segments and other business segments within DuPont and Dow and that the development and growth of the seed and crop protection businesses was funded with ill-gotten profits from the underreported production price-fixing scheme and DowDuPont did a spinoff of the seed and crop protection businesses into Corteva, Inc. to conceal this conduct. We further allege that Corteva, Inc.'s officers are aware of the accounting fraud of ill-gotten profits concealed within the prior seed and crop protection businesses of DuPont, Dow, and DowDuPont to assist Iluka's failure of consideration to us for the saleable minerals and that after the spinoff Corteva, Inc. has engaged in fraudulent transactions to conceal the fraudulent accounting, ill-gotten revenue and equity preserved within it to provide substantial assistance to Iluka to conceal its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals and continues to reinvest the fraudulently obtained profits concealed within it from the unreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. We further allege that

28

46

DuPont's operational consulting and training businesses were part of the ongoing underreported production price-fixing scheme and that DuPont encouraged large titanium dioxide pigment purchasers to participate in fraudulent transactions for these operational consulting and training services and that DuPont delivered significant quantities of titanium dioxide pigment and products containing titanium dioxide pigment to these large customers and received consideration for it booked as the sale of operational consulting and training services. The customers that engaged in these accounting practices, or knew about them, knew that DuPont was underreporting the production of titanium dioxide pigment. We also allege that, in addition to the outright sale of titanium dioxide pigment produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, many of the products sold by DuPont, Chemours, and Dow contained large amounts of titanium dioxide pigment including, but not limited to, paint and coatings and that the titanium dioxide pigment in these products was produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.  DuPont sold several products that were essentially batches containing large weight-percentages of titanium dioxide pigment that customers needing titanium dioxide pigment could have mixed internally in their manufacturing processes and such products were utilized by DuPont to disguise the sale of titanium dioxide pigment produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

71. We also allege that the conduct complained of in this complaint is also common law conversion however, we only choose the bases for rescission and remedies available for a jury trial about the proportional liability of each defendant for the 22.425 billion dollar value of the one-third share of the saleable miners recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive damages due from each defendant under California law which include a jury trial for a bare money judgement for the value of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the

29

punitive damages in this action for relief under Cal. Civil Code Sec. 1692 based on rescission as determined by a jury and each of the Defendants has liability to us in the jury trial for rescission due to their participation in the underreported production price-fixing scheme which caused Iluka's failure of consideration to us for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

72. We allege that Kerr-McGee Corporation knowingly received tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while engaging in price-fixing with Iluka to obtain said saleable minerals at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME while knowing that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment to the DMME.

73. We allege that Dupont and its officers, and directors are actively participating in an ongoing fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

74. We allege that Dow Chemical and is actively participating in an ongoing fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

30

75. We allege that Chemours is actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

76. We allege that Corveta, Inc. is actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

77. We allege that Iluka is actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

78. We allege that Dupont, Dow Chemical, Corteva, Inc., and Chemours are collectively the largest financial beneficiary of Iluka's failure of consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and continue to actively conceal the underreported production price-fixing scheme that deprived Betty P. Graham and her family of fair and equitable consideration for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

79. We allege that Tronox knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered

31

from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment produced with said saleable minerals at its Savanna, GA and Hamilton, MS titanium dioxide plants to its regulators including, but not limited to, the EPA as it used said saleable minerals to produce titanium dioxide pigment at its Hamilton, MS and Savanna GA titanium dioxide plants; and, we allege that Tronox sold some of said titanium dioxide pigment in Los Angeles County California, Los Angeles County California, and elsewhere in California while concealing the volume of these sales.   We allege that the tons of the saleable minerals obtained by Tronox that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed were obtained by false pretenses. We allege that Tronox provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and that it provided substantial assistance to Iluka by underreporting its production of titanium dioxide pigment to said regulators and that it benefited financially by obtaining said tons of saleable minerals at below fair and equitable prices. We allege that the tons of the saleable minerals obtained by Tronox that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed were obtained by false pretenses.

80.

81. We allege that Millennium Inorganic Chemicals, Inc., and Millennium Chemicals, Inc. collectively ("Millennium") knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported its Baltimore Maryland and Ashtabula Ohio titanium dioxide plants' production to its

32

regulators including, but not limited to the states of Maryland, Ohio, and the EPA to aid and abet Iluka's failure of consideration to us for said saleable minerals and that this conduct caused us substantial harm; and, we allege that Millennium sold some of said titanium dioxide pigment in California while concealing the quantity of these sales to aid and abet Iluka's failure of consideration to us for said saleable minerals. We allege that Millennium provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and that it provided substantial assistance to Iluka by underreporting its production of titanium dioxide pigment to said regulators and that it benefited financially by obtaining said tons of saleable minerals at below fair and equitable prices. We allege that the tons of the saleable minerals obtained by Millennium that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed were obtained by false pretenses.

82. We allege that the National Industrialization Company ("TANSEE") provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable encouragement to us for the one-third share of the saleable minerals recovered from the ten parcels of land listed in the 97 Deed and engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore extracted from the ten parcels of land listed in the 97 Deed and provided substantial support to Iluka by underreporting its production of titanium dioxide pigment to its regulators including but not limited to the EPA to aid and abet Iluka in its failure of consideration to us for said saleable minerals and that TANSEE profited from this conduct that caused us substantial harm; and, we allege that TANSEE sold some of said titanium dioxide pigment in California while concealing the quantity of these sales. We further allege that TANSEE knew about us and the minerals located

33

below the ten parcels of land listed in the 97 Deed. We further allege that TANSEE obtained said saleable minerals by false pretenses.

83. We allege that the National Titanium Dioxide Company Ltd. provided substantial encouragement to Iluka to breach its fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals extracted from the ore that was recovered from the ten parcels of land listed in 97 Deed and engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported its production of titanium dioxide pigment to its regulators including, but not limited to the EPA to aid and abet Iluka's failure of consideration to us for said saleable minerals and that it did all of these bad acts for profit and profited substantially from engaging in this conduct that was directed at us wherever and whenever the failure of consideration occurred and it occurred in California and this conduct caused us substantial harm; and, we allege the National Titanium Dioxide Company Ltd sold titanium dioxide pigment containing some of said titanium dioxide pigment California while concealing the quantity of those sales to aid and abet Iluka's failure of consideration to us for said one-third share of the saleable minerals. We allege that the National Dioxide Company Ltd. We allege that National Titanium Dioxide Company Ltd. knew about us and the minerals located below the ten parcels of land listed in the 97 Deed. We further allege that Cristal obtained said saleable minerals by false pretenses.

84. We allege that Cristal was acquired by Ineos and that Tronox was involved in facilitating the transaction while both Ineos and Tronox knew that TANSEE, National Titanium Dioxide Company, Ltd., and Cristal provided substantial encouragement to

34

Iluka to breach its fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals and provided substantial assistance to Iluka by underreporting its production of titanium dioxide pigment at its Ashtabula, OH titanium dioxide pigment plants knowingly received tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting production to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment to its regulators including, but not limited to, the EPA; and, we allege that Cristal sold some of said titanium dioxide pigment in Los Angeles California while concealing the quantity of these sales to aid and abet Iluka's breach of fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and benefited financially from such conduct that caused us substantial harm.

85. We allege that Ineos engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while Ineos provided substantial encouragement to Iluka to breach its fiduciary duty to us and provided substantial assistance to Iluka in its failure of consideration to us by underreporting production of titanium dioxide pigment at its Ashtabula, OH titanium dioxide plant to its regulators including, but not limited to the state of Ohio and the EPA; and, that it sold some of said titanium dioxide pigment in California while concealing the quantity of these sales to aid and abet Iluka's breach of fiduciary duty to us and benefited financially by doing so, purposefully availed itself of California jurisdiction by doing so and caused us

35

53

substantial harm by doing so. We allege that the Ineos obtained said tons of saleable minerals by false pretenses and that Ineos was aware of us and the minerals located below the ten parcels of land listed in the 97 Deed.

86. We allege Kronos Worldwide, Inc. ("Kronos Worldwide") is a Delaware corporation with its principal place of business in Texas and that it drilled into the subsurface minerals located below the ten parcels of land listed in the 97 Deed and tested the quality of the minerals therefrom because Betty's parents told us so and because a geologist that drilled and tested said parcels in 1989 told Laurence Laurence did not directly talk to any geologists that were employed by Kronos to confirm so. We further allege that Kronos Worldwide had the expertise to build the Lake Charles Louisiana titanium dioxide pigment plant and built it with the intention of acquiring saleable minerals recovered from the ten parcels of land listed in the 97 Deed by false pretenses. We allege that Huntsman Corporation ("Huntsman") and Kronos Worldwide owned the Lake Charles Louisiana titanium dioxide pigment plant and partnered in a joint venture named Louisiana Pigment Company, L.P. ("LPC") to operate the Lake Charles Louisiana titanium dioxide pigment plant. We allege that Kronos World Wide and Huntsman provided substantial encouragement to Iluka by encouraging it to underreport the production of saleable minerals extracted from the ten parcels of land listed in the 97 Deed and breach its fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals and informed Iluka that it would help conceal said underreported production by, among other things, underreporting titanium dioxide pigment production of the LPC titanium dioxide pigment plant to the EPA and state regulators. We allege that Kronos and Huntsman knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme and they benefited financially by doing so and caused us harm by doing so because they knew that Iluka would not deliver fair and equitable consideration to us for the

36

saleable minerals recovered from the ore extracted from the ten parcels of land listed in the 97 Deed and we allege that they purposefully availed themselves of California jurisdiction by aiding and abetting the failure of consideration wherever and whenever it occurred and it occurred in California. We further allege that Kronos and Huntsman sold some of said titanium dioxide pigment in California, while concealing the volume of said sales to aid and abet Iluka's failure of consideration to us. We further allege that Huntsman knowingly used some of said titanium dioxide pigment in Los Angeles California to make other products that contained some of said titanium dioxide pigment and sold products in Los Angeles California that contained some of said titanium dioxide pigment, while concealing the volume of said sales to help conceal Iluka's failure of consideration to us; and, we allege that Huntsman spun off its titanium dioxide manufacturing business and its share of Louisiana Pigment into Venator Materials plc which owns and controls several entities and subsidiaries including Venator Materials LLC. Venator Materials plc and Venator Materials LLC are collectively ("Venator") and that after said spinoff Huntsman knowingly purchased and used titanium dioxide pigment from produced from saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to make other products in California while knowing that LPC and Venator Materials plc, and Kronos Worldwide were underreporting their Lake Charles Louisiana titanium dioxide pigment plant's production to their regulators including, but not limited to, the state of Louisiana and the EPA, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore extracted from the ten parcels of land listed in the 97 Deed to aid and abet Iluka's failure of consideration to us wherever and whenever it occurred and it occurred in California; therefore, they purposefully availed themselves of California jurisdiction; and, we allege that Venator sold some of said titanium dioxide pigment in California while concealing the volume of these sales to aid and abet Iluka's failure of consideration to us. We allege that Venator and Kronos obtained said saleable minerals by false pretenses.

37

87. We allege that Venator Materials plc is an entity organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom.

88. Venator Materials, LLC is a limited liability company organized in Delaware and a citizen of Delaware.

39. We allege that OXY is a large producer of PVC plastics and participated in the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and, we allege that OXY sold products containing some of said saleable minerals in California and concealed the quantity of such sales to aid and abet Iluka's failure of consideration to us for said third-share of the saleable minerals wherever and whenever it occurred which is purposeful availment of jurisdiction in California because the failure of consideration occurred in California. We further allege that OXY inherited Kerr-McGee Corporation's liabilities and has certain assets in the US that may be liquidated to pay for its liability to us. We further allege that OXY was aware of the minerals located below the ten parcels of land listed in the 97 Deed, the conveyance of the one-third share of said minerals by the 97 Deed and that Iluka was involved in the 02-26 contested deed litigation prior to the settling of such litigation because Laurence talked with a Kerr-McGee executive about the minerals located below the ten parcels of land listed in the 97 Deed and the 02-26 contested deed litigation and that Kerr-McGee suddenly changed from a firm that was interested in entering leases to mine the minerals located below the ten parcels of land listed in the 97 Deed to an entity that was not interested and informed Laurence thereof by their executive informing Laurence that he was concerned about, "...getting his head blown off by one of these big Australian mining companies." We believe that DuPont and Iluka influenced Kerr-McGee to make that veiled threat to Laurence. We further allege that Kerr-McGee provided substantial assistance to Iluka

38

56

to breach its fiduciary duty to deliver fair and equitable consideration to us for said one-third share of the saleable minerals by underreporting the production of titanium dioxide pigment at its Hamilton Mississippi titanium dioxide plant and Savanna Georgia titanium dioxide plant to its regulators including, but not limited to, the EPA and obtained said tons of saleable minerals by false pretenses. We further allege that OXY concealed the volume of sales of PVC and other products containing titanium dioxide pigment made with our saleable minerals to aid and abet Iluka's breach of fiduciary duties to deliver fair and equitable consideration to us for said saleable minerals and that some of such conduct occurred in California which is purposeful availment of California jurisdiction and caused us substantial harm.

90. We allege that Precision Castparts Corp. is a Delaware corporation with its principal place of business in acquired Titanium Metals Corporation with the assumption of liabilities related to its business.  Precision Castparts Corp. and Titanium Metals Corporation are collectively referred to as ("TIMET-PCP"). TIMET-PCP provided substantial encouragement and assistance to Iluka by knowingly engaging in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels and the entire Old Hickory Heavy Mineral Reserve to the DMME, as part of the underreported production price-fixing scheme that it knew DuPont designed and that it knew the titanium dioxide pigment producers where engaging in, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and we allege that TIMET-PCP caused us substantial harm by participating in the underreported production price-fixing scheme and sold products containing some of said saleable minerals in California.  We allege that TIMET-PCP also produced titanium sponge in Vallejo California with the saleable minerals obtained from Iluka throughout 2020, and likely produced some during the period of 2021-224 that it is concealing it to thwart rescission and aid and abet Iluka's breach of fiduciary duties to

39

us. We allege that TIMET-PCP obtained tons of saleable minerals in California and elsewhere from Iluka by false pretenses.

91. We allege that Berkshire Hathaway Inc. ("BH") is a Delaware Corporation with its principal place of business in Omaha Nebraska. We allege that BH acquired Precision Castparts Corp. with the assumption of liabilities related to its business; therefore, BH owns Precision Castparts Corp. and Titanium Metals Corporation and owns all of the liability to us that they have and are insolvent for. Although we have great respect and admiration for the charitable contributions that its chairman has made to various causes, it has a large amount of liability to us and we expect that it will embrace our PFAS settlement fund because it will also be a charitable contribution; and, BH will pay whatever portion of the 125 billion dollars plus jury award that it has to pay to us although we would rather settle with BH and have it become an advocate for the PFAS settlement fund before we render Dupont, Dow Chemical, Corteva, Inc., Chemours, and certain of the other defendants insolvent for the liability that they have to us. Because BH owns Precision Castparts Corp. and Titanium Metals Corporation and they have purposefully availed themselves of the jurisdiction of the California Superior Court, as alleged in this complaint, BH has also availed itself of said jurisdiction. Furthermore, BH is at home in California as it owns numerous businesses in California and has numerous employees in California in addition to the employees of Precision Castparts Corp. and Titanium Metals Corporation located in California who are witnesses.

92. We allege that Kinder Morgan, Inc. ("KM") is a Delaware Corporation with its principal place of business in Houston Texas has been the operator of warehouses and property used to store the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and provided substantial encouragement and assistance to Iluka while knowingly participating in the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka would not deliver fair and equitable consideration to us for the

40

saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and that KM stored some of said saleable minerals and products containing some of said saleable minerals in Los Angeles California and that KM may still have some of the saleable minerals stored in Los Angeles California and elsewhere in California. We allege that before any minerals were ever extracted from the ten parcels of land listed in the 97 Deed, KM was involved in the advance planning of the unreported production price-fixing scheme by acquiring warehouses and property to store said saleable minerals and provided substantial encouragement and assistance to Iluka to proceed with the underreported production price-fixing scheme. KM profited substantially from the underreported production price-fixing scheme and because the amount of production was not reported, KM did not pay taxes on the profits that it made and concealed this information from regulators to further aid and abet Iluka and that the other defendants that had minerals shipped to their plants at our expense because KM knew that Iluka would not deliver fair and equitable consideration to us for said minerals. KM provided substantial assistance to conceal the stockpiling of minerals that Iluka could not do in Virginia for fear of exposing underreported production price-fixing scheme. We allege that KM aided and abetted the defendants that received said saleable minerals by false pretenses and Iluka's failure of consideration to us and benefited financially for said conduct which caused us harm. Furthermore, some of said conduct occurred in California; therefore, KM purposefully availed itself of the jurisdiction of the California Courts.

93. We allege that DuPont was the architect of the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and knowingly engaged in price-fixing to obtain tons of said saleable minerals at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while DuPont

41

59

underreported its De Lisle Mississippi, Edge More Delaware, New Johnsonville Tennessee, and Altamira Mexico plants' production of titanium dioxide pigment to its regulators including, but not limited to, their state regulators and the EPA as it used said saleable minerals to produce titanium dioxide pigment at its at its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants; and, we allege that DuPont sold some of said titanium dioxide pigment and other products containing some of said titanium dioxide pigment in California while concealing the volume of and revenue from those sales to aid and abet Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals whenever and wherever it occurred and it occurred in California and we allege that DuPont obtained said saleable minerals by false pretenses.

94. We allege that Chemours knowingly engaged in price-fixing to obtain tons of said saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while Chemours underreported its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants' production of titanium dioxide pigment to its regulators including, but not limited to, its state regulators and the EPA to aid and abet Iluka's failure of consideration to wherever and whenever it occurred and it occurred in California while it used said saleable minerals to produce titanium dioxide pigment at its at its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants; and, we allege that Chemours sold some of said titanium dioxide pigment and other products containing some of said titanium dioxide pigment in Los California while concealing the volume of and revenue from these sales to aid and abet Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us

42

for said saleable minerals all of which conduct caused us substantial harm. We allege that Chemours obtained said saleable minerals by false pretenses. We allege that Dupont, Dow Chemical, Chemours, Corveta, Inc., OXY, Huntsman, KM, Kronos Worldwide, Venator, HAK, TIMET-PCP, Ineos, JM, TANSEE, Reed Mayo and other unnamed companies and individuals referred to herein as DOES are actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that each of these entities and other unnamed companies referred to herein as DOES has liability to us for their evil and malicious participation in the underreported production price-fixing scheme alleged above that caused loss and harm to us and the liability is equal to one-third of the present fair market value of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed plus punitive damages. The secret meetings started in 1989 on the ten parcels of land listed in the 97 Deed and continued at annual titanium dioxide industry conferences dating back into the early 1990s and more recently the TiO2 Summit conferences that date back to the early 2000s in various iterations in which these defendants met annually in locations in the US and around the world to conspire about obtaining our saleable minerals by false pretenses and they also did so substantially with continuous communications to and meetings at Kinder Morgan storage facilities and terminals in California, Pennsylvania, and the other Kinder Morgan terminals and storage facilities near the other titanium dioxide plants, and ports beginning in the early 2000s before 2002 and it is ongoing. The Pennsylvania Terminal was a location for continuous meetings and communications between Iluka and DuPont and Kinder Morgan officers before the beginning of mining until the end and afterwards with the concealment and harboring of the minerals obtained by false pretenses for dissipation to plants in the region and up to Ohio as well as the export of tons of zircon and titanium minerals. We are going to discover off-shore entities that they created and used to conceal their obtaining the

43

minerals by false pretenses and we'll track down the dissipation of the ill-gotten gains to corrupt officers and agents that preserve them.

95. We allege that J-M has used thousands of tons of titanium dioxide pigment per year containing saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to manufacture PVC pipe and obtained said titanium dioxide pigment from some of the titanium dioxide pigment producers that have been named as defendants in this action while knowing that they were engaged in the underreported production of titanium dioxide pigment while J-M provided substantial assistance to said titanium dioxide pigment producers and Iluka as it aided and abetted the underreported production of titanium dioxide pigment and the underreported production of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting the production of saleable minerals recovered from the Old Hickory Heavy Mineral Reserve to the DMME and would not deliver fair and equitable consideration for said saleable minerals.  J-M is engaged in secret meetings and communications to aid and abet and the underreported production price-fixing scheme alleged herein from which J-M financially benefited by obtaining thousands of tons of titanium dioxide pigment per year made with the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below market prices while knowing that the underreported production of titanium dioxide pigment by the titanium dioxide pigment producing defendants was part of the underreported production price-fixing scheme to aid and abet Iluka's failure of consideration for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed; and, we allege that J-M sold products containing some of said saleable minerals in California while concealing the volume of said sales to aid and abet Iluka's failure of consideration for the saleble minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

96. We allege that Dupont, Dow Chemical, Chemours, Corveta, Inc., OXY,  Huntsman, KM, Kronos Worldwide, Venator, HAK, TIMET-PCP, Ineos, JM, TANSEE, Reed

44

Mayo and other unnamed companies and individuals referred to herein as DOES continue to actively participate in a fraudulent scheme to conceal the failure of consideration by Iluka to us for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed to aid and abet Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for said saleable minerals.

97. We request that the Court take judicial notice of https://www.lawyerdb.org/lawyer/kenneth-reed-mayo/ and all other directories of lawyer credentials regarding Kenneth Reed Mayo's prior employment as proof that he was an associate in Hunton & Williams and Hunton & Williams LLP, collectively and hereinafter ("HW"). The firms of Hunton & Williams LLP and Andrews Kurth Kenyon LLP merged to form Hunton Andrews Kurth LLP ("HAK") and HAK provided substantial assistance to Iluka by advising Iluka to aid and abet Iluka in its breach of its fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed and on how to breach its fiduciary duty to disclose how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the location of each of those tons to us in California which was done with malice and evil intent towards each of us, see attached letter from Iluka to Los Gatos, CA dated 6/12/2023 which included the MEMORANDUM OF TERMINATION OF MINING LEASE prepared by HAK ("EXHIBIT F") as evidence of HAK's evil and malicious conduct of aiding and abetting Iluka to deprive us of fair and equitable consideration for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed in California and evidence of HAK's liability for its evil and malicious conduct of aiding and abetting Iluka's breach of its fiduciary duties to deliver reporting to us about the saleable minerals to us in California and aiding and abetting breach of fiduciary duties to disclose information about the saleable minerals to us in California, concealment, and aiding and abetting Iluka's failure to deliver fair and equitable consideration to us for the saleable minerals in California.

45

98. We also allege an ongoing conspiracy to commit and conceal fraud by Dupont, Dow Chemical, Chemours, Iluka, and each of the other named defendants and other unnamed companies referred to herein as DOES with secret meetings and communications between these defendants to conceal the failure of consideration for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that such conduct amounts to an enterprise engaged to commit fraud.

99. We allege that the defendants conspired to committed fraud in litigation against us in California Superior Court County of San Francisco Case #: CGC-24-611963, "San Francisco litigation", to cause us expense and delay and that this conduct also tolled any statute of limitations.

100.    We allege that the defendants' reference to saleable minerals as ore is evidence of fraud, active concealment, and ongoing conspiracy to conceal the failure of consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed because ore is the sediment that minerals exist within when in the ground and the failure of consideration that formed the basis for rescission occurred in California and is for saleable minerals that were recovered from ore not ore.

101.    We allege that the defendants that obtained the tons of titanium minerals by price-fixing and the titanium dioxide pigment produced therefrom also have liability to us for the failure of consideration to us for the tons of zircon minerals because the failure of consideration to us for the zircon minerals was part of the furtherance of said scheme that they aided and abetted and financially benefited from and they were all aware of it as they aided and abetted Iluka's failure of consideration to us for all the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

102.    We allege that the defendants that obtained the tons of titanium minerals, obtained them by false pretenses and also have liability to us for the failure of consideration to

46

us for the tons of zircon minerals because the failure of consideration to us for the
zircon minerals was part of the furtherance of said scheme that they aided and abetted
and financially benefited from and they were all aware of it as they aided and abetted
Iluka's failure of consideration to us for all the tons of saleable minerals recovered
from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

103.    We also allege that Iluka, Iluka Aus, DuPont, Chemours, Kerr-McGee
Corporation, Millennium, Huntsman, Kronos Worldwide, Venator, TANSEE,
Tronox, Ineos, and TIMET-PCP, were engaged in ongoing price-fixing for the
saleable minerals recovered from the ore that was extracted from the ten parcels of
land listed in the 97 Deed, with DuPont being succeeded by Chemours, Millennium
being succeeded by  and that the succeeding entities are now engaged in ongoing
price-fixing to suppress the market prices of minerals similar to the saleable minerals
recovered from the ore that was extracted from the ten parcels of land listed in the 97
Deed to conceal the prior price-fixing of said saleable minerals, the failure of
consideration to us for said saleable minerals, and reduce the value received by us for
the rescission of the Leases pertaining to the one-third share of the minerals conveyed
by the 97 Deed and later recovered, as saleable minerals, from the ore that was
extracted from the ten parcels of land listed in the 97 Deed and this this conduct
suppressed the prices of said saleable minerals and similar saleable minerals in
California and continues to do so.

104.    We also allege that DuPont, Chemours, Kerr-McGee Corporation, Millennium,
Huntsman, Kronos Worldwide, Venator, TANSEE, Tronox, Ineos, and TIMET-PCP,
were engaged in price-fixing for the saleable minerals recovered from the ore that
was extracted from the ten parcels of land listed in the 97 Deed and that the
succeeding entities were also engaged in said price fixing and that the succeeding
entities are now engaged in ongoing price-fixing to suppress the market prices of
minerals similar to the saleable minerals recovered from the ore that was extracted
from the ten parcels of land listed in the 97 Deed to conceal the prior price-fixing of
said saleable minerals, the failure of consideration to us for said saleable minerals,

47

and reduce the value received by us for the rescission of the Leases pertaining to the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and this this conduct suppressed the prices of said saleable minerals and similar saleable minerals in California.

105.    We also allege that the above alleged underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is tortious interference with the Leases and that Dupont, Dow Chemical, Chemours, Corveta, Inc., OXY, Huntsman, KM, Kronos Worldwide, Venator, Iluka, HAK, TIMET-PCP, and Ineos and other unnamed companies referred to herein as DOES caused us harm by their evil and malicious act of engaging in said tortious conduct and each of these Defendants and other unnamed companies referred to herein as DOES has liability to us for the loss and damage caused to us by said conduct.

106.    We also allege that the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is tortious interference with contract expectations as the fair and equitable consideration that we expected under the Leases was not delivered to us by Iluka and each of Defendants and the other unnamed companies referred to herein as DOES caused us harm by their evil and malicious act of engaging in said tortious conduct and each of the Defendants and other unnamed companies referred to herein as DOES has liability to us for the loss and damage caused to us by said conduct.

107.    We allege that none of the Defendants were a party to the Leases when signed; therefore, none of the defendants have a right to compel arbitration and the unavailability of punitive damages and legal fees is a surprise.

108.    We allege that Iluka did not exist in 1989.

109.    We allege that the leases were fraudulently induced in 1989 but neither Betty nor Laurence nor Betty's other son Luke P. Graham ("Luke") was in Virginia in 1989.

48

110.   We allege that by concealing the number of tons of each kind of mineral extracted from the acres of land described in the 97 Deed that Iluka concealed the number of tons of each kind of saleable mineral recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

111.   We also allege that Iluka breached a fiduciary duty by its concealment of the number of tons of each kind of mineral that was extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed. We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief we seek under Cal Civil Code Section 1692.

112.   We also allege that Iluka breached a fiduciary by its concealment of the number of tons of each type of mineral that were extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed and the fair market value of each of those tons. We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

113.   We also allege that Iluka breached a fiduciary by its concealment of the number of tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed and the fair market value of each of those tons. We further allege that breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.  We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

114.   We also allege further malicious and evil conduct which includes, but is not limited to, the manipulative and tortious use of undue influence by Iluka's officers, Reed Mayo, HW, and other rogue attorneys to induce Betty and Luke into a 2002 Sussex County Virginia court case that contained 02-26 in the case number; and, your manipulation of Betty's parents is also appalling. Bringing you to justice with guilty

49

pleas from your officers, Reed Mayo, and other attorneys that aided and abetted you is an important part of this. You know that the Sussex County, VA 02-26 contested deed litigation ("02-26 lawsuit") was life threateningly stressful and harmful to Betty and tremendously stressful and harmful to Laurence and that it was motivated by the furtherance of a fraudulent scheme. HW provided substantial assistance to Iluka in planning and implementing the tortious inducement of Betty and Luke into the 02-26 lawsuit. The severe undue influence that put Betty and Luke under duress included, but is not limited to, Iluka's threatening not to mine over Laurence's inquiries about the minerals that elicited the instruction not to mine from Betty and quickly turned into threats to sue Betty and destroy her financial security from Iluka and its agents all while Iluka and its agents sought to deprive Betty of her rights. In 2001 or 2002 HW was brought in to help Iluka gain access to the minerals conveyed by the 97 Deed and advised Iluka to continue with threats to sue Betty that Iluka had been making since early in 2001 and also provided substantial assistance to Iluka by drafting the complaint for the 02-26 lawsuit that was designed to gain access to the minerals conveyed by the 97 Deed, which Laurence and Betty had denied by telling Iluka not to mine; and, HW advised Iluka in the recruitment of Harry Benjamin Vincent, Esq. ("Mr. Vincent") (now deceased) and helped Iluka gain his loyalty to help Iluka file and prosecute the 02-26 lawsuit. I, Laurence J. Graham, spoke with luka's officer by telephone in 2002 and he threatened to sue me to set aside Betty's 10/23/200 Deed of Gift explaining that HW had drafted a complaint to set aside Betty's Deed of Gift to me and my brother Luke based on undue influence and that Iluka's attorney Mr. Vincent would file it if I kept requesting information about the minerals. I, Laurence J. Graham, spoke with Iluka's officer multiple times and he was commonly evasive and aggressive and I fear for my safety after enduring the duress leading up to, during, and since the 02-26 lawsuit. Iluka and its agents had destroyed Betty's free will before the filing of the 02-26 lawsuit with evil and malicious intent to do so and HW was aware of it and participated in it with evil and malicious intent. The evil and malicious treatment of Betty by Iluka and its agents caused Betty to be admitted into a mental health hospital and stay for several days and she was later

50

admitted into an assisted living facility. Iuka, HW, and Mr. Vincent proceeded to effect the filing of the 02-26 lawsuit with Iluka as a defendant, then HW advised Iluka to delay the resolution of the 02-26 lawsuit and directed the litigation with Iluka by instructing Mr. Vincent to take actions to prolong the 02-26 lawsuit and thwart settlement. HW knew before it joined in the design and implementation of the 02-26 lawsuit, that after gaining access to the minerals conveyed by the 97 Deed was achieved, depriving us of fair and equitable consideration for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed would be the objective and that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed although it knew that Iluka had a fiduciary duty to do so which is aiding and abetting the breach of a fiduciary duty and HW did it for financial gain.

115.  We also allege that, in the operation of their fraudulent scheme, the defendants have committed numerous, tortous and criminal acts in attempt to deprive Betty of her rights which is an ongoing source of harm to Betty and Laurence.

116.  We allege that each of the Defendants participated in the underreported production price-fixing scheme and helped to conceal the underreported volume of products sold in California that contained the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed which is aiding and abetting Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the one-third share of said saleable minerals and that this conduct by each of the defendants is purposeful availment of jurisdiction in California and that it was directed at us wherever and whenever the failure of consideration occurred and it occurred in California.

117.  We also allege that Iluka has been concealing the amount of consideration that it disbursed for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed in attempt to thwart and obstruct the rescission of the Leases but, with Iluka's final representation of royalties due for the saleable minerals recovered from the ore that was extracted from the ten parcels of

51

land listed in the 97 Deed, Laurence calculated that the total amount disbursed for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed at less than 27 million dollars and there were land lease payments disbursed that Laurence calculated to be less than 1.2 million dollars.

118.   Virginia is not a convenient venue for either of us and we have never appeared in court there and Betty fears that the defendants will falsely imprison her in Virginia and we hereby notify you that we object to any legal proceedings in Virginia. I, Betty Patrick Graham, hereby notify you that I fear that Iluka seeks to weaponize Virginia courts to harm by the use of unethical and unlawful tactics intended to delay and deprive and that it is a threat to me to ever have to appear in any legal proceeding in Virginia, therefore I object to it. We object to any legal proceedings in Virginia because, among other reasons, it is an inconvenient venue; and, we reserve the right to assert other bases to determine Virginia courts inappropriate for any litigation involving us which may include, but is not limited to, you perpetrating frauds in and upon Virginia courts.  Furthermore, it is important to note that the delay tactics used by Iluka are enormously harmful and have taken so much of our lives and its efforts to delay and try to avoid wire fraud charges and likely prosecution for other criminal charges is also part of the furtherance of a fraudulent scheme.

119.   I, Laurence John Graham, believe that you have spent millions trying to deprive Betty P. Graham of her rights. It may be discovered that the amount of questionable payments made to rogue lawyers and others acting unlawfully to influence the outcome of litigation involving us is many times more than the 6.445 million dollar payment that DuPont made to the law firm of Friedman, Rodriguez, Ferraro, and St. Louis that was alleged to have influenced a Miami, FL Benlate case. Betty and I empathize with the Benlate victims who valiantly sought justice against DuPont. The reported sum total that DuPont paid out for judgments and settlements in Benlate litigation seems unconscionably low as are the PFAS settlements and we intend to set forth a plan for all the cancer victims and their survivors. Abuse and alleged

52

corruption of the justice system by DuPont de Nemours, Inc., ("Dupont"), Corteva, Inc., Dow Inc. The Dow Chemical Company, and The Chemours Company is also a public interest concern as the 6.445 million dollar payment that DuPont made to the law firm of Friedman, Rodriguez, Ferraro, and St. Louis was alleged to have influenced a Miami, FL Benlate case and now their PFAS settlements are unconscionably low. Plaintiffs don't believe that most PFAS cancer victims and their survivors have a fair chance in court against these defendants and our experience reinforces that belief, see, https://www.ewg.org/news-insights/news/why-are-dupont-and-chemours-still-discharging-most-notorious-forever-chemical which we request that the Court take judicial notice of. Considering the 22.425 billion dollar value of a one-third share of the saleable minerals recovered from ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive damages due to us in this action for relief under Cal. Civil Code Sec. 1692 for rescinding the Leases, we believe that we will recover over 125 billion dollars and will only consider offers for settlement that exceed 125 billion dollars with 120 billion of it going into a PFAS settlement fund for the PFAS cancer victims and their survivors. As we have learned more about these chemicals called "forever chemicals" that stay in the soil and groundwater and accumulate in people and cause cancer, we determined that it is more equitable to contribute a large portion of the proceeds from the liquidation of the insolvent defendants and a large portion of the proceeds from any judgement solvent defendants to PFAS victims. PAFS chemicals may stay in the environment for thousands of years so 120 billion is not going to pay for injury to all of the victims, some of which haven't even been born yet. Increasing awareness of the PFAS crisis is important to stopping production of these chemicals and finding solutions. Certain of these defendants are known for changing the name of PFAS chemicals and altering them slightly to avoid regulation. Rendering these defendants insolvent due to the liability that they have to us and our donation to a PFAS settlement fund will be meaningful not only because those who have been harmed will be compensated but because it will stop certain of these defendants from continuing to produce PFAS chemicals. The PFAS settlement fund needs to have the

53

money to pay victims and then pay it out because the justice system is not working for the victims. Many of the victims are sick and grieving and have adversely impacted income, depleted savings and other challenges that render them unable to endure the bad faith frauds upon courts that these defendants commit. We also want to consider the pension obligations of the insolvent defendants and have requested auditable accounting of such obligations from some of the insolvent defendants but the pensions of senior executives such as Charles O. Holliday, Jr. ("Mr. Holliday"), who was president of the titanium dioxide division of DuPont and became chief executive officer, will not be honored because he participated in the design of the underreported production price-fixing scheme and became CEO of DuPont to implement the company-wide accounting fraud. However, there are many thousands of pensioners other than the board members, senior managers, and senior plant engineers who knew about the underreported production at those plants and the resulting environmental damage and reduced tax revenue, see https://iehn.org/resources/resolution/dupont-costs-of-pfoa-related-pollution-remediation-from-facilities which we request that the Court take judicial notice of. We are taking this case to a jury and Mr. Holliday can have his time before the jury which should result in a perp walk and a conviction. He was the scienter of the underreported production price-fixing scheme and we expect that his attorneys will argue that he does not have to go to jail because he exited DuPont. He did exit DuPont and we believe that he did so to avoid a several decades long prison sentence which could have exceeded his life. He then applied his law firm connections and scorched earth litigation prowess to help Bank of America avoid financial crisis liability. Mr. Holliday was CEO of DuPont when DuPont made the 6.445 million dollar payment to the law firm of Friedman, Rodriguez, Ferraro, and St. Louis that was widely criticized as a payoff to influence litigation, see firmhttps://archive.blogs.harvard.edu/ethicalesq/2003/09/10/ethics-charges-come-late-in-miami-benlate-case/ which we request that the Court take judicial notice of; see also, https://www.panna.org/archive/panna-dupont-convicted-racketeering-benlate-case/ which we request that the Court take judicial notice of. However, there

54

are more pensioners that know and feel what it means to be a citizen of this country
than the defendants can stifle. The pensioners who worked in titanium dioxide
pigment plants and PVC plants can come clean and will deserve respect for doing so.
Those who are willing to turn over evidence against these defendants will be given
consideration to keep their pensions vested. Unfortunately, the unreported production
of titanium dioxide pigment is also a large environmental crime.  Titanium dioxide
pigment plants are known to be the largest emitters of dioxins into the atmosphere of
all US industrial plants and the executives of the titanium pigment producing
defendants knew it in 1989 which has been a motivating factor for underreported
production at these plants and continues to be a motivating factor for concealing the
underreported production given the storms and wildfires that the emissions of the
titanium dioxide pigment plants are a measurable contributor to.  Now we are left to
deal with winding down and liquidating the insolvent defendants and we will do a
better job of it than the management that is participating in concealing the
underreported production price-fixing scheme and we are going to do it with
compassion for the pensioners. Initially our plan was to donate part of the proceeds of
the jury award to charities that have a record of successful contribution but knowing
about DuPont's conduct in the Benlate litigation and seeing the bad faith conduct by
the defendants in the San Francisco litigation has opened our eyes to the PFAS
litigation and the PFAS crisis. See, https://chemsec.org/reports/the-top-12-pfas-
producers-in-the-world-and-the-staggering-societal-costs-of-pfas-pollution/ which we
request that the Court take judicial notice of.  As anyone can see by the defendants'
conduct in the San Francisco litigation their officers and directors are only increasing
their liability. The defendants don't have any valid defense for their liability to us and
committed fraud in court as is evidenced by the declaration of Joseph Mullins
("EXHIBIT J")[2] which they all adopted in support.  Said declaration is fraudulent for
many reasons, one of which is found in EXHIBIT J at page 2, at lines 7-9 which is

---

[2] EXHIBIT J includes pages 1-5 of the declaration of Joseph Mullins, exhibits are excluded.

55

paragraph 5 by which Iluka and the other defendants claimed that, *"...Iluka supplied minerals within a geographic market that almost exclusively included consumers of mineral sands products primarily in Ohio, Delaware, South Carolina, Alabama, Tennessee, New York, and New Hampshire."*, which is a fraudulent statement, part of a fraudulent declaration, perjury, and clearly intended to conceal the fact that the titanium dioxide pigment plants in Mississippi and Louisiana were continuously supplied with saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, see the attached map showing the location of many of the plants that were supplied with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. Furthermore, the claim that New Hampshire is a significant state in which minerals are distributed is not plausible because there aren't any plants in New Hampshire. In light of the map that Iuka produced, EXHIBIT K, in which Iluka delineated the location of its customers, the Court must conclude that the defendants have committed fraud and perjury in the San Francisco litigation with the Joseph Mullins declaration, EXHIBIT J. The reason that the defendants have committed fraud and perjury in court with the Joseph Mullins declaration, EXHIBIT J, is because they have a large amount of liability to us without any valid defense. Most of the defendants are insolvent for their liability to us.

120.    As was required by California law, prior to rescinding the Leases, I, Laurence John Graham, first offered to restore Iluka. Although I allege that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed Leases has been rescinded and that I have previously offered to restore Iluka prior to rescinding said portion of the Leases, I will here again offer to restore Iluka although this offer does not and cannot disturb the prior rescission of said portion of the Leases. Now, by the powers that I have, to bring, prosecute, and settle all claims involving the one-third share of the minerals conveyed to Betty by the 97 Deed, which include, but are not limited to, the powers and authority to represent Betty's interests and Luke's interests which were awarded

56

74

to me in the settlement of the 02-26 lawsuit by the 9/29/03 settlement agreement, I hereby offer to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return $400,000.00 dollars of the land lease payments; and, by such powers, I hereby also offer to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Julia P. Boyd, (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 dollars of the land lease payments; and, by such powers, I hereby to also offer to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 of the land lease payments.

121.    Although, in the paragraph above, I again offered to restore Iluka more than the total amount in dollars that was disbursed to Betty's parents, their three daughters, and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed which I, Laurence John Graham, calculated to be less than 27 million dollars of royalties that were disbursed as consideration for said saleable minerals. I also calculated that less than $1,200,000.00 of land lease payments were disbursed although they aren't consideration for the saleable minerals and I offered to restore Iluka those land lease payments in addition to 27 million dollars of royalties but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive

57

damages which will probably increase the recovery to over 125 billion dollars which is an additional reason that returning money to Iluka is not applicable.

122.    I, Laurence J. Graham, have the powers to bring, prosecute, and settle all claims involving the minerals conveyed to Betty by the 97 Deed, which include, but are not limited to, the powers and authority to represent Betty's interests and Luke's interests which were awarded to me in the settlement of the 02-26 lawsuit by the 9/29/03 settlement agreement, and based upon a failure of consideration for the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and each separate allegation made hereinabove, I have already rescinded the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, to the extent that it is determined that I did not rescind said portions of the Leases, I hereby separately rescind them based upon a failure of consideration; and, by such powers, and based upon a failure of consideration for the one-third share of the minerals conveyed to Julia P. Boyd (also known as Julia H, Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other separate allegations made herein above, I separately rescinded the portion of the Leases pertaining to the one-third share of the minerals conveyed to Julia P. Boyd (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, to the extent that it is determined that I did not rescind said portion of the Leases, I hereby separately rescind it based upon a failure of consideration; and, by such powers, and based upon a failure of consideration for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97

58

Deed and the other separate allegations made herein above, I separately rescinded the portion of the Leases pertaining to the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, to the extent that it is determined that I did not rescind said portion of the Leases, I hereby rescind it based upon a failure of consideration. Now, I demand that you immediately pay $22,396,800,000.00 (22.3968 billion dollars) for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed by sending a check c/o Laurence J. Graham to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 as this is my address for payment of the rescission money.

123.    Immediate proof that you have the money to pay $125,000,000,000.00 is demanded from you and I reserve the right to demand proof of additional liquid funds; recovering these funds is the avenue that I choose as having a bankruptcy court dissolve your companies is not the relief sought; however, I reserve all rights to recover the money judgement that is sought herein together with punitive damages.

124.    I, Betty Patrick Graham, believe that the sum total of royalties disbursed for the one-third share of the minerals that were conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is severely insufficient and therefore a failure of consideration for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; therefore, I, Betty Patrick Graham offered to return 9 million dollars of royalties to Iluka which is more than the maximum sum total amount that was disbursed for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return $400,000.00 of land lease payments. Although I allege that the portion of the Leases pertaining to the one-third share of the minerals conveyed to me by the 97 Deed and

59

later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed Leases has been rescinded and that I have previously offered to restore Iluka prior to rescinding said portion of the Leases, I will here again offer to restore Iluka although this offer does not and cannot disturb the rescission of said portion of the Leases. Now, I here again offer to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return $400,000.00 dollars of the land lease payments but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to over 125 billion dollars which is an additional reason that returning money to Iluka is not applicable; and, I offered to return another 18 million dollars of royalties to Iluka which amounts to a total of 27 million dollars of royalties that I offered to return to Iluka which is much more than they disbursed to my parents, their three daughters (one of which is me Betty), and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return an additional $800,000.00 of land lease payments to Iluka which amounts to a total of $1,2000.000.00 of land lease payments that I also offered to restore Iluka in addition to 27 million dollars of royalties but the $67,275,000,000.00 (67.275 billion dollars) value of all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka was not applicable and, if it is determined that I, my son Laurence, or Laurence and I did not rescind such portion of the Leases, I have already offered to restore Iluka. Now, I here again offer to return said sums of money but the $22,425,000,000.00 (22.425

60

billion dollars) value of only a one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which may increase the recovery to a multiple of 125 billion dollars which is an additional reason that returning money to Iluka is not applicable. Based upon a failure of consideration and each separate allegation made hereinabove and the other separate allegations made herein above, I already have rescinded the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels land listed in the 97 Deed; however, if it is determined that said portions of the Leases have not been rescinded, I hereby separately rescind each of them; and, if rescinding a portion of the Leases was not possible, I rescinded the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed based upon Iluka's failure of consideration for all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels land listed in the 97 Deed and based on each separate allegation made hereinabove; and, if it is determined that the portion of the Leases pertaining to the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed has not been rescinded, I hereby rescind it; and, to the extent that it is determined that rescinding said portions of the Leases is not possible, I hereby rescind the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed based upon Iluka's failure of consideration for all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that

61

was extracted from the ten parcels land listed in the 97 Deed and each separate allegation made hereinabove; now, I again demand that you immediately pay $22,396,800,000.00 (22.3968 billion dollars) for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore extracted from the ten parcels of land listed in the 97 Deed by sending a check c/o Laurence to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 as this is my address for receipt of the rescission money.

125.    I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) believe that the royalties disbursed for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is severely insufficient and therefore a failure of consideration for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and, as Agent for Betty P. Graham (also known as attorney in-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham, I offered to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return $400,000.00 dollars of the land lease payments and I here again offer to return said sums of money but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to over 125 billion dollars; and, by such powers, I offered to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Julia P. Boyd, (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted

62

from the ten parcels of land listed in the 97 Deed and I also offered to return another $400,000.00 dollars of the land lease payments and here again offer to return said sums of money but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to a multiple of 125 billion dollars; and, by such powers, I offered to return 9 million dollars of royalties to Iluka which is more than the maximum amount that was disbursed for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offered to return another $400,000.00 of the land lease payments and I here again offer to return all such money but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to a multiple of 125 billion dollars.

126.    Although we offered to restore Iluka the total amount in dollars that was disbursed to Betty P. Graham parents, their three daughters (one of which is Betty), and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed which I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham), calculated to be less than the 27 million dollars of royalties disbursed as consideration for said minerals and I calculated that less than $1,200,000.00 of land lease payments were also disbursed which I also offered to restore Iluka but the $22,425,000,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed

63

exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable; and, a jury must determine the value of the punitive damages which will probably increase the recovery to over 125 billion dollars; therefore, returning money to Iluka is not applicable.

127.    Based upon a failure of consideration and each separate allegation made hereinabove, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney in-in-fact for Betty P. Graham) and attorney-in-fact for Betty P. Graham rescinded the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, if it is determined that I and/or Betty did not rescind said portions of the Leases I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham hereby rescind said portions of the Leases. I have rescinded the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, if it is determined that I and/or Betty have not, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham hereby rescind it. However, if it is determined that rescinding a portion of the Leases is not possible, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham rescinded the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and, if it is determined that I and/or Betty did not effectuate such rescission, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) and as attorney-in-fact for Betty P. Graham hereby rescind the Leases

64

pertaining to the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and, I demand that you immediately pay $22,396,800,000.00 (22.3968 billion dollars) to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 c/o Laurence J. Graham for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the parcels of land listed in the 97 Deed.

128.    I, Betty Patrick Graham, emphasize that my son Laurence J. Graham is my Agent (also known as my attorney-in-fact) and that he is the only person authorized to bring, prosecute, and settle claims for me; accordingly, my son, Laurence J. Graham has the authority to do all things necessary to prosecute this rescission and recover the value of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed plus the punitive damages determined by a jury. My son Laurence J. Graham also has the authority to donate the majority of the 22.3968 billion dollars plus the punitive damages to charity.

WHEREFORE, Plaintiffs pray for a jury trial to determine each defendants separate proportional liability for the 22.3968 billion dollar value of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive damages due in our action for relief under Cal Civil Code Sec 1692; and,

For a jury to determine any affirmative defenses raised by any of the Defendants; and,

For the costs incurred herein; and,

For post judgement interest; and,

For attorneys' fees incurred herein; and,

For interest on the 22.3968 billion dollars due for delays by the Defendants; and,

For the Court to order that Iluka pay the slightly over 2.5 million dollars of royalties represented in its 2/12/2023 letter to Laurence so that plaintiffs will have resources to maintain this action for relief under Cal. Civil Code Sec. 1692; accordingly, we request

65

for the Court to order Iluka to pay $2,500,000.01 to Laurence within 5 business days and that the acceptance of said money by Laurence shall be done with the reservation of all rights and claims and that plaintiffs shall maintain their action for relief under Cal. Civil Code Sec. 1692 after Laurence receives said funds free and clear in his personal bank account; and,

For such other and further relief that the Court deems proper including, but not limited to, ordering the return to of any tons of saleable minerals, that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed that the Court determines are not subject to the Leases; accordingly, Betty's address for the return any tons of said saleable minerals, that are not subject to the Leases, is 114TH SW AVE AND SOUTHWEST MCBRIDE PL BEAVERTON, OR 97005 and, if said tons of saleable minerals are not available, her address for payment of the present fair market value of all such tons of saleable minerals is 4647 Kingswell Ave Ste 105 Los Angeles CA 90027; however, Laurence's address for return of any tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed that the Court determines are not subject to the Leases is in front of 4647 Kingswell Ave. Ste 105 Los Angeles, CA 90027 and, if not available, his address for payment of the present fair market value of all such tons of saleable minerals is 4647 Kingswell Ave. Ste 105 Los Angeles, CA 90027

Dated: June, 2 2025

We now sign this VERIFIED COMPLAINT FOR RELIEF BASED ON RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL in Los Angeles California.

Respectfully Submitted,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

66

1 | Laurence J. Graham for Laurence J. Graham: _Larry Graham_

2 | Laurence John Graham for Laurence John Graham: _Larry Graham_

67

85

SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Settlement Agreement") is made this _29_ day of September, 2003, by and among Betty P. Graham ("Betty"), Luke P. Graham ("Luke") and Laurence J. Graham ("Laurence").

Recitals

A.   WHEREAS, Betty is the mother of Luke and Laurence;

B.   WHEREAS, G. L. and Mary Elizabeth Parson (the "Parsons") are the parents of Betty and the grandparents of Luke and Laurence;

C.   WHEREAS, the Parsons were the owners of certain real estate interests in the Counties of Sussex and Dinwiddie, Virginia, including valuable minerals (including titanium) in, on and under the surface of the real property identified on Exhibit "A" attached hereto (hereinafter the "Real Property");

D.   WHEREAS, the Parsons entered into with RGC (USA) Minerals, Inc. ("RGC") certain Deeds of Mining Lease dated October 13, 1989, (the "Leases"), wherein the Parsons granted to RGC the right to explore for, mine and remove the minerals on and below the Real Property;

E.   WHEREAS, Iluka Resources, Inc. now claims to be the successor in interest to RGC (USA) Minerals, Inc.;

F.   WHEREAS, the Parsons executed a Deed of Gift dated May 19, 1997, and which is recorded in the Office of the Circuit Court of Dinwiddie County, Virginia at Deed Book 410, Page 204 and in the Office of the Clerk of the Circuit Court of Sussex County, Virginia at Deed Book 155, Page 626 (the "Parsons' Deed of Gift"), a copy of which is attached hereto as Exhibit "B";

G.   WHEREAS, the Parsons' Deed of Gift conveyed all right, title and interest in and to the minerals of every kind and character, in, on and under the Real Property and their Lessor management power and rights and all other title interest in the Leases to the Parsons' three (3) daughters, including Betty, as tenants in common, in equal one-third (1/3) parts, reserving only to themselves the next two "advance royalty payments" that remained due and payable under the Leases at that time and the annual "Rental Payments" under the Leases;

H.   WHEREAS, Betty executed a Deed of Gift dated October 23, 2000, and which is recorded in the Office of the Clerk of the Circuit Court of Dinwiddie County, Virginia in Deed Book 493 at Page 152 and in the Office of the Clerk of the Circuit Court for Sussex County, Virginia in Deed Book 175 at Page 181 (the "Graham Deed of Gift"), a copy of which is attached as Exhibit "C";

I.   WHEREAS, the Graham Deed of Gift conveyed all of the interests conveyed to Betty by the Parsons' Deed of Gift, including but not limited to the interests in the mineral rights in, on and under the surface of the Real Property and her Lessor management power and rights, and all other title interest in the Leases (all of such interests are hereinafter referred to as the "Property"), to Luke and Laurence with Luke receiving forty percent (40%) of Betty's interests and Laurence receiving sixty percent (60%) of Betty's interests;

J.   WHEREAS, it was the intent of Betty that Laurence was to have control over the Property conveyed to Luke and Laurence;

K.   WHEREAS, a dispute has arisen regarding the validity of the Graham Deed of Gift;

L.   WHEREAS, Betty and Luke filed a Bill of Complaint in the

Circuit Court of the County of Sussex (the "Circuit Court"), styled Betty P.
Graham and Luke P. Graham v. Laurence J. Graham and Iluka Resources, Inc.,
Chancery No. 02-26 as well as a Bill of Complaint in the action styled Betty
P. Graham and Luke P. Graham v. Laurence J. Graham in the Circuit Court for
the County of Sussex, Virginia, Chancery No. 02-1033 (collectively, the
"Actions");

M.    WHEREAS, pursuant to the Decree entered by the Circuit Court
on April 16, 2002, the Clerk of the Circuit Court is holding as of September
29, 2003, $ 5 13,358.63  made up of funds paid to the Clerk by Iluka and
interest (the "Court Held Funds");

N.    WHEREAS, in lieu of further litigation, Betty, Luke and Laurence
each desire to compromise, resolve and settle all claims, disputes, causes, disputes
or other issues among them arising out of or relating to the Actions, the
Leases, the Parson's Deed of Gift, the Graham Deed of Gift and any other
issues among them relating thereto.

NOW, THEREFORE, for and in consideration for the mutual covenants
and agreements set forth herein and other good and valuable consideration,
the mutual receipt and legal sufficiency of which are hereby acknowledged,
the Parties expressly agree as follows:

1.    All of the foregoing "WHEREAS" clauses are hereby incorporated by
reference as if fully set forth herein.

2.    Except for the rights and obligations set forth in this Settlement Agreement and in
consideration of the terms and conditions of this Settlement Agreement, Betty, Luke and
Laurence, each on their behalf and on behalf of their respective heirs, executors, estate
administrators, successors, and assigns does hereby and unconditionally forever waive,
release, remise, discharge and covenant not to sue each other, from and against any and all
liabilities, claims, lawsuits, causes of action, demands, actions, appeals, costs, expenses, interest
on money, and attorney's fees which they now have or may hereinafter have against each
other, whether known or unknown, arising out of, possibly arising out of or relating in any way to
the Actions, the Leases, the Parson's Deed of Gift, the Graham Deed of Gift, any allegation
raised in the Actions or which could have been raised in the Actions by any party to this
Settlement Agreement, or any other issues among them relating thereto with respect to any of the
foregoing, arising or accruing prior to the date hereof.

3.    Betty and Luke hereby acknowledge and confirm the validity of the Graham Deed of Gift as
of the date of its execution of October 23, 2000, and forever waive, release and relinquish any
claim of duress, undue influence, mental illness or incompetence as a defense to the Graham
Deed of Gift or as a basis for setting aside, challenging or avoiding the Graham Deed of Gift.
All parties represent, acknowledge and agree that by virtue of the Parson's Deed of Gift and the
Graham Deed of Gift, Laurence and Luke are the owners, as tenants in common, of the Property
conveyed to Betty, with Luke owning 40% of the interests in the Property and Laurence owning
60% of the interests in the Property conveyed to Betty.  Laurence and Luke have the
sole right to receive all royalty payments and all income due on account of the Property including,
but not limited to revenues derived from the sale of the Property and royalty payments under the
Leases (including any amendment, renewal, extension or renegotiation payments they are
entitled to receive as Lessors) with Luke receiving 40% of any such payments and Laurence
receiving 60% of any such funds; however Laurence shall allow the Court Held Funds to be
disbursed 50% to him and 50% to Luke with Luke reimbursing Laurence for taxes on the Larry to
Luke portion of such disbursement being approximately $50,000.00.

4.    The parties agree that this Settlement Agreement does not constitute an assignment of any
of Laurence's rights under the Graham Deed of Gift to Betty and/or Luke and shall not be
construed as such. Similarly this Settlement Agreement does not constitute an assignment of any
of Luke rights under the Graham Deed of Gift to Betty.  This Settlement Agreement shall not be
construed as a ratification of any Lease or conduct by Iluka or a waiver of any claims and rights
against Iluka.

5.    The parties agree that should any third party contest or challenge that Laurence and Luke

Page 2

are the owners, as tenants in common or otherwise, of the Property including the Leases, or assert, allege, seek declaratory relief, claim, question or testify that Betty by the Parsons' Deed of Gift or that Laurence and Luke by the Graham Deed of Gift received only an assignment of the royalties to be paid under the Leases or less than lessor and title interest in the Leases (hereinafter collectively referred to as a "Tenancy in Common Challenge"), that they will each contest any such Tenancy in Common Challenge and not take any position contrary to paragraphs 3, 4 and 5 of this Settlement Agreement. For the purpose of fulfilling the obligations contained in this paragraph 5, Betty hereby grants a power of attorney to Laurence and appoint Laurence as her true and lawful attorney-in-fact, with full authority to act on their behalf with respect to a Tenancy in Common Challenge, including, but not limited to, the right to commence, prosecute, discontinue, defend and settle any or all actions or other legal proceedings related thereto. The power of attorney contained in this paragraph 5 is a durable power of attorney coupled with an interest and is irrevocable.

6. Betty hereby assigns, transfers and conveys to Laurence any and all claims she may have, known or unknown, against Iluka and/or RGC relating to the Leases, including, but not limited to, all fraud claims or breach of contract claims, if any. To the extent any of such claims are personal and not assignable, Betty hereby grants a power of attorney to Laurence and appoints Laurence as her true and lawful attorney-in-fact, with full authority to act on her behalf with respect to any such claim, including, but not limited to, the right to commence, prosecute, discontinue, defend and settle legal actions or other legal proceedings, and further assigns, transfers and conveys to Laurence any settlement or recovery from such claims. The power of attorney contained in this paragraph 6 is a durable power of attorney coupled with an interest and is irrevocable.

7. Betty shall, within 60 days of the full execution of this Settlement Agreement, transfer her assets, real and personal (excluding her personal residence in Naples, Florida, personal affects and household goods) to the Trustee of The Graham Family Trust Agreement, dated ~~September 29~~, 2003, a copy of which is attached hereto as Exhibit "D" (hereinafter the "Graham Trust"), to be held and administered pursuant to the terms of the Graham Trust.

8.   Within 60 days of receiving and at his discretion choosing to accept any money, royalty or other payment from or relating to the Real Property, the mineral rights below the surface of the Real Property and the Leases (including as the Lease may be modified, amended, changed or extended) (hereinafter "Laurence's Mineral Proceeds"), Laurence shall pay to Luke, by certified or bank check, a sum of money equal to one-sixth or 16.67% of Laurence's Mineral Proceeds after deducting estimated taxes which may be owed or due on account thereof as determined by a certified public accountant (the "Larry-to-Luke Payment"). With respect to disbursement of the Court Held Funds, Laurence hereby authorizes the direct payment to Luke of the gross Larry to Luke payment, and Luke shall, at his expense, retain a CPA to determine the applicable gift and income taxes due by Laurence for the 16.67% Larry to Luke payment ( approximately $50,000.00) given by Laurence, and refund Laurence said amount for taxes within 60 Days. Thereafter, within 60 days of receiving and at his discretion choosing to accept Laurence's Mineral Proceeds, Laurence shall pay of sum of money equal to 33.33% of Laurence's remaining Mineral Proceeds to the Trustee of the Graham Trust, to be held and administered pursuant to the terms of the Graham Trust. Laurence shall make such payment to the Trustee of the Graham Trust until such time as Laurence has paid an aggregate total of $350,000.

9.   Within 60 days of receiving and at his discretion choosing to accept any money, royalty or other payment from or relating to the Property, the mineral rights below the surface of the Property and the Leases (including as the Lease may be modified, amended, changed or extended) (hereinafter "Luke's Mineral Proceeds") and receipt of the Larry-to-Luke Payment, Luke shall pay a sum of money equal to 33.33% of Luke's Mineral Proceeds after deducting any estimated taxes which may be owed or due on account thereof as determined by a certified public accountant to the Trustee of the Graham Trust, to be held and administered pursuant to the terms of the Graham Trust. Luke shall make such payment to the Trustee of the Graham Trust until such time as Luke has paid an aggregate total of $350,000.

10.   The discretion referenced in 8 and 9 above is only applicable in the event that a lessee including, but not limited to Iluka makes a payment accompanied by the assertion or requirement that Laurence and/or Luke ratify the Leases or waive any claims or rights against the lessee. In the event that such payment is tendered by a Lessee and Larry or Luke refuse to accept then

Page 3

88

Luke or Laurence shall have 180 days to resolve the dispute out or court or initiate litigation over the same. Neither Laurence or Luke can interfere with the others ability to exercise discretion.

11.  Notwithstanding anything contained herein, the parties agree that Laurence has the right, at his own cost and expense, to commence, prosecute, discontinue, defend and settle legal actions, claims and other legal proceedings against any lessee, including, but not limited to, Iluka and/or RGC, relating to the Property or the Leases including, but not limited to, breach of contract claims and the right to have the Leases set aside or rendered invalid; and Luke and Betty agree that they will not intentionally interfere with or take positions contrary to such claims. Commensurate with this right, Laurence shall have the right to negotiate the resolution of those claims and/or a sale or transfer of all or a portion of this interests and Luke's interests in the Property or Leases to a third party, including, but not limited to Iluka.  Luke shall be bound by such resolution and/or contract to sell or transfer and shall transfer his interests in the Property or Leases  to such third party provided:  (1) Laurence also transfers or sells the same share of his interests in the Property or Leases to such third party as Luke transfers or sells (2) Laurence and Luke receive the same amount of money  from the transfer or sale of their interests in the Property; and (3) Luke receives for his interests a cashiers check, bank check or immediate entitlement to escrowed funds in an amount  equal to the greater of : (a) an amount equal to the present value of Luke's share of the estimated royalty payments to be paid under the Leases (as estimated by Iluka and shown on Exhibit "E" attached hereto), after deductions for all advance royalty payments and royalty payments paid through such time, and (b) the net proceeds paid for Luke's interest, after deducting 50% of reasonable compensation earned by attorneys and costs and expenses incurred by Laurence in pursuing and resolving claims relating to the Property and Leases.  Upon satisfaction of the conditions set forth in this paragraph, Luke agrees to simultaneously execute the appropriate documentation to transfer or sell his interests in the Property to a third party within fourteen (14) calendar days of receipt of written demand (the "Written Demand") by Laurence or such third party.  The parties agree that a copy of the Written Demand shall be sent at the same time counsel for Luke.  Should and only upon satisfaction of the conditions set forth in this paragraph and Luke's failure to executed the appropriate documentation to transfer or sell his interests in the Property within fourteen (14) calendar days of receipt of the Written Demand, Luke hereby grants a power of attorney to Laurence and appoints Laurence as his true and lawful attorney-in-fact, with full authority to act on his behalf for the limited purpose of transferring or selling Luke's interests in the Property.

12.  Without ratifying the Leases, reserving all rights, without prejudice to any rights and without waiving or altering the rights granted to Laurence in paragraph 11 above, and reserving all such rights, the parties agree that in accordance with the Graham Deed of Gift, Laurence is entitled to receive 60% of the Court Held funds and Luke is entitled to receive 40% of the Court Held funds.

13.  Luke and Laurence represent and warrant to each other that they have not assigned nor are there any liens against or affecting any of their rights relating to the Property, including the mineral rights below the surface of the Real Property and the Leases.  Betty represents and warrants that she transferred all of her interests in the Property and Leases by the Graham Deed of Gift free and clear of any liens against or affecting any of the rights relating to the Property and the Leases, and other than the Graham Deed of Gift, she did not make, and has not made, any other assignment or transfer of such interests.

14.  It is the intent of the parties to this Settlement Agreement that this agreement and the actions to be taken hereunder, are not intended to and shall not ratify the Leases, is entered into with full reservation of all rights and claims under the Leases and without prejudice to those rights.  Subject to the rights and obligations set forth in this Settlement Agreement, Laurence and Luke further recognize and agree that they hold the Property as tenants in common with neither party having control over the Property nor control over nor ability to act on behalf of the other's interest in the Property.  The parties further agree that any transfer, exchange or payment of rights, interests or amount of money under this Settlement Agreement has been made for the sole purpose of settling the Actions and resolving all disputes between the parties.

15.  The parties agree to the entry by the Circuit Court of the order in the form attached as Exhibit "G" (1) directing the Clerk of the Circuit Court of Sussex County to disburse the Court Held Funds; and (2) dismissing with prejudice the Actions and all claims related thereto. The

Page 4

09/30/2024

parties shall cooperate and take all necessary and appropriate action to accomplish the same without delay. In the event the Circuit Court will not enter the order as presented, the settlement of the Actions and this Settlement Agreement will stand as binding upon the parties, and the parties agree to endorse a new order that encompasses the covenants and agreements within this Settlement Agreement.

16.   The parties shall bear their own costs and legal fees in connection with the Actions.

17.   The parties agree that the execution of this Settlement Agreement and the release of any claims hereunder shall not constitute nor be deemed an admission of liability or wrongdoing by any party.

18.   This Settlement Agreement and the respective covenants, provisions, terms, conditions and agreements contained herein shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, estate administrators, successors and assigns. Notwithstanding the foregoing, Iluka, RGC and their successors cannot be beneficiaries, third-party or otherwise, of any of the releases contained in this Settlement Agreement.

19.   The parties agree and affirm that they have each sought the advice of legal counsel with respect to the Settlement Agreement and by signing each party certifies that he or she has reviewed the terms of the Settlement Agreement with counsel of his or her choice, has had all questions and concerns regarding the Settlement Agreement answered or resolved to his or her complete satisfaction and fully understands and agrees to such terms.

20.   In entering into this Settlement Agreement, each party represents that he or she has relied exclusively on his or her own judgment, investigation and analysis of the facts, and has not relied on any representations or conditions not included in this Settlement Agreement.

21.   In the event legal action is commenced to enforce or interpret this Agreement or for declaratory relief with respect thereto, the prevailing party or parties in such action shall be entitled to recover from the  non-prevailing party or parties the reasonable attorneys fees and costs incurred by the prevailing party in such action, in such amount as determined by the Court.

22.   The parties agree to act in good faith to carry out the terms and intent of this Agreement. The parties shall also, at all times in the future, upon the reasonable request of the other or others, execute and delivery to the others, or to cause the execution and delivery of, all additional documents which may be reasonably necessary to fully consummate and carry out the terms and intent of this Settlement Agreement.  However, nothing contained in this section shall require any party or other entity to assume any liability, expense, obligation or duty not expressly required by the terms of this Settlement Agreement.

23.   The parties agree that this Settlement Agreement and the Graham Trust shall constitute the entire agreement among the parties relating to the subject matter hereof and the obligations set forth hereunder may not be altered, amended, or modified in any respect except by and in writing, duly executed by all parties.  This Settlement Agreement supercedes any and all prior oral or written understandings, agreements, guarantees, contracts and arrangements between the parties, with the exception of the Graham Deed of Gift.

24.   The parties agree that no presumption of construction exists against either party based upon the drafting of the Settlement Agreement.

25.   Each provision of this Settlement Agreement is a separate and independent clause.  If any provision of this Settlement Agreement is held invalid, such invalidity shall not invalidate the entire agreement, and the remainder of the Settlement Agreement will not be affected.

26.   The terms and conditions of this Settlement Agreement are confidential, and the parties agree that they will not disclose to or discuss with others the nature, terms and amount of the settlement which has been reached among the parties, except as may be necessary for the compliance with the terms and conditions contained herein, as may be required by law or with the prior written approval of the party not seeking to disclose such information.

27.   The execution of this Settlement Agreement shall include four (4) duplicate original copies, including exhibits, each initialed on each page by each of the parties and signed by each of the parties and notarized.

28.   The Settlement Agreement shall be governed and construed in accordance with the laws of

Page 5

the Commonwealth of Virginia.

29.    The parties agree that any litigation arising out of a dispute over the Settlement Agreement shall occur in Collier County Circuit Court in the State of Florida, without regard to the conflict of laws.  The parties agree that they will mediate any such dispute arising out of this Settlement Agreement prior to initiating litigation.


BETTY P. GRAHAM;{SEAL} _Betty P. Graham_


COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL, to wit:

   The foregoing was acknowledged before me this 29 day of ~~August~~ Sept, 2003, by Betty P. Graham.

_Nancy D. Long_
Notary Public

My commission expires:

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836


LUKE GRAHAM:{SEAL}

COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL, to wit:

   The foregoing was acknowledged before me this 27 day of ~~August~~ Sept, 2003, by Luke Graham.

_Nancy D. Long_
Notary Public

My commission expires:

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836


LAURENCE GRAHAM: {SEAL}

   COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL    , to wit:

   The foregoing was acknowledged before me this 29 day of ~~August~~ Sept, 2003, by Laurence Graham.

_Nancy D. Long_
Notary Public

My commission expires: March 9, 2007

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836

Page 6

# EXHIBIT B

Dinwiddie: 410/204

Deed #97-1974

This Document Prepared By:        Grantees' Address:
Thomas H. Rose, Jr.               Betty P. Graham
Attorney at Law                   6157 Westwood Terrace
P. O. Drawer B                    Norfolk, Virginia 23508
Stony Creek, Virginia 23882-0075
(804-246-4941)                    Ann P. Everett


                                  Julia P. Boyd


THIS DEED IS EXEMPT FROM RECORDATION TAXES PURSUANT TO
SECTION 58.1-811D OF THE CODE OF VIRGINIA, 1950, AS AMENDED.


     THIS DEED OF GIFT, made this 19th day of May, 1997, by
and between George Lee PARSON, Jr. and Mary Elizabeth
PARSON, his wife, Parties of the First Part and hereinafter
styled "Grantors", and Betty P. GRAHAM, Ann P. EVERETT, and
Julia P. BOYD, Parties of the Second Part and hereinafter
styled "Grantees".


                   W I T N E S S E T H


     That for and in consideration of the sum of Ten Dollars
($10.00) cash in hand paid by the Grantees to the Grantors,
the receipt of which is hereby acknowledged, the Grantors do
hereby give, grant and convey unto Betty P. Graham, Ann P.
Everett and Julia P. Boyd, in equal shares, all of their
right, title and interest in and to the minerals of every
kind and character in, on and under those certain tracts of
parcels of land situate in Stony Creek Magisterial District,
Sussex County, Virginia, and Sapony District, Dinwiddie
County, Virginia, containing a total of 1169.86 acres, more
or less, being shown and described on Exhibits A thru J
attached to this Deed of Gift, together with the right of
ingress and egress, and possession at all times for the
purpose of mining, drilling and operating for said minerals
and the maintenance of facilities and means necessary or
convenient for producing, treating and transporting such
minerals.

     This conveyance is made subject to certain Deeds of
Mining Lease dated October 13, 1989, between the Grantors
and RGC (USA) Minerals, Inc., a Delaware Corporation, the
First Amendments to Deeds of Mining Lease dated June 30,
1994, and the Second Amendments to Deeds of Mining Lease
dated February 23, 1996, but, for the same consideration
hereinabove mentioned, the respective Grantees, their heirs,
successors or assigns, all of the royalties accruing or to
accrue under said leases for the above described land except
as hereinafter reserved.

     The Grantors reserve and except from the conveyance the
advance royalty payments from RGC (USA) Minerals, Inc. as
set forth in the First Amendments to Deeds of Mining Lease
dated June 30, 1994, it being understood that two (2) annual
advance payments remain due and payable under each lease.


                         1

The Grantors further reserve and except the annual rental payments from RGC (USA) Minerals, Inc., as set forth in the Deeds of Mining Lease dated October 13, 1989.

WITNESS the following signatures and seals:

*George Lee Parson Jr.* (SEAL)
George Lee Parson, Jr.

*Mary Elizabeth Parson* (SEAL)
Mary Elizabeth Parson

STATE OF VIRGINIA
CITY/COUNTY OF _Smyth_____, to-wit:

The foregoing instrument was acknowledged before me this 30th day of June_____, 1997, by George Lee Parson, Jr. and Mary Elizabeth Parson.

My term expires: _August 31 1997_

*Margaret W Rose*____ (SEAL)
Notary Public

2

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit A

That same tract or parcel of land conveyed to G. L. Parson, Jr. by
Warranty Deed, dated December 18, 1972, and recorded in Deed Book
160 at page 61, in Clerk's Office of Circuit Court of Dinwiddie
County, Virginia.   To Wit:  All of that certain tract, piece or
parcel of land lying and being situate in Sapony District,
Dinwiddie County, Virginia, South of what is called Dover Spring
Branch, containing one hundred and forty (140) acres, more or less,
and bounded on the North by the said Dover Spring Branch, on the
East by the land of Charlie Pride and the land of Lee Parson, on
the South by the land of S. T. Rideout and on the West by the land
of Mrs. C.C. Rideout; and being the same land described in and
conveyed by deed dated July 20, 1896, from Thomas J. Crowder and
wife to Mary H. Carraway, duly recorded in the Clerk's Office of
the Circuit Court of Dinwiddie County, Virginia, in Deed Book 20,
No. 1 at page 317; and being in all respects the same real estate
conveyed to G. Lee Parson from W. Potter Sterne, Special
Commissioner, by deed dated the 13th day of May, 1938, and recorded
in the aforesaid Clerk's Office in Deed Book 62, at page 24.

LESS and EXCEPT:  That same tract or parcel of land conveyed to
Lance V. Everett and Ann P. Everett; Husband and wife, by Warranty
Deed, dated December 18, 1976, and recorded in Deed Book 182 at
page 259, in the Clerk's Office of Circuit Court of Dinwiddie
County, Virginia.   To Wit:  All that certain lot, piece or parcel
of land lying and being situate in Sapony District, Dinwiddie
County, Virginia, containing 2.68 acres, more or less, as shown on
a plat of survey made by W. G. Chappell, C.L.S., dated December 10,
1976, which plat is attached hereto and made a part hereof, and on
which plat said lot is described as follows, to-wit:  Beginning at
a spike in the center of State Highway Route No. 619, thence N 86°
00' E 638.80 feet to an iron (set); thence S 4° 00' E 189.00 feet
to an iron (set); thence S 86° 00' W 638.80 feet to a spike in the
center of said Route No. 619; thence N 4° 00' W 189.00 feet along
the center of said Route No. 619 to a spike, the point of
beginning.

Being in all respects a part or portion of the same real estate
conveyed to G. L. Parson, Jr. from G. Lee Parson, also known as G.
L. Parson, Sr. and Virgie F. Parson, his wife, by deed dated the
18th day of December, 1972, and recorded in the Clerk's Office of
the Circuit Court of Dinwiddie County, Virginia, in Deed Book 160,
at page 61.

AND ALSO LESS and EXCEPT 14.63 acres, as described in unrecorded
survey, by Kenneth O. Peterson, L.S. 1553 dated 9-19-1989, standing
in the name of G.L. Parsons.

Subject property is referred to in the Dinwiddie County tax records
as Tax Parcel Number 101-4.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit B

That same tract or parcel of land bequeathed to G. L. Parson, Jr. by Last Will and Testament of G. Lee Parson, Sr. (also known as G. L. Parson and also known as G. L. Parson, Sr.), dated May 3, 1966, recorded March 8, 1973, in Volume 23, page 430 through 436 of the Clerk's Office of Sussex Circuit Court, Sussex County, Virginia. To Wit:  The farm that I own, situate near Concord Church in Sussex County, Virginia, and known as "The Walter Harrison Farm", across State Road No. 619, from Berry Ridout Farm, the side where the home part is situated and containing approximately 125 acres.

ALSO, being that same tract or parcel of land conveyed to G. L. Parson, by Warranty Deed, dated February 8, 1924, and recorded in Deed Book 28 at page 519, in Clerk's Office of Circuit Court of Sussex County, Virginia.  To Wit:  ...... all that certain tract or parcel of land situated in the Stony Creek Magisterial District, County of Sussex, State of Virginia; containing one hundred and twenty five acres, more or less and bounded as follows:  on the North and West by the Walker's Mill Road, on the East by the lands of C. W. Parsons and Willis Roberson, (Willis Robinson) and on the South by the land of B. Wesley Barns and the public road leading to Stony Creek, Virginia.

EXEMPTING from this tract of land all mining operations for a cemetery, situated upon 0.50 acres, more or less and six (6) bulk barns, situated upon 2.00 acres more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-7.

BOOK 100 PAGE 84

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit C

That same tract or parcel of land conveyed to G. L. Parson (also known as G. Lee Parson, Sr.), from M. L. Finney, as grantor, by Trustees Deed dated January 25, 1941 and recorded in Book 38 at page 100 in the Clerk's Office of Sussex Circuit Court.

The property is a small part of "The Wesley Barnes Farm", between the parsonage and the two branches down beside the public road and around the grave-yard to the road and back to the branch again, in fee-simple, as found in Deed Book 11, page 464, Deed Book 5, page 613, Deed Book 11, page 196 and Deed Book 22 page 409.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr. deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

EXEMPTING from all mining operations a one acre parcel of land lying in the southerly part of this tract. This parcel of land is presently unsurveyed and is used as a cemetery.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 8-101-6.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit D

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated April 15, 1960, and recorded in Deed Book 59 at page 579, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All "that certain tract or parcel of land lying and being situate in the County of Sussex and State of Virginia containing sixteen and five tenths acres (16.5) more or less and herein after described as follows:  Beginning at an iron stob on the Cabin Point Road, running thence along the said Road South 79° 15' East 983 feet, thence North 32° 00' East 343 feet along the said Road, thence North 7° 00' West 1013 feet to a pine tree, thence South 41° 45' West 1537 feet to the point of beginning.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-13.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit E

That same tract or parcel of land conveyed to G.L. Parson, Jr. by
Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59
at page 559, in Clerk's Office of Circuit Court of Sussex County,
Virginia.  To Wit:  ...... all that certain tract, piece or parcel
of land lying and being situate in Stony Creek Magisterial
District, Sussex County, Virginia, containing, by estimation, two
hundred (200) acres, and bounded as follows:  On the North by G.
Lee Parson; on the East by W. S. Barnes; on the South by the public
road leading from Stewart's to Concord Church; on the West by R. C.
Chappell and said public road leading from Stewart's to Concord
Church and Wesley Barnes, reserving a certain road or passage-way
which leads from the house now owned by W. S. Barnes through said
tract of land to the public road at the forks of the road, on of
which leads to Purdy, as and for an outlet of the occupants of the
said house now occupied by W. S. Barnes, with the right or
privilege of the purchaser of straightening said road, if he shall
so desire."; and being in all respects the identical real estate
that was conveyed to G. Lee Parson, Sr., in the name of G. Lee
Parson, by deed from John H. Cole, Special Commissioner, dated June
1, 1927, and duly recorded in the Clerk's Office of the aforesaid
county in Deed Book 31 at page 244.

Subject property is referred to in the Sussex County tax records as
Tax Parcel Number 101-31.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit F

That same tract or parcel of land conveyed to G. Lee Parson, Jr. by Warranty Deed, dated February 16, 1970, and recorded in Deed Book 73 at page 600, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract, piece or parcel of land, lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing one hundred and eighty-seven (187) acres, more or less, adjoining the lands of Markham B. Chappell; Old Eppes Tract; Green Church Road; and Wyatt Mill Road, being in all respects the same land which was devised unto Nannie B. Chappell by John E. Stewart, as will be seen by reference to the first clause of his last will and testament, of record in the clerk's Office of the Circuit Court of Sussex County, Virginia, except a portion thereof, containing about twenty-five (25) acres, which was conveyed to Nannie B. Chappell to Markham B. Chappell by deed recorded in the aforesaid Clerk's Office in Deed Book 27, at page 323; and being in all respects the same real estate conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, from John H. Cole, Special Commissioner, by deed dated the 29th day of December, 1934, and recorded in the aforesaid Clerk's Office in Deed Book 34, at page 283.

EXEMPTING from this tract of land three (3) bulk barns, situated upon two (2) acres, more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-38.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit G

That same tract or parcel of land conveyed to G.L. Parson (also known as G. Lee Parson, Sr.) by Warranty Deed, dated November 14, 1959, and recorded in Deed Book 59 at page 279, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing four and seventeen hundredths (4.17) acres by actual survey, and being shown and designated on a certain plat of survey, dated March 1, 1952, made by H.C. Frye, C.E., which said plat of survey is recorded in the aforesaid Clerk's Office in Plat Book 7, at page 26, and reference thereto is hereby invited for a more perfect description of the real estate herein conveyed; and being more particularly described on said plat as follows: Commencing on the West side of State Highway Route No. 619 at the Southeastern corner of a certain lot of land owned by B.J. Rideout, Jr.; thence S. 79° 30' W. 443 ft. to a point; thence South 24° 46' E. 494 ft. to a point; thence N. 62° 30' E. 465 ft. to a point; thence along Route 619 N. 30° 00' W. 370 ft. to the point of beginning; and being in all respects the same real estate that was conveyed to the parties of the first part, as husband and wife, by the entireties, with the right of survivorship as at common law, by deed from B.J. Rideout, Sr. and wife, and dated March 17, 1952, and recorded in the aforesaid Clerk's Office in Deed Book 48 at page 477.

The above stated land bequeathed and devised to Virgie Fraher Parson (also known as Virgie F. Parson) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

AND ALSO the above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of Virgie F. Parson (also known as Virgie Fraher Parson), deceased, in Will Book 31 at page 314 dated September 25, 1973, recorded October 15, 1982 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-3.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit H

That same tract or parcel of land conveyed to G. Lee Parson (also
known as G. Lee Parson, Sr.), by Warranty Deed, dated December 24,
1947, and recorded in Deed Book 44 at page 126, in Clerk's Office
of Circuit Court of Sussex County, Virginia.  To wit:  All of that
certain track or parcel of land, with the appurtenances thereto
belonging, containing Three and one-half (3 1/2) acres, more or
less, lying, being and situate on both sides of the Milwaukee Road
Little Mill Magisterial District, Sussex County, Va., and bounded
as follows:  On the North, East and West by lands of Lee Parson and
on the South by the land of Willis Robinson, the said tract of land
hereby conveyed being situate about 300 yards West of the present
residence of said G. Lee Parson.

The above stated land bequeathed and devised to George Lee Parson,
Jr. (also known as G. L. Parson and G. L. Parson, Jr.) from the
Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430
dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of
Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as
Tax Parcel Number 101-14.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit I

That same tract or parcel of land conveyed to G.L. Parson Jr., by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ......all of that certain tract or parcel of land sold in bulk and not by acres, said to contain fifty (50) acres, be it the same more or less, and being in Stony Creek Magisterial District Sussex County, Virginia, with general warranty. Bounded and described as follows, on the North by Public Road leading from Concord Church to Stony Creek, On the East by the 'Old Man-love Tract' formerly owned by Camp Manufacturing Company, on the South by a branch and on the West by said public road leading from Concord Church to Stony Creek, Va."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter Harrison and wife, dated April 16, 1915 and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-17.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit J

That same tract or parcel of land conveyed to G. Lee Parson, Jr., by Warranty Deed, dated March 22, 1960, and recorded in Deed Book 59 at page 524, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract of land, with all the improvements thereon and the appurtenances thereto belonging, lying, being and situate on the East side of the Nottoway River in Stony Creek Magisterial District, Sussex County, Virginia, containing eight hundred (800) acres, more or less, and bounded as follows: On the north by the lands now or formerly belonging to Slate, C.R. Chappell, Robinson and Camp Manufacturing Company; on the east by the lands now or formerly belonging to Otho Chappell, Henry Poole, G. Lee Parson, Sr. and the Wyatt Mill Road; on the South by the lands now or formerly belonging to J. H. Poole and the Nottoway River; and on the West by said Nottoway River and the land now or formerly belonging to the Camp Manufacturing Company; the land hereby conveyed is the same that was conveyed to G. Lee Parson, Sr. from J. Thompson Wyatt, Special Commissioner, by deed dated June 11th, 1946 recorded in the Circuit Court Clerk's Office of said County in Deed Book 42, at page 180; by deed from Francis E. Wyatt, and others, dated May 3, 1945, and recorded in said Clerk's Office in Deed Book 41 at page 137; by deed from William E. Anderson, unmarried, dated November 7th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 365, and by deed from Benjamin G. Anderson, unmarried, dated May 10th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 136.

The above described property was resurveyed by J. C. Shearin, dated March 20, 1972, recorded May 30, 1989 in Plat Book 18 at Page 6 in the Sussex County, Virginia records. The above stated deed recites 800.0 acres which is now corrected to recite 933.30 acres which is an increase of 133.30 acres, stated as follows: Tract No. 1 contains 50.0 acres, Tract No. 2 contains 343.0 acres, Tract No. 3 contains 379.0 acres and an open tract of land not presently surveyed containing approximately 161.30 acres, more or less.

LESS and EXCEPT from this tract of land the westerly portion thereof, containing 487.30 acres.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-36.

INSTRUMENT #9701374
RECORDED IN THE CLERK'S OFFICE OF
DINWIDDIE ON
JULY 2, 1997 AT 09:47AM
ANNIE L. WILLIAMS, CLERK
BY: _____ DEPUTY CLERK

VIRGINIA:    In the Clerk's Office of the Circuit Court of Sussex County. The foregoing instrument was this day presented in the office aforesaid and is, together with the certificate of acknowledgment annexed, admitted to record this ......7th.... day of ......July............, 19 97.... at .....9:19....... A. M.

TESTE: _Annie L. Williams_ Clerk

STD Lease
VA 8/89



COPY

96-1031

## DEED OF MINING LEASE

**THIS DEED OF MINING LEASE**, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into on ___October 13,___ 1989 ___ by and

between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA

G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA

Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife

Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
   (a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
   (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
   (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
   (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
   (f) To use all easements, means of access, and rights-of-way from and to the Property; and
   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. **Initial Advance Royalty and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment | |
|---|---|---|---|
| Lease Date | Initial Payment | $250 per acre | GLP Jr GLP, Jr. DPW |
| Lease Date | Advance Royalty $1,221.88 | $290 per acre | MEP MEP |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre | |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $110,370.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) | |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $110,370.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) | |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $110,370.00 lump sum, subject to 70% Limitation | |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) | |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

105

100 LA

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

10.   **Safety.**   Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted.  All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

11.   **RGC to Comply With Safety Laws and to Indemnify Lessor.**   RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are now but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damage, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

12.   **RGC's Right to Determine Whether, When and Where to Mine.**   Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

13.   **Compliance With Laws.**   RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

14.   **Reclamation.**   RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of the Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

15.   **Audit.**   Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given; if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

16.   **Taxes.**   Taxes will be apportioned and paid as follows:
(a)   RGC will pay the following taxes or portions thereof:  any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.
(b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.
(c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.
(d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

17.   **Warranty of Title.**   Lessor warrants as follows:
(a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;
(b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;
(c)   Lessor has full power and authority to execute this Lease;
(d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;
(e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and
(f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

18.   **Lessor Interest.**   In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

19.   **Termination.**   RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice.  Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

20.   **Title Documents.**   Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

21.   **Compensation for Buildings.**
(a)   Principal Residence.  If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers complied by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

-2-

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(e). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    **Third-Party Claims.** If RGC learns that a third party makes a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.    **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    **Entirety.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part provided, however, that:

(a)    The party making such an assignment must give the other party prior written notice thereof;

(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.    **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.    **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will attempt any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lessor will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.    **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.    **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.    **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral, or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    **Separability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

-3-

**39.    _Memorandum._**  At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record.  In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.    _Mortgagee Consent._**  Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property.  Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.    _Headings._**  The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.    _Obligations That Survive This Lease._**  In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease:  Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.    _Good Faith._**  During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

**OWNER:**

_G L Parson Jr_                [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_        (SEAL)

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_

My Commission Expires:

_October 28, 1991_

_Thomas H Reasey_
Notary Public

[NOTARIAL SEAL]

**RGC (USA) MINERALS INC.:**

By: _Daniel P. Wolcott_

Its: _____Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF    FLORIDA
COUNTY OF    CLAY

The foregoing instrument was acknowledged before me this _13_ day of _February_, ~~1989~~ 1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

418TEMP2

- 4 -

108

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ____Sapony____ Magisterial District, __Dinwiddie____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 122.65 acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated December 18, 1972, and recorded in Deed Book 160 at page 61, in Clerk's Office of Circuit Court of Dinwiddie County, Virginia.  To Wit:  All of that certain tract, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, South of what is called Dover Spring Branch, containing one hundred and forty (140) acres, more or less, and bounded on the North by the said Dover Spring Branch, on the East by the land of Charlie Pride and the land of Lee Parson, on the South by the land of S. T. Rideout and on the West by the land of Mrs. C.C. Rideout; and being the same land described in and conveyed by deed dated July 20, 1896, from Thomas J. Crowder and wife to Mary H. Carraway, duly recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 20, No. 1 at page 317; and being in all respects the same real estate conveyed to G. Lee Parson from W. Potter Sterne, Special Commissioner, by deed dated the 13th day of May, 1938, and recorded in the aforesaid Clerk's Office in Deed Book 62, at page 24.

LESS and EXCEPT:  That same tract or parcel of land conveyed to Lance V. Everett and Ann P. Everett; Husband and wife, by Warranty Deed, dated December 18, 1976, and recorded in Deed Book 182 at page 259, in the Clerk's Office of Circuit Court of Dinwiddie County, Virginia.  To Wit:  All that certain lot, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, containing 2.68 acres, more or less, as shown on a plat of survey made by W. G. Chappell, C.L.S., dated December 10, 1976, which plat is attached hereto and made a part hereof, and on which plat said lot is described as follows, to-wit:  Beginning at a spike in the center of State Highway Route No. 619, thence N 86° 00' E 638.80 feet to an iron (set); thence S 4° 00' E 189.00 feet to an iron (set); thence S 86° 00' W 638.80 feet to a spike in the center of said Route No. 619; thence N 4° 00' W 189.00 feet along the center of said Route No. 619 to a spike, the point of beginning.

Being in all respects a part or portion of the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, also known as G. L. Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 18th day of December, 1972, and recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 160, at page 61.

AND ALSO LESS and EXCEPT 14.63 acres, as described in unrecorded survey, by Kenneth O. Peterson, L.S. 1553 dated 9-19-1989, standing in the name of G.L. Parsons.

EXEMPTING from all mining operations a parcel of land used for a cemetery.

Subject property is referred to in the Dinwiddie County tax records as Tax Parcel Number 101-4.

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
<u>husband and wife</u>
**(Lessor)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1.  **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

    (a)   "Principal Minerals" means Ilmenite, Rutile and Zircon.

    (b)   "Minor Minerals" means Minerals other than Principal Minerals.

    (c)   "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

    (d)   "Sales Value per ton of each Mineral" means the amount per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

    (e)   "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

    (f)   "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

    (g)   "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2.  **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3.  **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

    (a)   The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

    (b)   Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

    (c)   Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

    (d)   Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

    (e)   A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

    The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4.  **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5.  **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6.  **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

    (a)   RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

    (b)   Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

        (i)     "Mining" - extracting and delivery of mineral sand ore to the concentrator;

        (ii)    "Concentrating" - removal of non-commercial material;

        (iii)   "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

    Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. *Royalty Payment Calculations*.

(a) Principal Minerals Sold

(i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v) The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c) Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8. *Commingling and Stockpiling*. 
RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to stockpile Minerals depending on market conditions.

## 9. *Sales to Affiliates*. 
RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10. *Most Favored Lessor*. 
If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Advance Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and if the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11. *Completion of Mining*.

(a) RGC will send Lessor written notice when it has completed Mining on the Property.

(b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d) If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12. *Advance Royalty Payment: "70% of Estimated Future Royalty Payments"*. 
At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or ___497,643___ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13. *No Reliance on Estimates or Representations*. 
Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

STD Lease
VA 8/89

## DEED OF MINING LEASE



761-1083

COPY

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on __October 13,__ 1989 by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife, Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.     Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.     Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.     Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.     Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:

(a)    To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b)    To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

(c)    To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d)    To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any courses in the Property any water from RGC's Operations;

(e)    To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f)    To use all easements, areas of access, and rights-of-way from and to the Property; and

(g)    To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.     Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall continue upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.     Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump-sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $24,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $24,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $24,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.     Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.     Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3500 per acre for all of the Property upon which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.     Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") of RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government abatement, subsidy, stabilization or conservation programs that may apply to the Property.

10.   **Safety.**  Except as otherwise provided in this Lease, only RGC employees and invitees authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted.  All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

11.   **RGC to Comply With Safety Laws and to Indemnify Lessor.**  RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations.  RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities.  RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities.  RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

12.   **RGC's Right to Determine Whether, When and Where to Mine.**  Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all.  RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence) and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

13.   **Compliance With Laws.**  RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

14.   **Reclamation.**  RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property.  RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law.  RGC will defend, indemnify and hold harmless Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease.  RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

15.   **Audit.**  Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit.  Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor.  Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

16.   **Taxes.**  Taxes will be apportioned and paid as follows:

   (a)   RGC will pay the following taxes or portions thereof:  any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

   (b)   Lessor will pay all other taxes related to the Property, including but not limited to:  any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

   (c)   Lessor will send RGC copies of all assessments, tax bills or other tax notice related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same.  Lessor will cooperate with RGC in any such protest or appeal.  RGC may, in its discretion, pursue such protest or appeal independently of Lessor.  RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

   (d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

17.   **Warranty of Title.**  Lessor warrants as follows:

   (a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

   (b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, and of record;

   (c)   Lessor has full power and authority to execute this Lease;

   (d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

   (e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

   (f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

18.   **Lessor Interest.**  In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title).  Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

19.   **Termination.**  RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination.  The termination will take effect upon the date specified in the notice.  Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination.  In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land.  After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land.  Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property.  Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

20.   **Title Documents.**  Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to:  title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way.  Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property.  At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease.  Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof.  Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

21.   **Compensation for Buildings.**

   (a)   **Principal Residence.**  If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so.  At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of the MAI or FHA-approved appraisers compiled by RGC.  Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal.  No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

- 2 -

410TEMP2

(b)  Other Buildings. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.  Third-Party Claims.  If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.  Additional and After-Acquired Rights.  If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.  Entireties.  If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.  Multiple Owners.  Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.  Assignment.  Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)  The party making such an assignment must give the other party prior written notice thereof;

(b)  The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)  Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)  Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)  No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.  Force Majeure.  Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.  No Broker.  Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from any liability with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.  Condemnation.  Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.  Dispute Resolution.  Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.  No Interference With RGC's Operations.  Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.  No Implied or Continuing Waiver.  If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.  Notices.  Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.  Entire Agreement; No Oral Modification.  This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.  Choice of Law.  This Lease will be construed, interpreted and governed by the laws of Virginia.

36.  Successors and Assigns.  This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.  Severability.  In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will (with respect to the provision that has been petitioned) the court or arbitrator to reform this provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and the Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.  Modification to Cure Any Violation of the Rule Against Perpetuities.  Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

-3-

39.   **Memorandum.**  At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record.  In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40.   **Mortgagee Consent.**  Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property.  Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41.   **Headings.**  The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42.   **Obligations That Survive This Lease.**  In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease:  Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43.   **Good Faith.**  During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

*G. L. Parson, Jr.* [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


*Mary Elizabeth Parson* [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of October, 1989, by G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife


My Commission Expires:

Octo. 28, 1981

*Thomas N. Berry*
Notary Public

[NOTARIAL SEAL]


RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott*

Its:   Vice                           President

[CORPORATE SEAL]

Attest: *[signature]*

Its: _____   Secretary


STATE OF    FLORIDA
COUNTY OF     CLAY

The foregoing instrument was acknowledged before me this 13 day of February, ~~1989,~~ 1990, by Daniel P. Wolcott as Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

*Ruth Robino*
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 23, 1993
~~Bonded Thru Troy Fain - Insurance Inc.~~

[NOTARIAL SEAL]


418TEMP2

- 4 -

VA 9/89

STATE OF VIRGINIA
COUNTY OF ___Sussex___

### MEMORANDUM OF MINING LEASE



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated ___October 13, 1989___
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.      RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.      Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.      The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.      During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.      The Lessor's name and address are:
        G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
        Route 1, Box 60
        Stony Creek, Virginia 23882

6.      RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

        IN  WITNESS  WHEREOF,  RGC  and  Lessor  have  executed  this  Memorandum  of  Lease  as of ___October 13, 1989___

LESSOR: *G. L. Parson, Jr.*

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


*Mary Elizabeth Parson*

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

CITY/COUNTY OF ___Sussex___

The foregoing instrument was acknowledged before me this 18th day of ___October___, 19 89
by ___G. L. Parson, Jr., and Mary___
___Elizabeth Parson, husband and___
___wife___


My Commission Expires: October 28, 1991

_____
Notary Public

[NOTARIAL SEAL]

---

RGC (USA) MINERALS INC.

By: *Daniel P. Wolcott*

Its: ___Vice___ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF ___FLORIDA___

CITY/COUNTY OF ___CLAY___

The  foregoing  instrument  was  acknowledged  before  me this  13 day  of  ___February___   19 90
by ___Daniel P. Wolcott___
as ___Vice___ President of RGC (USA)
MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission expires:

Notary Public

Notary Public, State of Florida
My Commission Expires May 21, 199__
Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

EXHIBIT A

Under the terms of the above-referenced mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, __Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to _55.00_ acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson Jr., by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ......all of that certain tract or parcel of land sold in bulk and not by acres, said to contain fifty (50) acres, be it the same more or less, and being in Stony Creek Magisterial District Sussex County, Virginia, with general warranty. Bounded and described as follows, on the North by Public Road leading from Concord Church to Stony Creek, On the East by the 'Old Man-love Tract' formerly owned by Camp Manufacturing Company, on the South by a branch and on the West by said public road leading from Concord Church to Stony Creek, Va."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter Harrison and wife, dated April 16, 1915 and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-17.

118

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

119

## EXHIBIT A

Under the terms of the above-referenced mining lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the ___ Stony Creek ___ Magisterial District, Sussex ___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 55.00 acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson Jr., by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ......all of that certain tract or parcel of land sold in bulk and not by acres, said to contain fifty (50) acres, be it the same more or less, and being in Stony Creek Magisterial District Sussex County, Virginia, with general warranty. Bounded and described as follows, on the North by Public Road leading from Concord Church to Stony Creek, On the East by the 'Old Man-love Tract' formerly owned by Camp Manufacturing Company, on the South by a branch and on the West by said public road leading from Concord Church to Stony Creek, Va."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter Harrison and wife, dated April 16, 1915 and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-17.

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
C. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)   "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)   "Minor Minerals" means Minerals other than Principal Minerals.

   (c)   "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains mineral-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)   "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)   "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)   "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)   "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)   The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)   Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)   Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)   Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e)   A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the Fiscal Year (July 1 - June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)   RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)   Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

       (i)    "Mining" - extracting and delivery of mineral sand ore to the concentrator;

       (ii)   "Concentrating" - removal of non-commercial material;

       (iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

RGCTEL003                                                    - 6 -

The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)   Within 30 days of the end of each Fiscal Year, KCC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7.   <u>Royalty Payment Calculations</u>.

   (a)   <u>Principal Minerals Sold</u>

      (i)    Within 30 days of the end of each Quarter, KCC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

      (ii)   The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

      (iii)  The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

      (iv)   KCC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

      (v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

   (b)   <u>Minor Minerals Sold</u>

      Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(iv) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

   (c)   <u>Adjustments</u>

      At the end of each Fiscal Year, KCC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8.   <u>Commingling and Stockpiling</u>.   KCC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in KCC's sole discretion from time to time stockpile Minerals depending on market conditions.

9.   <u>Sales to Affiliates</u>.   KCC may in its sole discretion sell part or all of its Minerals to affiliates of KCC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on KCC's sales to non-affiliates. If such non-affiliate sales are less than 50% of KCC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on KCC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 0623.0209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10.   <u>Most Favored Lessor</u>.   If KCC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of KCC's then-current estimate of the lessor's total Advance Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, KCC will within 30 days of the more favorable levels pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11.   <u>Completion of Mining</u>.

   (a)   KCC will send Lessor written notice when it has completed Mining on the Property.

   (b)   The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which KCC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 3 (Minimum Royalty) of the Lease.

   (c)   If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's final Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

   (d)   If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to KCC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above, or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12.   <u>Advance Royalty Payment: "70% of Estimated Future Royalty Payments"</u>.   At least one year before KCC commences Mining on the Property, KCC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or  75,193  tons and applying reasonably expected Recovery Rates and prices, KCC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Minerals in the Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13.   <u>No Reliance on Estimates or Representations</u>.   Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representations, estimates, or data, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 3 (Minimum Royalty) of the Lease applies only if KCC engages in Mining on the Property, and even then applies only to the total number of acres from which KCC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

-7-

5:1:TEMP2

123

STD Lease
VA 8/89

9G1-1034

COPY

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is  made  and  entered  into  on  __October 13,__ _____ 1989 ____ by  and

between __G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA__

__G. Lee Parson, Jr. and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA__

__Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife__

__Route 1, Box 60, Stony Creek, Virginia  23882__

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:

   (a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

   (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

   (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

   (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

   (f) To use all easements, means of access, and rights-of-way from and to the Property; and

   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

   Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined by the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $3,500.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $3,500.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $3,500.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC has to Lessor to make the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

3.5

124

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will not and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10. Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11. RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other Improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12. RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the requisite property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13. Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14. Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15. Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16. Taxes.** Taxes will be apportioned and paid as follows:

    (a)   RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

    (b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

    (c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

    (d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17. Warranty of Title.** Lessor warrants as follows:

    (a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

    (b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

    (c)   Lessor has full power and authority to execute this Lease;

    (d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

    (e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

    (f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18. Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19. Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20. Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, litigation, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21. Compensation for Buildings.**

    (a)   Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

-2-

(b)    Other Buildings. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    Third-Party Claims. If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.    Additional and After-Acquired Rights. If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    Entireties. If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    Multiple Owners. Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    Assignment. Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)    The party making such an assignment must give the other party prior written notice thereof;

(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration Operations or Reclamation on the Property;

(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    Force Majeure. Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approval, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.    No Broker. Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.    Condemnation. Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    Dispute Resolution. Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under the Lease, or interfere in any way with RGC's Operations.

31.    No Interference With RGC's Operations. Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.    No Implied or Continuing Waiver. If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.    Notices. Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier, as required above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    Entire Agreement; No Oral Modification. This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    Choice of Law. This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    Successors and Assigns. This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    Severability. In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform the provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    Modification to Cure Any Violation of the Rule Against Perpetuities. Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce this Lease as so reformed.

-3-

418T6MP2

**39.** *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** *Mortgage Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.** *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

*G L Parson, Jr* [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

*Mary Elizabeth Parson* [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF *Sussex*

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr., and Mary_ _Elizabeth Parson, husband and_ _wife_ _____

_____

_____

My Commission Expires:

_October 28, 1991_

*Thomas K. Reary*
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott*

Its: Vice _____ President

[CORPORATE SEAL]

Attest: *_____*

Its: _____ Secretary

STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_, 1989, 1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

*Ruth Robbins*
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)  "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)  "Minor Minerals" means Minerals other than Principal Minerals.

   (c)  "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)  "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the final sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)  "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)  "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)  "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)  The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)  Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)  Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)  Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e)  A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)  RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)  Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

      (i)   "Mining" - extracting and delivery of mineral sand ore to the concentrator;

      (ii)  "Concentrating" - removal of non-commercial material;

      (iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

419TEMP2

- 6 -

The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)   Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7.   **Royalty Payment Calculations.**

   (a)   Principal Minerals Sold

      (i)   Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

      (ii)   The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-in/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

      (iii)   The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

      (iv)   RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

      (v)   The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

   (b)   Minor Minerals Sold

      Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

   (c)   Adjustments

      At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionally from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8.   **Commingling and Stockpiling.** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9.   **Sales to Affiliates.** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06120209, 1982=100). Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10.   **Most Favored Lessor.** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre, or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11.   **Completion of Mining.**

   (a)   RGC will send Lessor written notice when it has completed Mining on the Property.
   (b)   The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 6 (Minimum Royalty) of the Lease.
   (c)   If that Stock Report reflects that all tons of Minerals attributed to the Property have been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).
   (d)   If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12.   **Advance Royalty Payment: "70% of Estimated Future Royalty Payments".** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling, data and survey information, the tons of Minerals located therein. Using this information and applying reasonably expected Recovery Rates and prices, RGC will estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13.   **No Reliance on Estimates or Representations.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 6 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

419TEMP2                                          -7-

129

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to MGC, and granted to MGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the _____ Stony Creek _____ Magisterial District, _Sussex_ _____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to _3.50_ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson (also known as G. Lee Parson, Sr.), by Warranty Deed, dated December 24, 1947, and recorded in Deed Book 44 at page 126, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track or parcel of land, with the appurtenances thereto belonging, containing Three and one-half (3 1/2) acres, more or less, lying, being and situate on both sides of the Milwaukee Road Little Mill Magisterial District, Sussex County, Va., and bounded as follows: On the North, East and West by lands of Lee Parson and on the South by the land of Willis Robinson, the said tract of land hereby conveyed being situate about 300 yards West of the present residence of said G. Lee Parson.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-14.

VX 8/89

STATE OF VIRGINIA
COUNTY OF ____ Sussex ____

### MEMORANDUM OF MINING LEASE



RCC (USA) Minerals Inc., a Delaware corporation, ("RCC") and

("Lessor") have entered into a Deed of Mining Lease dated ____ October 13, 1989 ____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.   RCC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.   Lessor has granted to RCC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.   The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.   During its term, Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.   The Lessor's name and address are:

G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
Route 1, Box 60
Stony Creek, Virginia  23882

6.   RCC's name and address are: RCC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN   WITNESS   WHEREOF,   RCC   and   Lessor   have   executed   this   Memorandum   of   Lease   as of ____ October 13, 1989 ____

LESSOR:   _G. L. Parson, Jr._

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

RCC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _____ Vice _____ President
[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF _FLORIDA_
CITY/COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this 13 day of February ____ 19 90 by Daniel P. Wolcott as _Vice_ President of RCC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:

_____
Notary Public

Notary Public, State of Florida
My Commission Expires May 21, 199_
Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

STATE OF VIRGINIA
CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_ ____ 19 _89_ by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_

My Commission Expires: _October 28, 1991_

_____
Notary Public

[NOTARIAL SEAL]

416TEMP2

132

STD Lease
VA 8/89

## DEED OF MINING LEASE


COPY

THIS DEED OF MINING LEASE including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on __October 13,__ 19__89__ by and between __G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA__ __G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA__ __Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife__ __Route 1, Box 60, Stony Creek, Virginia  23882__

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.   Defined Terms.**  Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.   Purpose.**  The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.   Grant of Lease.**  Lessor hereby leases to RGC the Property (as defined on Exhibit A) on the terms and conditions in this Lease.

**4.   Grant of Rights.**  Lessor grants to RGC the following exclusive rights with regard to the Property:

(a)   To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b)   To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

(c)   To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d)   To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

(e)   To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f)   To use all easements, means of access, and rights-of-way from and to the Property; and

(g)   To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.   Term of Lease.**  This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.   Initial Payment and Advance Royalty Payments.**  Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $4,170.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $4,170.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $4,170.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.   Royalty Payments.**  RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.   Minimum Royalty.**  If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.   Lessor's Use of the Property.**  During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, RGC will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

4.17

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.   Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other Improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.   Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, draining and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.   Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.** Taxes will be apportioned and paid as follows:

   (a)   RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

   (b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

   (c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

   (d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.   Warranty of Title.** Lessor warrants as follows:

   (a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

   (b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, and of record;

   (c)   Lessor has full power and authority to execute this Lease;

   (d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

   (e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

   (f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.   Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Released Land. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice wherever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

   (a)   **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

-2-

134

        (b)   Other Buildings. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

    **22.**   **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

    **23.**   **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

    **24.**   **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership in acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

    **25.**   **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

    **26.**   **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:
        (a)   The party making such an assignment must give the other party prior written notice thereof;
        (b)   The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;
        (c)   Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;
        (d)   Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and
        (e)   No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

    **27.**   **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, criminal action, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

    **28.**   **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

    **29.**   **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

    **30.**   **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

    **31.**   **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

    **32.**   **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

    **33.**   **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the [[ address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

    **34.**   **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

    **35.**   **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

    **36.**   **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

    **37.**   **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of this Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

    **38.**   **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

-3-

39. *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. *Mortgagee Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

**OWNER:**

_____ Parson, Jr. [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


Mary Elizabeth Parson [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife_
_____
_____

My Commission Expires:

_October 28, 1991_
_Thomas H. Rief_
Notary Public

[NOTARIAL SEAL]


**RGC (USA) MINERALS INC.:**

By: _Daniel P. Wolcott_

Its: _Vice_ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_, 1989, 1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robino_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 23, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]


418T2MP2

- 4 -

136

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___ Stony Creek ___ Magisterial District, __Sussex__ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to __4.17__ acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson (also known as G. Lee Parson, Sr.) by Warranty Deed, dated November 14, 1959, and recorded in Deed Book 59 at page 279, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing four and seventeen hundredths (4.17) acres by actual survey, and being shown and designated on a certain plat of survey, dated March 1, 1952, made by H.C. Prye, C.E., which said plat of survey is recorded in the aforesaid Clerk's Office in Plat Book 7, at page 26, and reference thereto is hereby invited for a more perfect description of the real estate herein conveyed; and being more particularly described on said plat as follows: Commencing on the West side of State Highway Route No. 619 at the Southeastern corner of a certain lot of land owned by B.J. Rideout, Jr.; thence S. 79° 30' W. 443 ft. to a point; thence South 24° 46' E. 494 ft. to a point; thence N. 62° 30' E. 465 ft. to a point; thence along Route 619 N. 30° 00' W. 370 ft. to the point of beginning; and being in all respects the same real estate that was conveyed to the parties of the first part, as husband and wife, by the entireties, with the right of survivorship as at common law, by deed from B.J. Rideout, Sr. and wife, and dated March 17, 1952, and recorded in the aforesaid Clerk's Office in Deed Book 48 at page 477.

The above stated land bequeathed and devised to Virgie Fraher Parson (also known as Virgie F. Parson) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

AND ALSO the above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of Virgie F. Parson (also known as Virgie Fraher Parson), deceased, in Will Book 31 at page 314 dated September 25, 1973, recorded October 15, 1982 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-3.

SPL Roy Pol
VA 8/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
__husband and wife__
**(Lessor)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

**I.** **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)   "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)   "Minor Minerals" means Minerals other than Principal Minerals.

(c)   "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d)   "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)   "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f)   "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g)   "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

**2.** **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

**3.** **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a)   The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b)   Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c)   Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d)   Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e)   A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

**4.** **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

**5.** **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

**6.** **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)   RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)   Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)   "Mining" - extracting and delivery of mineral sand ore to the concentrator;

(ii)   "Concentrating" - removal of non-commercial material;

(iii)   "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)     The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)     Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7.      *Royalty Payment Calculations*.

(a)     Principal Minerals Sold

(i)     Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)   The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)     The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)     Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)     Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8.      *Commingling and Stockpiling*. RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9.      *Sales to Affiliates*. RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10.     *Most Favored Lessor*. If RGC agrees, after signing this Lease, to pay a higher Initial Royalty Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to make retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11.     *Completion of Mining*.

(a)     RGC will send Lessor written notice when it has completed Mining on the Property.

(b)     The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)     If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)     If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12.     *Advance Royalty Payment: "70% of Estimated Future Royalty Payments"*. At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or ___9,304___ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13.     *No Reliance on Estimates or Representations*. Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

VA 8/89

STATE OF VIRGINIA
COUNTY OF ___Sussex___



### MEMORANDUM OF MINING LEASE

RCC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated ___October 13, 1989___
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.   RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.   Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.   The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.   During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.   The Lessor's name and address are:
     G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
     Route 1, Box 60
     Stony Creek, Virginia 23882

6.   RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN   WITNESS   WHEREOF,   RGC   and   Lessor   have   executed   this   Memorandum   of   Lease   as of ___October 13, 1989___

LESSOR: _G. L. Parson, Jr._____

_____
G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


_Mary Elizabeth Parson_____

_____
Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

CITY/COUNTY OF __Sussex__

The foregoing instrument was acknowledged before me this 18th day of _October_____, 19 8 9 by _G. L. Parson, Jr., and Mary_ _Elizabeth Parson, husband and_ _wife_ _____
_____

My Commission Expires: _October 28, 1991_
_Thomas H. Pitt_____
Notary Public

[NOTARIAL SEAL]


RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_____

Its: ____Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF ___FLORIDA___

CITY/COUNTY OF _____CLAY_____

The foregoing instrument was acknowledged before me this _13_ day of _February_____, 19 _90_ by _Daniel P. Wolcott___ as ____Vice_____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:

_____
Notary Public

Notary Public, State of Florida
My Commission Expires May 23, 19
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
<u>**AKA MRS. G. L. PARSON, JR., husband and wife**</u>
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

STD Lease
VA 8/89

# DEED OF MINING LEASE



**THIS DEED OF MINING LEASE,** including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into on ___October 13,___ 1989___ by and

between __G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA__

__G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA__

__Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife__

__Route 1, Box 60, Stony Creek, Virginia  23882___

("Lessor") and **RGC (USA) MINERALS INC.**, a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.** *Defined Terms.* Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.** *Purpose.* The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mixed shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.** *Grant of Lease.* Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.** *Grant of Rights.* Lessor grants to RGC the following exclusive rights with regard to the Property:
(a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");
(b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
(c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;
(d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;
(e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
(f) To use all easements, means of access, and rights-of-way from and to the Property; and
(g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.** *Term of Lease.* This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.** *Initial Payment and Advance Royalty Payments.* Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $223,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $223,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $223,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.** *Royalty Payments.* RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Value of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.** *Minimum Royalty.* If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds that total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.** *Lessor's Use of the Property.* During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

143

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10. Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11. RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings). Lessor will in no event be liable for special or consequential damages, and any payments otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12. RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13. Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14. Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, drying and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15. Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16. Taxes.** Taxes will be apportioned and paid as follows:

   (a)  RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

   (b)  Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

   (c)  Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

   (d)  RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17. Warranty of Title.** Lessor warrants as follows:

   (a)  Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

   (b)  The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

   (c)  Lessor has full power and authority to execute this Lease;

   (d)  RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

   (e)  There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

   (f)  This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18. Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19. Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20. Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurance or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor pays or has any discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21. Compensation for Buildings.**

   (a)  **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-

(b)   Other Buildings. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.   *Third-Party Claims.* If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sum deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.   *Additional and After-Acquired Rights.* If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.   *Entireties.* If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.   *Multiple Owners.* Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.   *Assignment.* Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)   The party making such an assignment must give the other party prior written notice thereof;

(b)   The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)   Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)   Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)   No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.   *Force Majeure.* Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornadoes, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.   *No Broker.* Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.   *Condemnation.* Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.   *Dispute Resolution.* Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.   *No Interference With RGC's Operations.* Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.   *No Implied or Continuing Waiver.* If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.   *Notices.* Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.   *Entire Agreement: No Oral Modification.* This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements which are not part of this Lease, by employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.   *Choice of Law.* This Lease will be construed, interpreted and governed by the laws of Virginia.

36.   *Successors and Assigns.* This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.   *Severability.* In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.   *Modification to Cure Any Violation of the Rule Against Perpetuities.* Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

- 3 -

**39.** *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** *Mortgagee Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.** *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson Jr_ [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_

My Commission Expires:

_October 28, 1991_

_Thomas H. Rice, Jr._
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _Vice_ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_, ~~1989~~, 1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

418TEMP2

-4-

146

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

147

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ___446.00___ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson, Jr., by Warranty Deed, dated March 22, 1960, and recorded in Deed Book 59 at page 524, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract of land, with all the improvements thereon and the appurtenances thereto belonging, lying, being and situate on the East side of the Nottoway River in Stony Creek Magisterial District, Sussex County, Virginia, containing eight hundred (800) acres, more or less, and bounded as follows: On the north by the lands now or formerly belonging to Slate, C.R. Chappell, Robinson and Camp Manufacturing Company; on the east by the lands now or formerly belonging to Otho Chappell, Henry Poole, G. Lee Parson, Sr. and the Wyatt Mill Road; on the South by the lands now or formerly belonging to J. E. Poole and the Nottoway River; and on the West by said Nottoway River and the land now or formerly belonging to the Camp Manufacturing Company; the land hereby conveyed is the same that was conveyed to G. Lee Parson, Sr. from J. Thompson Wyatt, Special Commissioner, by deed dated June 11th, 1946 recorded in the Circuit Court Clerk's Office of said County in Deed Book 42, at page 180; by deed from Francis E. Wyatt, and others, dated May 3, 1945, and recorded in said Clerk's Office in Deed Book 41 at page 137; by deed from William E. Anderson, unmarried, dated November 7th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 365, and by deed from Benjamin G. Anderson, unmarried, dated May 10th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 136.

The above described property was resurveyed by J. C. Shearin, dated March 20, 1972, recorded May 30, 1989 in Plat Book 18 at Page 6 in the Sussex County, Virginia records. The above stated deed recites 800.0 acres which is now corrected to recite 933.30 acres which is an increase of 133.30 acres, stated as follows: Tract No. 1 contains 50.0 acres, Tract No. 2 contains 343.0 acres, Tract No. 3 contains 379.0 acres and an open tract of land not presently surveyed containing approximately 161.30 acres, more or less.

LESS and EXCEPT from this tract of land the westerly portion thereof, containing 487.30 acres.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-36.

SPL Roy Pol
VA 8/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
**(Lessor)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

**1.** **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b) "Minor Minerals" means Minerals other than Principal Minerals.

(c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

(e) "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g) "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

**2.** **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

**3.** **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

**4.** **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

**5.** **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1–June 30) in which they were sold.

**6.** **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i) "Mining" - extracting and delivery of mineral sand ore to the concentrator;

(ii) "Concentrating" - removal of non-commercial material;

(iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

149

(c) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7. *Royalty Payment Calculations.*

   (a) <u>Principal Minerals Sold</u>

     (i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

     (ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

     (iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

     (iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

     (v) The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

   (b) <u>Minor Minerals Sold</u>

     Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

   (c) <u>Adjustments</u>

     At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8. *Commingling and Stockpiling.* RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9. *Sales to Affiliates.* RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06230209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10. *Most Favored Lessor.* If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels will then be prospective in nature until thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11. *Completion of Mining.*

   (a) RGC will send Lessor written notice when it has completed Mining on the Property.

   (b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 6 (Minimum Royalty) of the Lease.

   (c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

   (d) If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12. *Advance Royalty Payment: "70% of Estimated Future Royalty Payments".* At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 644,029 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13. *No Reliance on Estimates or Representations.* Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 6 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

STATE OF VIRGINIA
COUNTY OF ___Sussex___



### MEMORANDUM OF MINING LEASE

RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated ____October 13, 1989____

_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.     RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.     Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.     The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.     During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.     The Lessor's name and address are:

    G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
    Route 1, Box 60
    Stony Creek, Virginia  23882

6.     RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of ___October 13, 1989___

LESSOR: _G. L. Parson Jr_ (signature)

_G. L. Parson, Jr._
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ (signature)

_Mary Elizabeth Parson_
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

RGC (USA) MINERALS INC.

By: _____

Its: ___Vice___ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF ___FLORIDA___

CITY/COUNTY OF ___CLAY___

The foregoing instrument was acknowledged before me this 13 day of __February__, 1990 by _Daniel P. Wolcott_ as ___Vice___ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:

Notary Public, State of Florida
My Commission Expires May 21, 1993

_____
Notary Public

[NOTARIAL SEAL]

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of _October_, 1989 by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_

My Commission Expires: _October 28, 1991_

_____
Notary Public

[NOTARIAL SEAL]

COPY

416TEMP2

151

STD Lease
VA 8/89



## DEED OF MINING LEASE

**THIS DEED OF MINING LEASE**, including the attached Exhibits which are incorporated herein by this reference, ("Lease")
is made and entered into on _____October 13,_____ 19 89 by and
between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA
G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA
Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife
Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove
Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.** **_Defined Terms._** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term
and when it is capitalized will have the same meaning throughout this Lease.

**2.** **_Purpose._** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine,
remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other
property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: ilmenite,
Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to
any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.** **_Grant of Lease._** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and
conditions in this Lease.

**4.** **_Grant of Rights._** Lessor grants to RGC the following exclusive rights with regard to the Property:
   (a)   To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as
         "Exploration");
   (b)   To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other
         structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its
         absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to
         construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds,
         settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other
         structures and facilities on the Property; to take steps to prepare for mining on the Property; and to
         develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process,
         ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property
         in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
   (c)   To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from
         RGC's Operations;
   (d)   To use water from or appurtenant to the Property and to drain through and from the Property and to
         draw into any course in the Property any water from RGC's Operations;
   (e)   To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;
   (f)   To use all easements, means of access, and rights-of-way from and to the Property; and
   (g)   To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration,
         Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a
processing plant for the final separation of the concentrate into saleable Minerals.

**5.** **_Term of Lease._** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a)
the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons
other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to
commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is
automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate
upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive
days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in
effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.** **_Initial Payment and Advance Royalty Payments._** Subject to the terms and conditions of this Lease,
RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and
payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment | |
|---|---|---|---|
| Lease Date | Initial Payment | $250 per acre | *G.L.P Jr.* GLP, Jr. |
| Lease Date | Advance Royalty | $1,431.93 per acre | |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre | *M.E.P* MEP |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $107,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) | |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $107,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) | |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $107,000.00 lump sum, subject to 70% Limitation | |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) | |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty
Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty
Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full
any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.** **_Royalty Payments._** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the
Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and
paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.** **_Minimum Royalty._** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under
this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining
("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment
will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.** **_Lessor's Use of the Property._** During Exploration, Lessor and RGC will work together to accommodate
Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's
Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of
the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings,
irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC
notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.    Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.    RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.    RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.    Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.    Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.    Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.    Taxes.** Taxes will be apportioned and paid as follows:

(a)    RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income; capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)    Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal: RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.    Warranty of Title.** Lessor warrants as follows:

(a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, and of record;

(c)    Lessor has full power and authority to execute this Lease;

(d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.    Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.    Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.    Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills, conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.    Compensation for Buildings.**

(a)    Principal Residence. If RGC proposes to remove Lessor's principal residence or the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by paying a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-

(b)     Other Buildings. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.     **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.     **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.     **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.     **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.     **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)     The party making such an assignment must give the other party prior written notice thereof;

(b)     The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)     Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)     Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)     No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.     **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.     **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.     **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.     **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.     **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.     **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.     **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.     **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.     **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.     **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.     **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition for, will hereby be deemed to have petitioned the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.     **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

-3-

**39.** *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** *Mortgagee Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.** *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_____ [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_____ [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of _October_, 1989, by G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife

My Commission Expires:

October 28, 1991

_____
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _____

Its: Vice President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF FLORIDA
COUNTY OF CLAY

The foregoing instrument was acknowledged before me this 13 day of February, 1989, 1990, by Daniel P. Wolcott as Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_____
Notary Public

My Commission Expires Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

41STEMP2

-4-

155

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, __Sussex__ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to __125.00__ acres, and which is described as follows:

That same tract or parcel of land bequeathed to G. L. Parson, Jr. by Last Will and Testament of G. Lee Parson, Sr. (also known as G. L. Parson and also known as G. L. Parson, Sr.), dated May 3, 1966, recorded March 8, 1973, in Volume 23, page 430 through 436 of the Clerk's Office of Sussex Circuit Court, Sussex County, Virginia. To Wit:  The farm that I own, situate near Concord Church in Sussex County, Virginia, and known as "The Walter Harrison Farm", across State Road No. 619, from Berry Ridout Farm, the side where the home part is situated and containing approximately 125 acres.

ALSO, being that same tract or parcel of land conveyed to G. L. Parson, by Warranty Deed, dated February 8, 1924, and recorded in Deed Book 28 at page 519, in Clerk's Office of Circuit Court of Sussex County, Virginia.  To Wit:  ...... all that certain tract or parcel of land situated in the Stony Creek Magisterial District, County of Sussex, State of Virginia; containing one hundred and twenty five acres, more or less and bounded as follows:  on the North and West by the Walker's Mill Road, on the East by the lands of C. W. Parsons and Willis Roberson, (Willis Robinson) and on the South by the land of B. Wesley Barns and the public road leading to Stony Creek, Virginia.

EXEMPTING from this tract of land all mining operations for a cemetery, situated upon 0.50 acres, more or less and six (6) bulk barns, situated upon 2.00 acres more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-7.

SPL Roy Pol
VA 8/89

<div align="center">

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
<u>husband and wife</u>
**(Lessor)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

</div>

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. _**Definitions.**_ The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)   "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)   "Minor Minerals" means Minerals other than Principal Minerals.

   (c)   "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)   "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)   "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)   "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)   "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. _**Calculating Royalties.**_ This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. _**Stock Account and Stock Report.**_ From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)   The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)   Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)   Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)   Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payment) of the Lease;

   (e)   A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. _**Royalty Rate.**_ RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. _**Royalty Payment.**_ Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. _**Saleable Minerals Attributed to the Property.**_ Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)   RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)   Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

      (i)    "Mining" - extracting and delivery of mineral sand ore to the concentrator;

      (ii)   "Concentrating" - removal of non-commercial material;

      (iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)     The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)     Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7.    *Royalty Payment Calculations*

(a)    Principal Minerals Sold

(i)     Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)   The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)     The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)    Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)    Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8.    *Commingling and Stockpiling*.   RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9.    *Sales to Affiliates*.   RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10.    *Most Favored Lessor*.  If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the source of more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11.    *Completion of Mining*.

(a)     RGC will send Lessor written notice when it has completed Mining on the Property.
(b)     The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.
(c)     If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).
(d)     If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12.    *Advance Royalty Payment: "70% of Estimated Future Royalty Payments"*.  At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 495,939 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13.    *No Reliance on Estimates or Representations*.  Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands that the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

STATE OF VIRGINIA
COUNTY OF ____Sussex____

**MEMORANDUM OF MINING LEASE**



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated _____October 13, 1989_____
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.    The Lessor's name and address are:
·   G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
Route 1, Box 60
Stony Creek, Virginia  23882

6.    RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN   WITNESS   WHEREOF,   RGC   and   Lessor   have   executed   this   Memorandum   of   Lease   as
of _____October 13, 1989_____

LESSOR: _G. L. Parson, Jr._____

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_____

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA
CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 19 _89_ by _G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife_

My Commission Expires: _October 8, 1991_
_Thomas H. Clish_
Notary Public
[NOTARIAL SEAL]


RGC (USA) MINERALS INC.:
By: _Daniel P. Wolcott_
Its: _____Vice_____ President
[CORPORATE SEAL]
Attest: _____
Its: _____ Secretary

STATE OF ___FLORIDA___

CITY/COUNTY OF ___CLAY___

The foregoing instrument was acknowledged before me this _13_ day of _February_, 19 _90_, by _Daniel P. Wolcott_ as _____Vice_____ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:
_Ruth Hollins_
Notary Public

Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

416TEMP2

STD Lease
VA 8/89

## DEED OF MINING LEASE



COPY

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")
is made and entered into on _____October 13,_____ 1989_____ by and
between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA
G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA
Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife
Route 1, Box 60, Stony Creek, Virginia  23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove
Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations is a defined term
and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine,
remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other
property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite,
Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to
any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and
conditions in this Lease.

4. **Grant of Rights.** Lessor grants RGC the following exclusive rights with regard to the Property:

   (a)  To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as
   "Exploration");

   (b)  To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other
   structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its
   absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to
   construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds,
   settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other
   structures and facilities on the Property; to take steps to prepare for mining on the Property; and to
   develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process,
   ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property
   in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

   (c)  To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from
   RGC's Operations;

   (d)  To use water from or appurtenant to the Property and to drain through and from the Property and to
   draw into any course in the Property any water from RGC's Operations;

   (e)  To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

   (f)  To use all easements, means of access, and rights-of-way from and to the Property; and

   (g)  To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration,
   Operations and Reclamation on other property.

   Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a
processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a)
the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons
other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to
commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is
automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate
upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive
days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in
effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease,
RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and
payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $10,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty
Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty
Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full
any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the
Sales Values of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and
paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under
this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining
("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment
will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate
Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's
Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of
the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings,
irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC
notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.   Safety.**   Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.**   RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.**   Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.   Compliance With Laws.**   RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.**   RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.   Audit.**   Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's Fiscal Year (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.**   Taxes will be apportioned and paid as follows:

    (a)    RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

    (b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

    (c)    Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

    (d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.   Warranty of Title.**   Lessor warrants as follows:

    (a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

    (b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

    (c)    Lessor has full power and authority to execute this Lease;

    (d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

    (e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

    (f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   Lessor Interest.**   In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.   Termination.**   RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In those respects, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.**   Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

    (a)    **Principal Residence.**   If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

-2-

(b)     **Other Buildings.**  If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so.  At least 30 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals selected in the manner described in Section 21(a).  Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.     **Third-Party Claims.**  If RGC learns that a third party claims any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit.  The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.     **Additional and After-Acquired Rights.**  If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.     **Entireties.**  If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.     **Multiple Owners.**  Wherever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title.  Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.     **Assignment.**  Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)     The party making such an assignment must give the other party prior written notice thereof;

(b)     The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)     Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)     Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)     No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.     **Force Majeure.**  Neither party will be deemed in default under the Lease during any period in which its exercise of performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control.  Such an event is referred to in this Lease as "Force Majeure."  Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornadoes, winds, other damage from the elements, declared or undeclared war, strikes, labor dispute, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy.  The Term of this Lease will be extended for a period of time equal to the period of Force Majeure.  All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.     **No Broker.**  Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder.  In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.     **Condemnation.**  Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property.  Lessor will cooperate with RGC in defending or settling the same.  RGC may, in its discretion, defend its rights independently of Lessor.  Any condemnation award will be shared between Lessor and RGC as provided by law.  Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.     **Dispute Resolution.**  Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Any award of damages will be limited to actual, compensatory damages.  Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof.  Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim.  If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration.  The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect.  In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.     **No Interference With RGC's Operations.**  Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.     **No Implied or Continuing Waiver.**  If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.     **Notices.**  Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease.  All notices will be deemed to have been made when deposited in the mail or with the courier as provided above.  All notices will be deemed to have been received upon actual receipt by any person at the address listed above.  Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.     **Entire Agreement; No Oral Modification.**  This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral.  Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors.  This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.     **Choice of Law.**  This Lease will be construed, interpreted and governed by the laws of Virginia.

36.     **Successors and Assigns.**  This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.     **Severability.**  In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law.  If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.     **Modification to Cure Any Violation of the Rule Against Perpetuities.**  Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule.  If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

Document 1-1 Filed 07/07/25 Page 151 of 263 Page ID #:166

**39. Memorandum.** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40. Mortgagee Consent.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41. Headings.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42. Obligations That Survive This Lease.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43. Good Faith.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson Jr_ [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 1989, by G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife

My Commission Expires:

_____
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: Vice President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF FLORIDA
COUNTY OF CLAY

The foregoing instrument was acknowledged before me this 13 day of February, 1990, by Daniel P. Wolcott as Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robins_
Notary Public

My Commission Notary Public, State of Florida
My Commission Expires May 23, 1993
Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

418TEMP2

- 4 -

164

STD Lease
VA 8/89

# DEED OF MINING LEASE

 COPY

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into on _____October 13,_____ 19<u>89</u> by and

between <u>G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA</u>

<u>G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA</u>

<u>Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife</u>

<u>Route 1, Box 60, Stony Creek, Virginia 23882</u>

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1.   *Defined Terms.*  Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2.   *Purpose.*  The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products.  Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3.   *Grant of Lease.*  Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease:

4.   *Grant of Rights.*  Lessor grants to RGC the following exclusive rights with regard to the Property:

(a)   To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b)   To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, railings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

(c)   To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d)   To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

(e)   To take all steps to accomplish Reclamation (as defined in Section 16) of the Property;

(f)   To use all easements, means of access, and rights-of-way from and to the Property; and

(g)   To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5.   *Term of Lease.*  This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6.   *Initial Payment and Advance Royalty Payments.*  Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $10,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable.  The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC.  Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7.   *Royalty Payments.*  RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, RGC mines and sells.  The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8.   *Minimum Royalty.*  If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total.  Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9.   *Lessor's Use of the Property.*  During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property.  RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining.  Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property.  From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property.  During Reclamation, RGC will

165

SPL Roy Pol
VA 8/89

## EXHIBIT B
## TO
## MINING LEASE
### BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

### AND

### RGC (USA) MINERALS INC.
(RGC)

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b) "Minor Minerals" means Minerals other than Principal Minerals.

   (c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e) "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g) "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

      (i) "Mining" - extracting and delivery of mineral sand ore to the concentrator;

      (ii) "Concentrating" - removal of non-commercial material;

      (iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

      Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)     The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)     Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for that year.

## 7.   *Royalty Payment Calculations*

(a)    Principal Minerals Sold

(i)     Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)   The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)     The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)    Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)    Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8.   *Commingling and Stockpiling.* RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9.   *Sales to Affiliates.* RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (i) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10.  *Most Favored Lessor.* If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments resulting from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11.  *Completion of Mining.*

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.

(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12.  *Advance Royalty Payment: "70% of Estimated Future Royalty Payments"*  At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or __26,210__ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%); and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13.  *No Reliance on Estimates or Representations.* Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

S11TEMP2

-7-

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 10.00 acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson (also known as G. Lee Parson, Sr.), from M. L. Finney, as grantor, by Trustees Deed dated January 25, 1941 and recorded in Book 38 at page 100 in the Clerk's Office of Sussex Circuit Court.

The property is a small part of "The Wesley Barnes Farm", between the parsonage and the two branches down beside the public road and around the grave-yard to the road and back to the branch again, in fee-simple, as found in Deed Book 11, page 464, Deed Book 5, page 613, Deed Book 11, page 196 and Deed Book 22 page 409.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr. deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

EXEMPTING from all mining operations a one acre parcel of land lying in a southerly direction from the present cemetery adjacent to this tract of land. This parcel of land is presently unsurveyed and is to be used as a cemetery.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-6.

169

STATE OF VIRGINIA
COUNTY OF _____ Sussex _____

### MEMORANDUM OF MINING LEASE



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated _____ October 13, 1989 _____
_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

    1.   RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

    2.   Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

    3.   The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

    4.   During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

    5.   The Lessor's name and address are:

        G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
        Route 1, Box 60
        Stony Creek, Virginia 23882

    6.   RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of _____ October 13, 1989

LESSOR: *G. L. Parson Jr.*       RGC (USA) MINERALS INC.:

                                  By: *Daniel P. Wolcott*

G. L. Parson, Jr.
(Print Name)               Its: _____ Vice _____ President
AKA George Lee Parson, Jr.
AKA G. L. Parson             [CORPORATE SEAL]
AKA G. Lee Parson, Jr.

                            Attest: _____

                            Its: _____ Secretary

*Mary Elizabeth Parson*

Mary Elizabeth Parson       STATE OF   FLORIDA
(Print Name)
AKA Mary Butterworth Parson    CITY/COUNTY OF   CLAY
AKA Mary B. Parson
AKA Mary E. Parson          The foregoing instrument was acknowledged before me
AKA Mrs. G. L. Parson, Jr.     this 13 day of _____ February _____ 19 90
                           by Daniel P. Wolcott
                           as _____ Vice _____ President of RGC (USA)
                           MINERALS INC., a Delaware corporation, on behalf of the
                           corporation.

STATE OF VIRGINIA            My Commission Expires:    Notary Public, State of Florida
~~CITY~~/COUNTY OF *Sussex*           My Commission Expires May 21, 1993
                        Bonded Thru Troy Fain - Insurance Inc.
The foregoing instrument was acknowledged before
me this 18th day of _____ October _____ 19 89     Notary Public
by _____ G. L. Parson, Jr. and Mary
    Elizabeth Parson, husband and      [NOTARIAL SEAL]
    wife

My Commission Expires: October 28, 1991
*Thomas N. Berry*
Notary Public
[NOTARIAL SEAL]

416TEMP2



761-1040

STD Lease
VA 8/89

## DEED OF MINING LEASE

COPY

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on __October 13,__ 1989 by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wi Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.** *Defined Terms.* Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.** *Purpose.* The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.** *Grant of Lease.* Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.** *Grant of Rights.* Lessor grants to RGC the following exclusive rights with regard to the Property:

  (a)  To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

  (b)  To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or other obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

  (c)  To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

  (d)  To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

  (e)  To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

  (f)  To use all easements, means of access, and rights-of-way from and to the Property; and

  (g)  To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.** *Term of Lease.* This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which the Lease is in effect, and in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.** *Initial Payment and Advance Royalty Payments.* Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $880.20 ~~$750~~ per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $ 16,500.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $ 16,500.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $ 16,500.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.** *Royalty Payments.* RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Value of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.** *Minimum Royalty.* If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.** *Lessor's Use of the Property.* During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's operations will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

171

16.5

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.    Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.    RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.    RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.    Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.    Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.    Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given) if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments (for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.    Taxes.** Taxes will be apportioned and paid as follows:

(a)    RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)    Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.    Warranty of Title.** Lessor warrants as follows:

(a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)    Lessor has full power and authority to execute this Lease;

(d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property, or activities relating thereto; and

(f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.    Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.    Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations, and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Released Land. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.    Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.    Compensation for Buildings.**

(a)    Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor will thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-

418TEMP2

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.    **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)    The party making such an assignment must give the other party prior written notice thereof;

(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor dispute, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market price of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

28.    **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.    **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.    **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.    **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.    **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    **Entire Agreement: No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

-3-

39. **Memorandum**. At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. **Mortgagee Consent**. Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. **Headings**. The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. **Obligations That Survive This Lease**. In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. **Good Faith**. During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

*G L Parson, Jr* [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

*Mary Elizabeth Parson* [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_ 1989, by _G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife_

_____

My Commission Expires:

_October 28, 1991_

_Thomas H. Ray_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: *Daniel P. Wolcott*

Its: _Vice_ President
(CORPORATE SEAL)

Attest: _____

Its: _____ Secretary

STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_ 1989, 1990 by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

*Ruth Robbins*
Notary Public

My Commission Expires:

Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

**AND**

**RGC (USA) MINERALS INC.**
(RGC)

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

    (a)    "Principal Minerals" means Ilmenite, Rutile and Zircon.

    (b)    "Minor Minerals" means Minerals other than Principal Minerals.

    (c)    "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent change in the acreage of the Mineralized Property will not affect the lump sum payments.

    (d)    "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

    (e)    "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

    (f)    "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

    (g)    "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

    (a)    The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

    (b)    Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

    (c)    Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

    (d)    Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

    (e)    A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

    (a)    RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

    (b)    Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

        (i)     "Mining" - extracting and delivery of mineral sand ore to the concentrator;

        (ii)    "Concentrating" - removal of non-commercial material;

        (iii)   "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

    Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for this year.

**7.   Royalty Payment Calculations.**

(a)  Principal Minerals Sold

(i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)  Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)  Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionally from All Stock Accounts. If the actual production exceeds the attributed production, then this excess will be allocated proportionately among All Stock Accounts.

**8.   Commingling and Stockpiling.** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9.   Sales to Affiliates.** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index – Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10.  Most Favored Lessor.** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a Lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the value upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

**11.  Completion of Mining.**

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.

(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to such date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account (in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12.  Advance Royalty Payment: "70% of Estimated Future Royalty Payments".** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 51, 388 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to 70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13.  No Reliance on Estimates or Representations.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Lease and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

511TEMP2         -7-

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ___16.50___ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated April 15, 1960, and recorded in Deed Book 59 at page 579, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All "that certain tract or parcel of land lying and being situate in the County of Sussex and State of Virginia containing sixteen and five tenths acres (16.5) more or less and herein after described as follows: Beginning at an iron stob on the Cabin Point Road, running thence along the said Road South 79° 15' East 983 feet, thence North 32° 00' East 343 feet along the said Road, thence North 7° 00' West 1013 feet to a pine tree, thence South 41° 45' West 1537 feet to the point of beginning.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-13.

VA 8/89

STATE OF VIRGINIA

COUNTY OF ___Sussex___

### MEMORANDUM OF MINING LEASE



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated ___October 13, 1989___

_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.  RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.  Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.  The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.  During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.  The Lessor's name and address are:

    G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
    Route 1, Box 60
    Stony Creek, Virginia  23882

6.  RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of ___October 13, 1989___.

LESSOR: *G. L. Parson Jr.*

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

*Mary Elizabeth Parson*

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

RGC (USA) MINERALS INC.:

By: _____

Its: ___Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF ___FLORIDA___

CITY/COUNTY OF ___CLAY___

The foregoing instrument was acknowledged before me this 13 day of ___February___, 19 90, by ___Daniel P. Wolcott___ as ___Vice___ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:

Notary Public, State of Florida
My Commission Expires May 23, 1993
Bonded Thru Troy Fain Insurance Inc.

_____
Notary Public

[NOTARIAL SEAL]

STATE OF VIRGINIA

CITY/COUNTY OF ___Sussex___

The foregoing instrument was acknowledged before me this 18th day of ___October___, 19 89 by ___G. L. Parson, Jr., and Mary Elizabeth Parson, husband and wife___

_____

My Commission Expires: October 28, 1991

_____
Notary Public

[NOTARIAL SEAL]

416TEMP2

179

STD Lease
VA 8/89

COPY

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into on _____October 13,_____ 1989 _____ by and

between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA

G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA

Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife

Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.   *Defined Terms.*** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.   *Purpose.*** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.   *Grant of Lease.*** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.   *Grant of Rights.*** Lessor grants to RGC the following exclusive rights with regard to the Property:

(a)   To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b)   To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings) other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property within Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

(c)   To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d)   To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

(e)   To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f)   To use all easements, means of access, and rights-of-way from and to the Property; and

(g)   To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.   *Term of Lease.*** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.   *Initial Payment and Advance Royalty Payments.*** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of the Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment | |
|---|---|---|---|
| Lease Date | Initial Payment | $250 per acre | *GLP, Jr.* |
| Lease Date | Advance Royalty   $842.11 | $750 per acre | |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre | *MEP* |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $ 145,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) | |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $ 145,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) | |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $ 145,000.00 lump sum, subject to 70% Limitation | |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) | |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.   *Royalty Payments.*** RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.   *Minimum Royalty.*** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.   *Lessor's Use of the Property.*** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.** _Safety._ Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.** _RGC to Comply With Safety Laws and to Indemnify Lessor._ RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.** _RGC's Right to Determine Whether, When and Where to Mine._ Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.** _Compliance With Laws._ RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.** _Reclamation._ RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.** _Audit._ Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.** _Taxes._ Taxes will be apportioned and paid as follows:

    (a)  RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

    (b)  Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

    (c)  Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

    (d)  RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.** _Warranty of Title._ Lessor warrants as follows:

    (a)  Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

    (b)  The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

    (c)  Lessor has full power and authority to execute this Lease;

    (d)  RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

    (e)  There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

    (f)  This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.** _Lessor Interest._ In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.** _Termination._ RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.** _Title Documents._ Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, lien, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.** _Compensation for Buildings._

    (a)  **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-

418TEMP2

(b)   Other Buildings. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.   Third-Party Claims. If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.   Additional and After-Acquired Rights. If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.   Entireties. If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations under the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.   Multiple Owners. Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.   Assignment. Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)   The party making such an assignment must give the other party prior written notice thereof;

(b)   The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)   Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)   Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)   No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.   Force Majeure. Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as a "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.   No Broker. Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.   Condemnation. Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.   Dispute Resolution. Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.   No Interference With RGC's Operations. Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.   No Implied or Continuing Waiver. If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.   Notices. Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.   Entire Agreement; No Oral Modification. This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.   Choice of Law. This Lease will be construed, interpreted and governed by the laws of Virginia.

36.   Successors and Assigns. This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.   Severability. In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.   Modification to Cure Any Violation of the Rule Against Perpetuities. Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

418TEMP2

-3-

**39.** **Memorandum.** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** **Mortgagee Consent.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** **Headings.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** **Obligations That Survive This Lease.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.** **Good Faith.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

**IN WITNESS WHEREOF,** the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson, Jr._ [SEAL]

G. L. Parson, Jr.
(Print Name)
    AKA George Lee Parson, Jr.
    AKA G. L. Parson
    AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
    AKA Mary Butterworth Parson
    AKA Mary B. Parson
    AKA Mary E. Parson
    AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

~~CITY~~/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife_

_____
_____
_____

My Commission Expires: _October 28, 1991_

_Hyman H. Perry_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _Vice_____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF ___FLORIDA___
COUNTY OF ___CLAY___

The foregoing instrument was acknowledged before me this _13_ day of _February_ ~~1989~~, 1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Rollins_
Notary Public

My Commission Expires _Notary Public, State of Florida_
_My Commission Expires May 21, 1993_
_Bonded Thru Troy Fain - Insurance Inc._

[NOTARIAL SEAL]

415TEMP2

STATE OF VIRGINIA
COUNTY OF ___Sussex___

**MEMORANDUM OF MINING LEASE**



RGC (USA) Minerals Inc., a Delaware corporation, ("RGC") and

("Lessor") have entered into a Deed of Mining Lease dated _____October 13, 1989_____

_____ ("Lease"), the terms of which are incorporated herein by reference. The Lease provides among other things that:

1.    RGC, as tenant, has leased from Lessor, as landlord, the Property described on Exhibit A to the Lease, which exhibit is also attached hereto as Exhibit A.

2.    Lessor has granted to RGC the right to explore for and mine various minerals on and under the Property and to conduct mining-related operations on the Property.

3.    The term of the Lease begins on the date of the Lease set forth above and continues for a period of 20 years, unless earlier terminated or temporarily extended pursuant to the Lease.

4.    During its term, the Lease is binding upon any successors to all or any portion of Lessor's interest in the Property.

5.    The Lessor's name and address are:

G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife
Route 1, Box 60
Stony Creek, Virginia  23882

6.    RGC's name and address are: RGC (USA) Minerals, Inc., Attention: Land Manager, Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043.

IN WITNESS WHEREOF, RGC and Lessor have executed this Memorandum of Lease as of _____October 13, 1989_____

LESSOR:

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.


Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_ 19_89_ by _G. L. Parson, Jr., and Mary_ _Elizabeth Parson, husband and_ _wife_ _____

My Commission Expires: _October 28, 1991_

Notary Public

[NOTARIAL SEAL]


RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _Vice_ _____ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary

STATE OF _FLORIDA_

CITY/COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_, 19_90_, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

My Commission Expires:

Notary Public

Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

416TEMP2

184

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
(LESSOR)


**AND**

**RGC (USA) MINERALS INC.**
(RGC)

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to __200.00__ acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson, Jr. by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ...... all that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing, by estimation, two hundred (200) acres, and bounded as follows: On the North by G. Lee Parson; on the East by W. S. Barnes; on the South by the public road leading from Stewart's to Concord Church; on the West by R. C. Chappell and said public road leading from Stewart's to Concord Church and Wesley Barnes, reserving a certain road or passage-way which leads from the house now owned by W. S. Barnes through said tract of land to the public road at the forks of the road, on of which leads to Purdy, as and for an outlet of the occupants of the said house now occupied by W. S. Barnes, with the right or privilege of the purchaser of straightening said road, if he shall so desire."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from John H. Cole, Special Commissioner, dated June 1, 1927, and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 31 at page 244.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-31.

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
__husband and wife__
**(Lessor)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. *Definitions.* The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)   "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)   "Minor Minerals" means Minerals other than Principal Minerals.

   (c)   "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)   "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)   "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)   "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)   "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. *Calculating Royalties.* This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. *Stock Account and Stock Report.* From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)   The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)   Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)   Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)   Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e)   A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. *Royalty Rate.* RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. *Royalty Payment.* Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the Fiscal Year (July 1 - June 30) in which they were sold.

6. *Saleable Minerals Attributed to the Property.* Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)   RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)   Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

      (i)     "Mining" - extracting and delivery of mineral sand ore to the concentrator;

      (ii)    "Concentrating" - removal of non-commercial material;

      (iii)   "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

      Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

188

  .J    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. Royalty Payment Calculations.

**(a)**    <u>Principal Minerals Sold</u>

(I)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(II)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(III)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

**(b)**    <u>Minor Minerals Sold</u>

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

**(c)**    <u>Adjustments</u>

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8. Commingling and Stockpiling. 
RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9. Sales to Affiliates. 
RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10. Most Favored Lessor. 
If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11. Completion of Mining.

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.

(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12. Advance Royalty Payment: "70% of Estimated Future Royalty Payments". 
At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or ___601,915___ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13. No Reliance on Estimates or Representations. 
Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**


**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

STD Lease
VA 8/89

96-1043



### DEED OF MINING LEASE

**THIS DEED OF MINING LEASE**, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on ____October 13,____ 19**89**____ by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.** *Defined Terms.* Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.** *Purpose.* The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.** *Grant of Lease.* Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.** *Grant of Rights.* Lessor grants to RGC the following exclusive rights with regard to the Property:

(a)   To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b)   To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

(c)   To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d)   To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

(e)   To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f)   To use all easements, means of access, and rights-of-way from and to the Property; and

(g)   To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.** *Term of Lease.* This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary termination, to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.** *Initial Payment and Advance Royalty Payments.* Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $65,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $65,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $65,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.** *Royalty Payments.* RGC will pay to Lessor quarterly Royalty Payments equal to eight percent (8%) of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.** *Minimum Royalty.* If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such payment. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.** *Lessor's Use of the Property.* During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

COPY

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

10.   *Safety.*   Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

11.   *RGC to Comply With Safety Laws and to Indemnify Lessor.*   RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

12.   *RGC's Right to Determine Whether, When and Where to Mine.*   Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

13.   *Compliance With Laws.*   RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

14.   *Reclamation.*   RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

15.   *Audit.*   Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of its report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

16.   *Taxes.*   Taxes will be apportioned and paid as follows:

(a)   RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

17.   *Warranty of Title.*   Lessor warrants as follows:

(a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)   Lessor has full power and authority to execute this Lease;

(d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

18.   *Lessor Interest.*   In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

19.   *Termination.*   RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

20.   *Title Documents.*   Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

21.   *Compensation for Buildings.*

(a)   *Principal Residence.*   If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

418TEMP2

- 2 -

(b)     <u>Other Buildings</u>. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.     <u>Third-Party Claims</u>. If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.     <u>Additional and After-Acquired Rights</u>. If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.     <u>Entireties</u>. If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations in the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.     <u>Multiple Owners</u>. Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.     <u>Assignment</u>. Both parties have the right to assign their rights and obligations under this Lease, in whole or in part provided, however, that:

    (a)     The party making such an assignment must give the other party prior written notice thereof;

    (b)     The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

    (c)     Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

    (d)     Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

    (e)     No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.     <u>Force Majeure</u>. Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.     <u>No Broker</u>. Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.     <u>Condemnation</u>. Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.     <u>Dispute Resolution</u>. Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.     <u>No Interference With RGC's Operations</u>. Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.     <u>No Implied or Continuing Waiver</u>. If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33.     <u>Notices</u>. Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.     <u>Entire Agreement: No Oral Modification</u>. This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.     <u>Choice of Law</u>. This Lease will be construed, interpreted and governed by the laws of Virginia.

36.     <u>Successors and Assigns</u>. This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.     <u>Severability</u>. In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.     <u>Modification to Cure Any Violation of the Rule Against Perpetuities</u>. Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

-3-

418TEMP2

39. *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. *Mortgage Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson, Jr._ [SEAL]

G. L. Parson, Jr.
(Print Name)
   AKA George Lee Parson, Jr.
   AKA G. L. Parson
   AKA G. Lee Parson, Jr.


_Mary Elizabeth Parson_ [SEAL]

Mary Elizabeth Parson
(Print Name)
   AKA Mary Butterworth Parson
   AKA Mary B. Parson
   AKA Mary E. Parson
   AKA Mrs. G. L. Parson, Jr.


STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this _18th_ day of _October_, 1989, by _G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife_

My Commission Expires:

_October 28, 1991_

_Thomas H. Ray_
Notary Public

[NOTARIAL SEAL]


RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _Vice_ President

[CORPORATE SEAL]

Attest: _____

Its: _____ Secretary


STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me this _13_ day of _February_ 1989-1990, by _Daniel P. Wolcott_ as _Vice_ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robbins_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993.
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]


418TEMP2

-4-

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN

G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)

AND

RGC (USA) MINERALS INC.
(RGC)

# EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 187.00 acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson, Jr. by Warranty Deed, dated February 16, 1970, and recorded in Deed Book 73 at page 600, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract, piece or parcel of land, lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing one hundred and eighty-seven (187) acres, more or less, adjoining the lands of Markham B. Chappell; Old Eppes Tract; Green Church Road; and Wyatt Mill Road, being in all respects the same land which was devised unto Nannie B. Chappell by John E. Stewart, as will be seen by reference to the first clause of his last will and testament, of record in the clerk's Office of the Circuit Court of Sussex County, Virginia, except a portion thereof, containing about twenty-five (25) acres, which was conveyed to Nannie B. Chappell to Markham B. Chappell by deed recorded in the aforesaid Clerk's Office in Deed Book 27, at page 323; and being in all respects the same real estate conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, from John H. Cole, Special Commissioner, by deed dated the 29th day of December, 1934, and recorded in the aforesaid Clerk's Office in Deed Book 34, at page 283.

EXEMPTING from this tract of land three (3) bulk barns, situated upon two (2) acres, more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-38.

196

SPL Roy Pol
VA 8/89

## EXHIBIT B
## TO
## MINING LEASE
### BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
### husband and wife
#### (Lessor)

### AND

### RGC (USA) MINERALS INC.
#### (RGC)

### RGC's Royalty Policy for Virginia Operations

### COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **_Definitions._** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b) "Minor Minerals" means Minerals other than Principal Minerals.

   (c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e) "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g) "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **_Calculating Royalties._** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **_Stock Account and Stock Report._** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **_Royalty Rate._** RGC will pay Lessor a Royalty Payment equal to eight percent (8%) of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **_Royalty Payment._** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. **_Saleable Minerals Attributed to the Property._** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

      (i) "Mining" - extracting and delivery of mineral sand ore to the concentrator;

      (ii) "Concentrating" - removal of non-commercial material;

      (iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

-6-

(c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7.    *Royalty Payment Calculations*.

(a)    Principal Minerals Sold

(i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)    The Royalty Payment payable to Lessor for the Quarter will equal eight percent (8%) of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)    Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)    Adjustments

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

**8.    *Commingling and Stockpiling*.** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9.    *Sales to Affiliates*.** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10.    *Most Favored Lessor*.** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of Lessor's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11.    *Completion of Mining*.

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.
(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.
(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).
(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12.    *Advance Royalty Payment: "70% of Estimated Future Royalty Payments"*.** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or ___88.635___ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the eight percent (8%) royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13.    *No Reliance on Estimates or Representations*.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

511TRMP2

-7-

# EXHIBIT D

June, 30 2023

To: Iluka Resources, Inc. Via registered agent: CT Corporation System 1200 S Pine Island Road Plantation, FL 33324

Dear Sir:

You are hereby notified that the royalty payment address of PO Box 170225 Boston, MA 02117 with corresponding street address of 133 Clarendon St #170225 Boston, MA 02117 which were previously changed are now changed to 481 N Santa Cruz Ave #178 Los Gatos, CA 95030; accordingly, the 7548 South US Hwy 1 #198 Port St Lucie, FL 34952 address for Betty has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address and the 2625 Alcatraz Ave #179 Berkeley, CA 94705 address for Laurence has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address.

As we previously notified you, the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc. may be rescinded in central Los Angeles, CA, Culver City, CA, Berkeley, CA, San Francisco, CA, and Santa Clara County, CA and the Superior Court for Santa Clara County, CA is the repository for all rescission money. For reference, there are ten leases that the minerals conveyed by the 97 Deed were conveyed subject to, and said leases have memorandums of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, and we hereby again notify you that said leases may be rescinded and hereby notify you that such rescission may be in any of the following venues: Culver City, CA, Berkeley, CA, or San Francisco, CA.

This document is not a waiver of any rights held by Betty P. Graham.  This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved.

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham for Laurence J. Graham: _____

Laurence J. Graham as attorney-in-fact for Betty P. Graham: _____

UNITED STATES POSTAL SERVICE.

MIDTOWN
301 UNION ST
SEATTLE, WA 98101-9998
(800)275-8777

/30/2023                    05:13 PM

oduct          Qty   Unit    Price
                     Price

iority Mail®      1           $12.55
Fort Lauderdale, FL 33324
Weight: 0 lb 0.30 oz
Expected Delivery Date
Mon 07/03/2023
Insurance                    $0.00
Up to $100.00 included
Certified Mail®              $4.15
Tracking #:
9589 0710 5270 0702 8236 45
Affixed Postage              -$0.63
Affixed Amount: $0.63

tal                          $16.07

and Total:                   $16.07

sh                           $50.00
ange                        -$33.93

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

ext your tracking number to 28777 (2USPS)
o get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811.

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
scan this code with your mobile device,

To: Iluka Resources, Inc. Via registered agent: CT Corporation System 1200 S Pine Island Road Plantation, FL 33324

Dear Sir:

You are hereby notified that the royalty payment address of PO Box 170225 Boston, MA 02117 with corresponding street address of 133 Clarendon St #170225 Boston, MA 02117 which were previously changed are now changed to 481 N Santa Cruz Ave #178 Los Gatos, CA 95030; accordingly, the 7548 South US Hwy 1 #198 Port St Lucie, FL 34952 address for Betty has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address and the 2625 Alcatraz Ave #179 Berkeley, CA 94705 address for Laurence has been replaced by this 481 N Santa Cruz Ave #178 Los Gatos, CA 95030 address.

As we previously notified you, the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc. may be rescinded in central Los Angeles, CA, Culver City, CA, Berkeley, CA, San Francisco, CA, and Santa Clara County, CA and the Superior Court for Santa Clara County, CA is the repository for all rescission money. For reference, there are ten leases that the minerals conveyed by the 97 Deed were conveyed subject to, and said leases have memorandums of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, and we hereby again notify you that said leases may be rescinded and hereby notify you that such rescission may be in any of the following venues: Culver City, CA, Berkeley, CA, or San Francisco, CA, and Santa Clara County, CA. 1S BPG 6/30/23

This document is not a waiver of any rights held by Betty P. Graham. This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved. 7/01/23

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P. Graham*   *Betty P. Graham* 7/01/2

Laurence J. Graham for Laurence J. Graham: _____

Laurence J. Graham as attorney-in-fact for Betty P. Graham: _____ 7/01/23



Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324.

This letter will be mailed by USPS certified mail Adult signature requested to Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 and served,

1/30/24

Officers:

We have not received any indication that you are ready to admit to the liability that you have to us so we write this letter.

Iluka Resources, Inc. (hereinafter "Iluka") is already in receipt of a copy of Betty P. Graham's FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham may be referred to as "Betty" herein. I may be referred to as "Laurence" herein.

I, Betty Patrick Graham, may be referred to as Betty P. Graham herein; and, I Betty Patrick Graham may be referred to as Betty herein.

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") which, by its written language, is said to be drafted by one attorney who, although we did not know it at the time, had a history of performing work for RGC (USA) Minerals, Inc. (hereinafter, "RGC"); but, we did know that he was working on the 97 Deed with RGC and that the McGuire Woods law firm was involved.

With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the

maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). The 97 Deed severed the 1,169.86 acre lease from the 1,196.61 acre lease that Betty's parents and RGC entered into.

Accordingly, Betty P. Graham, Julia P. Boyd, and Ann P. Everett were each conveyed title to a separate one-third share of the tangible real property minerals located below the surface of ten parcels of land totaling more than 1,150 acres of land by the 97 Deed together with the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals, and each of them also received one-third of the royalties due under the Leases by the 97 Deed except for the next two annual advance royalty payments.

We allege that the Leases, pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of ten parcels of land totaling more than 1,150 acres of land and later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land, have been rescinded; however, if Iluka currently claims that said Leases, pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of ten parcels of land totaling more than 1,150 acres of land and later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land, have not been rescinded, they are claiming that it has a duty to deliver royalties and our address for receipt of all such royalties is 2210 W Sunset Blvd PMB 201 Los Angeles, CA 90026 c/o Laurence John Graham; **if Iluka currently claims that any of the ten October 13, 1989 Deeds of Mining Lease,** (pertaining to the one-third share of the

minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of the ten parcels of land listed in the 97 Deed that were later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land), **have not been rescinded, Iluka is thereby claiming that it has a duty to deliver royalties and our address for receipt of all such royalties is 2210 W Sunset Blvd PMB 201 Los Angeles, CA 90026 c/o Laurence John Graham** however, **this change is made without any agreement from us that the Leases,** pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed which were located below the surface of ten parcels of land listed in the 97 Deed and later recovered, as saleable minerals, from the ore that Iluka extracted from those ten parcels of land, **have not been rescinded as we allege that they have been rescinded;** accordingly, all changes made herein are done with the reservation of all rights and claims; all rights are reserved.

You have been served our 1/7/24 VERIFIED AMENDED COMPLAINT FOR RESCISSION OF CONTRACT[S]; AND, DEMAND FOR JURY TRIAL. As you know, you are involved in a massive fraud that is clearly one of largest examples of criminal racketeering by corporations in the modern era and it has caused us severe harm and loss; we are going to get justice against you; and, DuPont de Nemours, Inc.; and, The Dow Chemical Company (also known as Dow, Inc.); and, The Chemours Company; and, Corteva, Inc.; and, DOES 1-25, inclusive in court as we are going to file the 1/7/24 VERIFIED AMENDED COMPLAINT FOR RESCISSION OF CONTRACT[S]; AND, DEMAND FOR JURY TRIAL in the SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF SAN FRANCISCO.

Sincerely,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

Laurence J. Graham for Laurence J. Graham: *Larry Graham*

Laurence John Graham for Laurence John Graham: *Larry Graham*

FedEx Office.

Address:
3225 FILLMORE ST
SAN FRANCISCO
CA 94123
SFOKK
-BTC01

Location:
SFOKK
-BTC01
Device ID:
9403872962276
Transaction:

FedEx 2Day AM
Tracking Number:                          51.29
2704128076669         0.15 lb (S)
Declared Value         0
Recipient Address:
ILUKA RESOURCES, INC.
C/O CT CORPORATION SYSTEM
1200 S PINE ISLAND RD STE 250
Plantation, FL 33324
0000000000
0000

Scheduled Delivery Date 02/01/2024

Pricing option:
STANDARD RATE

Package Information:
FedEx Envelope

Shipment subtotal:        $51.29

Total Due:                $51.29

Cash:                    $100.00

Change Due:               $48.71

M = Weight entered manually
S = Weight read from scale
T = Taxable item

Terms and conditions apply, including terms that limit
FedEx's liability. The estimated shipping charge
may be different than the actual charges for your
shipment. Differences may occur based on actual weight,
dimensions and other factors. Shipment-related terms
and conditions and details on how shipping charges
are calculated are available upon request or at
fedex.com/serviceguide.

205

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Laurence John Graham<br><br>    TELEPHONE NO.: (954) 288-5138<br>    EMAIL ADDRESS: grahamlarrybetty@gmail.com<br>    ATTORNEY FOR: | **FOR COURT USE ONLY** |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**<br>   STREET ADDRESS:<br>   MAILING ADDRESS:<br>   CITY AND ZIP CODE:<br>      BRANCH NAME: | |
| PLAINTIFF: Laurence J. Graham<br><br>DEFENDANT: E.I. Du Pont De Nemours and Company, Iluka<br>         Resources, Inc.; The Dow Chemical Company, | CASE NUMBER: |
| **DECLARATION OF MAILING** | Ref. No. or File No.: |

1.  I, Louis Pardo, am at least 18 years of age and not a party to this action.

2.  Documents mailed:

    Letter

3.  A true copy of the documents were sealed in an envelope and placed in the United States mail with First Class postage prepaid as follows:

    Date:              1/30/2024
    Location:          MIAMI BEACH, FLORIDA
    Addressed:         Iluka Resources, Inc. By serving CT Corporation Systems as it's statutory
                       registered agent, 1200 S. Pine Island Road, Suite 240, Plantation, FL
                       33324

4.  Person performing mailing:

    Name:              Louis Pardo
    Firm:              COURTESY FLORIDA PROCESS SERVERS
    Address:           Payment Center, P.O. Box 40-3621, Miami Beach, FL 33140
    Telephone Number:  (888) 319-2205

5.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:


_____                    ▶ _____
     Louis Pardo                                        (SIGNATURE)
    (PRINTED NAME)


Page 1 of 1

**DECLARATION OF MAILING**                    Job Number JGS-2024000638









# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com*®.

Fort Lauderdale, FL 33324

| | |
|---|---|
| **Certified Mail Fee** | $4.40 |
| $ | |

**Extra Services & Fees** *(check box, add fee as appropriate)*
- ☐ Return Receipt (hardcopy) $
- ☐ Return Receipt (electronic) $
- ☐ Certified Mail Restricted Delivery $
- ☐ Adult Signature Required $
- ☐ Adult Signature Restricted Delivery $

**Postage**
$0.68

**Total Postage and Fees**
$8.73

Postmark Here

Sent To ILUKA RESOURCES, INC C/O ITS REGISTERED AGENT CT CORPORATION SYSTEMS

Street and Apt. No., or PO Box No. 1200 S. PINE ISLAND ROAD, SUITE 250

City, State, ZIP+4® PLANTATION, FL 33324

PS Form 3800, January 2023 PSN 7530-02-000-9047 · See Reverse for Instructions



**CERTIFIED MAIL**

RDC 80

9589 0710 5270 0714 8079 78

U.S. POSTAGE
FCM LETTER
MIAMI BEACH, FL
JAN 30, 2024
**$8.73**
R2304M114803-20





**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

LAURENCE JOHN GRAHAM AND
BETTY PATRICK GRAHAM c/o
LAURENCE JOHN
GRAHAM
8210 W SUNSET BLVD
PMD 201
LOS ANGELES CA 90026

9590 9402 8396 3166 2895 08

2. Article Number (Transfer from service label)
9589 0710 5270 0714 8079 78

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Priority Mail Express
☐ Registered Mail
☐ Certified Mail
☐ Signature Confirmation

Domestic Return Receipt

POS-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>Laurence John Graham<br><br>   TELEPHONE NO.: (954) 288-5138<br>   EMAIL ADDRESS: grahamlarrybetty@gmail.com<br>   ATTORNEY FOR: | *FOR COURT USE ONLY* |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES<br>   STREET ADDRESS:<br>   MAILING ADDRESS:<br>   CITY AND ZIP CODE:<br>   BRANCH NAME: | |
|---|---|

| PLAINTIFF: Laurence J. Graham<br><br>DEFENDANT: E.I. Du Pont De Nemours and Company, Iluka<br>          Resources, Inc., The Dow Chemical Company, | CASE NUMBER: |
|---|---|

| PROOF OF PERSONAL SERVICE--CIVIL | Ref. No. or File No.: |
|---|---|

1.   I am over 18 years of age and **not a party to this action.**
2.   I served the following **documents:**
     Letter

3.   I personally served the following **persons** at the address, date, and time stated:
     a.   Name: Donna Mock
     b.   Address: 1200 S. Pine Island Road, Suite 240, Plantation, FL 33324
     c.   Date: 1/30/2024
     d.   Time: 2:10 pm

4.   I am
          a.   not a registered California process server.

5.   My name, address, telephone number, and, if applicable, county of registration and number are:
     CARLOS PARDO
     COURTESY FLORIDA PROCESS SERVERS
     Payment Center, P.O. Box 40-3621, Miami Beach, FL 33140
     Telephone number:  (888) 319-2205
     Registration Number:  SPS # 519
     County:  Broward County, Florida

6.   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Date:


              CARLOS PARDO                                        ▶ _____
_____
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)              (SIGNATURE OF PERSON WHO SERVED THE PAPERS)

Form Approved for Optional Use
Judicial Council of California
POS-020 [New January 1, 2005]          **PROOF OF PERSONAL SERVICE--CIVIL**          Job Number JGS-2024000636

Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324.

This letter will be mailed by USPS certified mail Adult signature requested to Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 and served,

1/30/24

Officers:

We have not received any indication that you are ready to admit to the liability that you have to us so we write this letter.

Iluka Resources, Inc. (hereinafter "Iluka") is already in receipt of a copy of Betty P. Graham's FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham may be referred to as "Betty" herein. I may be referred to as "Laurence" herein.

I, Betty Patrick Graham, may be referred to as Betty P. Graham herein; and, I Betty Patrick Graham may be referred to as Betty herein.

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") which, by its written language, is said to be drafted by one attorney who, although we did not know it at the time, had a history of performing work for RGC (USA) Minerals, Inc. (hereinafter, "RGC"); but, we did know that he was working on the 97 Deed with RGC and that the McGuire Woods law firm was involved.

With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the

Signed in Miami Beach, Florida on Feb 10, 2024 and then mailed to Iluka Resources, Inc. c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 from Miami Beach January, 28, 2024 by USPS Priority Express overnight letter with signature requested and then served c/o CT Corporation System at the same address at approximately 9AM on 2/12/24.

Officers: Iluka Resources, Inc. is already in receipt of a copy of Betty P. Graham's FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to bring, prosecute, and settle all claims held by Betty P. Graham. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). Iluka is hereby notified that my 133 Clarendon St #170225 Boston, MA 02117 royalty payment address is hereby changed to 2625 Alcatraz Ave PMB 179 Berkeley, CA 94705; this is now my only royalty payment address and this change is made with the reservation of all rights and claims; accordingly, all rights are reserved. Sincerely, Laurence J. Graham: *Larry Graham*

2-10-24  2/10/24



**UNITED STATES POSTAL SERVICE®**

MIAMI BEACH
1300 WASHINGTON AVE
MIAMI BEACH, FL 33119-9998
(800)275-8777

02/10/2024                    02:09 PM

------------------------------------------------

| Product | Qty | Unit Price | Price |
|---|---|---|---|

------------------------------------------------

PM Express 2-Day    1              $30.45
Flat Rate Env
    Fort Lauderdale, FL 33324
    Flat Rate
    Signature Requested
    Scheduled Delivery Date
        Mon 02/12/2024 05:00 PM
    Money Back Guarantee
    Tracking #:
        EI046316457US
    Insurance                     $0.00
        Up to $100.00 included
Total                             $30.45

------------------------------------------------

Grand Total:                      $30.45

------------------------------------------------

Cash                              $40.00
Change                            -$9.55

------------------------------------------------

        Save this receipt as evidence of
    insurance. For information on filing an
        insurance claim go to
    https://www.usps.com/help/claims.htm
        or call 1-800-222-1811

    Text your tracking number to 28777 (2USPS)
    to get the latest status. Standard Message
    and Data rates may apply. You may also
    visit www.usps.com USPS Tracking or call
            1-800-222-1811.

            Preview your Mail
            Track your Packages
            Sign up for FREE @
        https://informeddelivery.usps.com

    All sales final on stamps and postage.
    Refunds for guaranteed services only.
        Thank you for your business.

        Tell us about your experience.
    Go to: https://postalexperience.com/Pos
    or scan this code with your mobile device.



        or call 1-800-410-7420.

------------------------------------------------

UFN: 115345-0410
Receipt #: 840-53300050-1-4872492-1
Clerk: 55

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>BETTY P. GRAHAM, LAURENCE J GRAHAM AND LAURENCE J GRAHAM<br>929 Alton Road<br>Suite 500<br>Miami Beach, FL 33139<br><br>   TELEPHONE NO.:<br>   ATTORNEY FOR: | *FOR COURT USE ONLY* |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**<br>   STREET ADDRESS: 400 MCALLISTER STREET<br>   MAILING ADDRESS:<br>   CITY AND ZIP CODE: SAN FRANCISCO, 94102<br>   BRANCH NAME: SAN FRANCISCO | |
| PLAINTIFF: LAURENCE J GRAHAM ON BEHALF OF HIMSELF AND AS<br>          ATTORNEY-IN-FACT FOR BETTY P. GRAHAM, AND AS<br>          AGENT FOR BETTY P GRAHAMLAURENCE J GRAHAM<br>DEFENDANT: DUPONT DE NEMOURS INC. ET AL. | CASE NUMBER:<br>CGC-24-611963 |
| **PROOF OF SERVICE** | Ref. No. or File No.: |

1.   I am over 18 years of age and not a party to this action.

2.   Received by ACCURATE SUPPORT RESOURCES on 2/11/2024 at 8:30 pm to be served on **ILUKA RESOURCES INC, R/A CT CORPORATION SYSTEM, 1200 S PINE ISLAND RD.,, PLANTATION, FL 33324.**

3.   Served the within named corporation by delivering a true copy of the **LETTER** with the date and hour of service endorsed thereon by me to DONNA MACH / SERVICE OF PROCESS MANAGER / CT CORP. as **Registered Agent** of the within named corporation, in compliance with State Statutes.

4.   Date and Time of service: 2/12/2024 at 9:00 am

5.   I am not a registered California process server.

6.   My name, address, telephone number, and, if applicable, county of registration and number are:

     Name: Richard Lang
     Firm: ACCURATE SUPPORT RESOURCES
     Address: P.O. Box 350096, Ft. Lauderdale, FL 33335
     Telephone number: (954) 761-9977
     Registration Number: Sps #259
     County: Broward County

7.   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

                    Richard Lang
   (TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)          (SIGNATURE OF PERSON WHO SERVED THE PAPERS)

Page 1 of 2

**PROOF OF SERVICE**                    Job Number ARL-2024000108

Signed in Miami Beach, Florida on Feb 10, 2024 and then mailed to Iluka Resources, Inc. c/o its

registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL

33324 from Miami Beach January, 28, 2024 by USPS Priority Express overnight letter with

signature requested and then served c/o CT Corporation System at the same address at

approximately 9AM on 2/12/24.

Officers: Iluka Resources, Inc. is already in receipt of a copy of Betty P. Graham's FLORIDA

GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014; I, Laurence J. Graham, am

Betty P. Graham's Agent (also known as her attorney-in-fact); I have the powers to bring,

prosecute, and settle all claims held by Betty P. Graham.  Betty P. Graham and her sisters Julia

P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal

shares, to tangible real property minerals of every kind and character located below the surface

of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the

19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed

Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page

204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of

subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the

right of ingress and egress, and possession at all times for the purpose of mining, drilling and

operating for said minerals and the maintenance of facilities and means necessary or convenient

for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred

all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to

Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance

royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by

Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are

intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by

Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases

being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the

Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases").

Iluka is hereby notified that my 133 Clarendon St #170225 Boston, MA 02117 royalty payment

address is hereby changed to 2625 Alcatraz Ave PMB 179 Berkeley, CA 94705; this is now my

only royalty payment address and this change is made with the reservation of all rights and

claims; accordingly, all rights are reserved. Sincerely, Laurence J. Graham:

| ATTORNEY OR PARTY WITHOUT ATTORNEY:<br>BETTY P. GRAHAM, LAURENCE J GRAHAM AND LAURENCE J GRAHAM<br>929 Alton Road<br>Suite 500<br>Miami Beach, FL 33139<br><br>TELEPHONE NO.:<br>ATTORNEY FOR: | *FOR COURT USE ONLY* |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**<br>STREET ADDRESS: 400 MCALLISTER STREET<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: SAN FRANCISCO, 94102<br>BRANCH NAME: SAN FRANCISCO | |
| PLAINTIFF: LAURENCE J GRAHAM ON BEHALF OF HIMSELF AND AS ATTORNEY-IN-FACT FOR BETTY P. GRAHAM, AND AS AGENT FOR BETTY P GRAHAMLAURENCE J GRAHAM<br>DEFENDANT: DUPONT DE NEMOURS INC. ET AL. | CASE NUMBER:<br>CGC-24-611963 |
| **PROOF OF SERVICE** | Ref. No. or File No.: |

1. I am over 18 years of age and not a party to this action.

2. Received by ACCURATE SUPPORT RESOURCES on 2/12/2024 at 8:30 am to be served on **ILUKA RESOURCES INC, R/A CT CORPORATION SYSTEM, 1200 S PINE ISLAND RD.,, PLANTATION, FL 33324.**

3. Served the within named corporation by delivering a true copy of the **LETTER** with the date and hour of service endorsed thereon by me to DONNA MACH / SERVICE OF PROCESS MANAGER / CT CORP as **Registered Agent** of the within named corporation, in compliance with State Statutes.

4. Date and Time of service: 2/12/2024 at 9:05 am

5. I am not a registered California process server.

6. My name, address, telephone number, and, if applicable, county of registration and number are:

   Name: Richard Lang
   Firm: ACCURATE SUPPORT RESOURCES
   Address: P.O. Box 350096, Ft. Lauderdale, FL 33335
   Telephone number: (954) 761-9977
   Registration Number: Sps #259
   County: Broward County

7. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
Richard Lang
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)

▶ _____
(SIGNATURE OF PERSON WHO SERVED THE PAPERS)

Page 1 of 2

**PROOF OF SERVICE**                    Job Number ARL-2024000110

Signed on 2/12/24 and then mailed to Iluka Resources, Inc. "Iluka" c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 from Orlando, FL on 2/12/24 by USPS certified mail hardcopy return receipt adult signature requested and served c/o CT Corporation System at the same address at approximately 9AM on 2/12/24. Officers: Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by Betty's father George L. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). Iluka is here again notified by this letter and was notified by **my prior letter mailed on 2/10/24 with USPS Tracking # EI046316457US, which is served herewith and will be arriving to Iluka this morning on 2/12/24, that my 133 Clarendon St #170225 Boston, MA 02117 royalty payment address has been changed to 2625 Alcatraz Ave PMB 179 Berkeley, CA 94705 and that this is now my only royalty payment address and Iluka is hereby notified that 2625 Alcatraz Ave PMB 179 Berkeley, CA 94705 is also my correspondence address and that these changes are made with the reservation of all rights and claims; accordingly, all rights are reserved.**
Sincerely, Laurence J. Graham: _Larry Graham_ 2/12/24

218

Signed on 5/31/24 in Miami, FL and then mailed to Iluka Resources, Inc. "Iluka" c/o its registered agent CT Corporation System at 1200 S Pine Island Road Suite 250 Plantation, FL 33324 from Miami, FL on 5/31/24 by USPS certified mail hardcopy return receipt adult signature requested and served c/o CT Corporation System at the same address.

Officers:

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P. Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by George Lee Parson, Jr. and Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). With the reservation of all rights and claims, Iluka is hereby notified that we are replacing all previously provided addresses with one single address; accordingly, all previously provided royalty payment addresses and correspondence address are hereby replaced with PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham and notify you that these changes are made with the reservation of all rights and claims; accordingly, all rights are reserved. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham and this letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham.  Also, this letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. All rights are reserved.

Sincerely,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

Laurence J. Graham for Laurence J. Graham: *Larry Graham*

Laurence John Graham for Laurence John Graham: *Larry Graham*

219



```
            COCONUT GROVE
            3191 GRAND AVE
          MIAMI, FL 33133-9998
            (800)275-8777
06/01/2024                    02:04 PM
-----------------------------------------
Product          Qty    Unit    Price
                        Price
-----------------------------------------
Priority Mail®    1             $9.85
Window FR Env
    Fort Lauderdale, FL 33324
    Flat Rate
    Expected Delivery Date
        Mon 06/03/2024
    Insurance                   $0.00
        Up to $100.00 included
    Certified Mail®             $4.40
    . Tracking #:
      9589 0710 5270 1206 0820 40
    Return Receipt              $3.65
      Tracking #:
      9590 9402 8629 3244 6711 07
Total                          $17.90
-----------------------------------------
Grand Total :                  $17.90

Cash                          $100.00
Change                        -$82.10
```



In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.



or call 1-800-410-7420

## <u>VERIFIED RETURN OF SERVICE</u>

**State of**                                                                **County of**

Case Number: _____

Plaintiff:
**Betty Patrick Graham and Laurence J. Graham**

vs.

Defendant:
**Iluka Resources, Inc.**

JGS2024005404

For:
Laurence J. Graham
Laurence John Graham and Betty Patrick Graham

Received by COURTESY FLORIDA PROCESS SERVERS on the 3rd day of June, 2024 at 11:08 am to be served on **Iluka Resources, Inc. By serving CT Corporation Systems as it's statutory registered agent, 1200 S. Pine Island Road, Suite 240, Plantation, FL 33324.**

I, CARLOS PARDO, do hereby affirm that on the **3rd day of June, 2024 at 11:52 am, I:**

**CORPORATE: served** by delivering a true copy of the LETTER with the date and hour of service endorsed thereon by me, to: **Donna Mock as Registered Agent** at the address of: **1200 S. Pine Island Road, Suite 240, Plantation, FL 33324** on behalf of **Iluka Resources, Inc.,** and informed said person of the contents therein, in compliance with state statutes.

Under penalty of perjury, I declare that I have read the foregoing affidavit and that the facts stated in it are true and correct, that I am a sheriff appointed, SPECIAL PROCESS SERVER IN GOOD STANDING for the in the county in which service was effected in accordance with Florida Statutes, and have no interest in the above action pursuant to F.S. 92.525 ( 2 ).

**CARLOS PARDO**
SPS # 519

**COURTESY FLORIDA PROCESS SERVERS**
**Payment Center**
**P.O. Box 40-3621**
**Miami Beach, FL 33140**
**(888) 319-2205**

Our Job Serial Number: JGS-2024005404

Copyright © 1992-2024 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

Signed on 5/31/24 in Miami, FL and mailed to Iluka Resources, Inc. "Iluka" c/o its registered agent CT Corporation System at 1200 S. Pine Island Road Suite 250 Plantation, FL 33324 from Miami, FL on 5/31/24 by USPS certified mail hardcopy return receipt adult signature requested and will be served to Iluka on Monday c/o its registered agent CT Corporation System at 1200 S. Pine Island Road Suite 250 Plantation, FL 33324.

Officers:

Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") With the conveyance of title to more than 1,150 acres of subsurface minerals located below surface of ten parcels of land, the 97 Deed also conveyed the right of ingress and egress, and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed also transferred all of Betty's parent's royalties due under ten certain October, 13 1989 Deeds of Mining Lease to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October, 13 1989 Deeds of Mining Lease were signed by George Lee Parson, Jr. and Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases"). With the reservation of all rights and claims, Iluka is hereby notified that we are replacing all previously provided addresses with one single address; accordingly, all previously provided address including, but not limited to, royalty payment addresses and correspondence addresses are hereby replaced with PO Box 470213 San Francisco, CA 94147 and notify you that these changes are made with the reservation of all rights and claims; accordingly, all rights are reserved. We have both been receiving mail at PO Box 470213 San Francisco, CA 94147; however, if any mail sent to Betty P. Graham at this address gets returned to sender, send it again to Betty P. Graham c/o Laurence J. Graham at PO Box 470213 San Francisco, CA 94147. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham and this letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham. Accordingly, this letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. All rights are reserved.

Sincerely,

Betty Patrick Graham for Betty Patrick Graham: _Betty Patrick Graham_

Laurence J. Graham as attorney-in-fact for Betty P. Graham: _Larry Graham_

Laurence J. Graham as Agent for Betty P. Graham: _Larry Graham_

Laurence J. Graham for Laurence J. Graham: _Larry Graham_

Laurence John Graham for Laurence John Graham: _Larry Graham_

Signed on 2/08/2025 and mailed by United States Postal Service PRIORITY MAIL EXPRESS, signature required with tracking # **ER 121 593 885 US** to:

Iluka Resources, Inc.
c/o Karen Jennings Evans, Esq.
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Officers: You are already in receipt of Betty P. Graham's DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts and the 9/29/03 Settlement Agreement both of which authorize Laurence J. Graham to act on Betty P. Graham's behalf which he does herein. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed"). The 97 Deed also transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease, (the "Leases") and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments. As you are aware, we are litigating in the United States District Court for the Northern District of California (Case#: 2:24-cv-01551-RFL) and the United States District Court for the Central District of California (Case #:2:24-cv-09444-FLA-SK) and we contend that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed has been rescinded; however, you are claiming that said portion of the Leases has not been rescinded; therefore, you are claiming that you have a contractual duty and fiduciary duty to pay royalty payments under the Leases and deliver reporting about the minerals extracted from the ten parcels of land listed in the 97 Deed, and the saleable minerals recovered from the ten parcels of land listed in the 97 Deed, and deliver other correspondence. With the reservation of all rights and claims, we hereby notify you that PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham is our address for receipt of all correspondence, royalty payments, etc.; accordingly, PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham shall be our address for royalty payments for any portion of the Leases for which a recovery cannot be made by our current and all future actions for relief under Cal. Civil. Code Sec. 1692. This letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham. This letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham. This letter is not a waiver of any rights held by Laurence John Graham and is not a waiver of any claims held by Laurence John Graham. All rights are reserved.
Sincerely,

Betty Patrick Graham for Betty Patrick Graham: _Betty Patrick Graham_

Betty P. Graham for Betty P. Graham: _Betty P. Graham_

Laurence J. Graham as attorney-in-fact for Betty P. Graham: _Lang Graham_

Laurence J. Graham as Agent for Betty P. Graham: _Lang Graham_

Laurence John Graham as Agent and attorney-in-fact for Betty P. Graham: _Lang Graham_

Laurence J. Graham for Laurence J. Graham: _Lang Graham_

Laurence John Graham for Laurence John Graham: _Lang Graham_

223

Signed on 2/10/2025 and mailed by United States Postal Service PRIORITY MAIL EXPRESS, signature required with tracking # ER 121 594 143 US to:

Iluka Resources, Inc.
c/o Karen Jennings Evans, Esq.
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Officers:  You are already in receipt of Betty P. Graham's DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts and the 9/29/03 Settlement Agreement both of which authorize Laurence J. Graham to act on Betty P. Graham's behalf which he does herein.  Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed"). The 97 Deed also transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease, (the "Leases") and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments. As you are aware, we are litigating in the United States District Court for the Northern District of California (Case#: 2:24-cv-01551-RFL) and the United States District Court for the Central District of California (Case #:2:24-cv-09444-FLA-SK) and we contend that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as valuable minerals, from the ten parcels of land listed in the 97 Deed has been rescinded; however, you are claiming that said portion of the Leases has not been rescinded; therefore, you are claiming that you have a contractual duty and fiduciary duty to pay royalty payments under the Leases and deliver reporting about the valuable minerals extracted from the ten parcels of land listed in the 97 Deed, and the saleable minerals recovered from the ten parcels of land listed in the 97 Deed, and deliver other correspondence. With the reservation of all rights and claims, we hereby notify you that PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham is our address for receipt of all royalty payments and Laurence J. Graham's correspondence address; accordingly, PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham shall be our address for royalty payments for any portion of the Leases for which a recovery cannot be made by our current and all future actions for relief under Cal. Civil Code Sec. 1692 and is our only royalty payment address. We also notify you that 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 c/o Laurence J. Graham is Betty P. Graham's correspondence address. This letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham. This letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham.  This letter is not a waiver of any rights held by Laurence John Graham and is not a waiver of any claims held by Laurence John Graham. All rights are reserved.
Sincerely,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

Laurence John Graham as Agent and attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham for Laurence J. Graham: *Larry Graham*

Laurence John Graham for Laurence John Graham: *Larry Graham*

Signed on 2/08/2025 and mailed by United States Postal Service PRIORITY MAIL EXPRESS, signature required with tracking # **ER 121 593 885 US** to:

Iluka Resources, Inc.
c/o Karen Jennings Evans, Esq.
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Officers: You are already in receipt of Betty P. Graham's DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts and the 9/29/03 Settlement Agreement both of which authorize Laurence J. Graham to act on Betty P. Graham's behalf which he does herein. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19ᵗʰ Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed"). The 97 Deed also transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease, (the "Leases") and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments. As you are aware, we are litigating in the United States District Court for the Northern District of California (Case#: 2:24-cv-01551-RFL) and the United States District Court for the Central District of California (Case #:2:24-cv-09444-FLA-SK) and we contend that the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed has been rescinded; however, you are claiming that said portion of the Leases has not been rescinded; therefore, you are claiming that you have a contractual duty and fiduciary duty to pay royalty payments under the Leases and deliver reporting about the minerals extracted from the ten parcels of land listed in the 97 Deed, and the saleable minerals recovered from the ten parcels of land listed in the 97 Deed, and deliver other correspondence. With the reservation of all rights and claims, we hereby notify you that PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham is our address for receipt of all correspondence, royalty payments, etc.; accordingly, PO Box 470213 San Francisco, CA 94147 c/o Laurence J. Graham shall be our address for royalty payments for any portion of the Leases for which a recovery cannot be made by our current and all future actions for relief under Cal. Civil. Code Sec. 1692. This letter is not a waiver of any rights held by Betty Patrick Graham and is not a waiver of any claims held by Betty Patrick Graham. This letter is not a waiver of any rights held by Betty P. Graham and is not a waiver of any claims held by Betty P. Graham. This letter is not a waiver of any rights held by Laurence J. Graham and is not a waiver of any claims held by Laurence J. Graham. This letter is not a waiver of any rights held by Laurence John Graham and is not a waiver of any claims held by Laurence John Graham. All rights are reserved.
Sincerely,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Laury Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Laury Graham*

Laurence John Graham as Agent and attorney-in-fact for Betty P. Graham: *Laury Graham*

Laurence J. Graham for Laurence J. Graham: *Laury Graham*

Laurence John Graham for Laurence John Graham: *Laury Graham*

# REED MAYO LAW FIRM, P.C.

**(757) 648-1376 - Office**
**(757) 648-1379 - Fax**

4604 Berrywood Road
Virginia Beach, VA 23464

K. Reed Mayo
Rmayo@reedmayolaw.com

February 12, 2023

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Los Gatos, CA  95030

7548 South US Hwy 1,  #198
Port St. Lucie, FL 34952

Re:    Iluka Resources Inc.:  Payment of Royalties Held in Escrow

Dear Mr. Graham:

I am writing to see if I can make arrangements to deliver a check to you for over $2.5 million.

As you may know, because of disputes over the ownership of royalties initially assigned to your mother by your grandparents, Iluka Resources Inc. ("Iluka") for many years deposited the royalties into an escrow account.  As a result of various interpleader actions, much of those funds were paid out to various creditors and to your brother directly.  Last September, the Sussex Circuit Court entered an order holding (among other things) that the balance of royalties being held in escrow belong to you.

Rather than paying those funds over to Florida or some other state as unclaimed property (to be held until you claim them), I would like to see if Iluka can pay those funds to you directly. To ensure that you actually receive the funds, however, Iluka will need to deliver its check to you in person, confirm your identity with a state or federal government issued ID bearing your picture, and have you sign an acknowledgement that you received the check.

Are you willing and able to meet these conditions?  Please call ((757 648-1376) or email me at Rmayo@reedmayolaw.com and let me know.

Thank you in advance.

Very truly yours,

K. Reed Mayo

KRM/0200

# REED MAYO LAW FIRM, P.C.

(757) 621-2216 - Office
(757) 720-3548 - Fax

4604 Berrywood Road
Virginia Beach, VA 23464

K. Reed Mayo
Rmayo@reedmayolaw.com

April 12, 2023

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Los Gatos, CA 95030

      Re:   Iluka Resources Inc.: Payment of Royalties Held in Escrow

Dear Mr. Graham:

     I am following up on my letter of February 12, to which I have received no response.

     Given your lack of response, Iluka Resources Inc. ("Iluka") would like to pay the funds to California under its Unclaimed Property Law until you step forward to claim them. (I previously was in contact with the state of Florida, but it indicated that California should receive the funds given that your last known address is the one above in Los Gatos). Iluka is shutting down its operations here and will be closing its offices permanently, so it would like to dispose of the funds it is holding for you.

     Before it can pay the funds to California, however, Iluka must not hear from you for three years. That is because the funds must go "unclaimed" for that period. Thus, every time you send a new letter, the three-year time period will start again. For this reason, I ask that you refrain from sending any letters or contacting Iluka until I notify you in November 2025 (which is three years after your last letter, dated October 25, 2022) that the funds have been paid over to California.

     Thank you in advance.

               Very truly yours,

               K. Reed Mayo

KRM/0200

# REED MAYO LAW FIRM, P.C.

(757) 621-2216 - Office
(757) 720-3548 - Fax

4604 Berrywood Road
Virginia Beach, VA 23464

K. Reed Mayo
Rmayo@reedmayolaw.com

April 26, 2023

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Los Gatos, CA  95030

Re:    Iluka Resources Inc.:  Payment of Royalties Held in Escrow

Dear Mr. Graham:

I am following up on my letter of February 12, to which I have received no response.

Given your lack of response, Iluka Resources Inc. ("Iluka") would like to pay the funds to California under its Unclaimed Property Law until you step forward to claim them. (I previously was in contact with the state of Florida, but it indicated that California should receive the funds given that your last known address is the one above in Los Gatos). Iluka is shutting down its operations here and will be closing its offices permanently, so it would like to dispose of the funds it is holding for you.

Before it can pay the funds to California, however, Iluka must not hear from you for three years. That is because the funds must go "unclaimed" for that period. Thus, every time you send a new letter, the three-year time period will start again. For this reason, I ask that you refrain from sending any letters or contacting Iluka until I notify you that the funds have been paid over to California. That will be no earlier than March 2026, which is three years after your last correspondence.

If you would prefer to get the funds sooner, we can arrange to have a check delivered to you in person. At that time, we will need to confirm your identity with a state or federal government issued ID bearing your picture and have you sign an acknowledgement that you received the check. **Please contact me only if you want to pursue this option.**

Thank you in advance.

Very truly yours,

K. Reed Mayo

KRM/0200

228



June 12, 2023

BY CERTIFIED MAIL/RETURN RECEIPT

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Las Gatos, CA 95030

### Notice of Termination of Mining Lease

Dear Mr. Graham:

This letter shall serve as formal written notice from Iluka Resources Inc., a Delaware corporation, as successor by merger to RGC (USA) Minerals Inc. ("Iluka"), of its election to terminate that certain Deed of Mining Lease dated October 13, 1989, as amended by First Amendment to Deed of Mining Lease dated June 30, 1994, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife, and RGC (USA) Minerals Inc., as assigned by Assignment of Mineral Leases effective as of October 6, 2006, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson and Ann P. Everett, and as assigned (as to future rents) by Assignment of Mineral Leases dated September 29, 2008, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson and Ann P. Everett and Julia H. Parson (collectively, the "Lease"), such termination to be effective as of September 30, 2023. Enclosed is an executed copy of the Memorandum of Termination of Mining Lease which we plan to record in the Clerk's Office of the Circuit Court of Sussex County, Virginia, within the next few weeks.

We appreciate the opportunity you have given us to do business with you on this parcel over these past several years.

Please don't hesitate to call me if you have any questions or concerns.

Kind Regards,

Ryan Inocco
US Country Manager

Enclosure

Lease No. 961-1033
Parcels 101-A-17 & 101-A-17A

Iluka Resources Inc. – VA Operations

12472 St. John Church Rd., Stony Creek, VA 23882

Phone: 434.348.4300



COPY

Prepared by and return to:

Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, Virginia 23219
Attn: Daniel M. Campbell, Esquire

Tax Map No.:   101-A-17, 101-A-17M and
101-A-17A

## MEMORANDUM OF TERMINATION OF MINING LEASE

THIS MEMORANDUM OF TERMINATION OF MINING LEASE (this "Memorandum") dated as of June 12, 2023 made by and between ANN P. EVERETT, as the lessor under the Lease and as a mineral rights owner, JULIA H. PARSON also known of record as JULIA P. BOYD, ANN P. EVERETT, TRUSTEE FOR CHRISTOPHER LANCE EVERETT AND LEE RANDOLPH EVERETT UNDER AGREEMENT DATED DECEMBER 12, 1994, LAURENCE J. GRAHAM, and LUKE P. GRAHAM, collectively as mineral rights owners, and ILUKA RESOURCES, INC., a Delaware corporation, as successor by merger to RGC (USA) Minerals Inc. ("Iluka"). recites and provides:

### RECITALS:

WHEREAS, by Deed of Mining Lease dated October 13, 1989, as amended by First Amendment to Deed of Mining Lease dated June 30, 1994, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife, and RGC (USA) Minerals Inc., as assigned to Ann P. Everett by Assignment of Mineral Leases dated October 6, 2006, and as further assigned (as to future rents payable under the Lease) by Assignment of Mineral Leases dated September 29, 2008, made by and between G. L. Parson, Jr. by Christopher L. Everett, his attorney-in-fact, and Mary Elizabeth Parson by Ann P. Everett, her attorney-in-fact, and Ann P. Everett and Julia H. Parson (collectively, the "Lease"), Iluka leased certain real property identified as Tax Map Parcels 101-A-17 and 101-A-17A located in Sussex County, Virginia (the "Property"). The Lease is evidenced by that certain Memorandum of Mining Lease dated October 13, 1989, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia (the "Clerk's Office") on August 17, 1990, in Deed Book 124 at page 513, and by Memorandum of First Amendment to Mining Lease dated June 30, 1994, recorded in the Clerk's Office on August 30, 1994, in Deed Book 141 at page 215, and by Assignment of Mineral Leases dated October 6, 2006, recorded in the Clerk's Office on October 20, 2006 in Deed Book 225 at page 460.

By Deed of Gift dated December 12, 1994, and recorded in the Clerk's Office on December 22, 1994, in Deed Book 143 at page 250, G. L. Parson, Jr. and Mary Elizabeth Parson, conveyed all of their right title and interest in and to a 1.0 acre portion of the Property known as "Dink's House Lot" identified as TM # 101-A-17A to Julia P. Boyd, now known as Julia H. Parson.

By Deed of Gift dated May 19, 1997, and recorded in the Clerk's Office on July 7, 1997, in Deed Book 155 at page 626, George Lee Parson, Jr. and Mary Elizabeth Parson, conveyed all of their right title and interest in and to the minerals underlying the Property, to Betty P. Graham, Ann P. Everett, and Julia P. Boyd, in equal shares, subject to the terms of the Lease.

By Deed dated May 18, 1998, and recorded in the Clerk's Office on May 28, 1998, in Deed Book 160 at page 596, G. L. Parson, Jr. and Mary Elizabeth B. Parson, conveyed the remaining 54 acre portion of the Property to Ann P. Everett, as Trustee for Christopher Lance Everett and Lee Randolph Everett under Agreement dated December 12, 1994.

By Deed of Gift dated October 23, 2000, and recorded in the Clerk's Office on November 2, 2000, in Deed Book 175 at page 181, Betty P. Graham conveyed all of her right title and interest in the minerals to Laurence J. Graham and Luke P. Graham.

WHEREAS, Iluka has terminated the Lease, and by this Memorandum Iluka now desires to provide record notice of the termination of the Lease.

-1-

TERMINATION:

1.    <u>Recitals</u>.  The foregoing Recitals are hereby incorporated herein and made a part hereof to the same extent as if set forth in full in this Memorandum.

2.    <u>Termination of Lease</u>.  Pursuant to Section 19 of the Lease, Iluka hereby confirms that the Lease and all rights and obligations of the parties thereunder are terminated effective as of September 30, 2023; and hereby provides notice of its release and relinquishment of all right, title, and interest, if any, it has or may have in the Property pursuant to the Lease.

*[Remainder of Page Intentionally Left Blank;*
*Signatures and Notary Acknowledgement Appears on Following Pages.]*

-2-

Iluka:

**ILUKA RESOURCES INC.**, a Delaware corporation, successor by merger to RGC (USA) Minerals Inc., a Delaware corporation:

By:
Name:    Ryan Inocco
Title:     US Country Manager

COMMONWEALTH OF VIRGINIA,
COUNTY OF SUSSEX, to-wit:

The foregoing instrument was acknowledged before me this 12th day of June, 2023, by Ryan Inocco, as US Country Manager of Iluka Resources Inc., a Delaware corporation, successor by merger to RGC (USA) Minerals Inc., a Delaware corporation, on behalf of the corporation.

My commission expires:  December 31, 2026

Notary Public

# EXHIBIT G

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2007*

**LAURENCE GRAHAM,**
Appellant,

v.

**FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES,** and
**CATHOLIC CHARITIES OF THE DIOCESE OF PALM BEACH, INC.,**
Appellees.

No. 4D07-996

[ December 5, 2007 ]

HAZOURI, J.

Appellant, Laurence J. Graham (Laurence Graham), appeals the following orders entered by the trial court: (1) Judgment of Guilt on Order to Show Cause Why Laurence Graham Should Not be Held in Contempt of Court; (2) Order Appointing Plenary Guardian of Person and Property Over Betty Pat Graham (Betty Graham)/Letters of Plenary Guardianship of Person and Property of Betty Pat Graham; and (3) Denial of Laurence Graham's Motion for Continuance. Luke Graham, Laurence's brother, is the only appellee who filed an answer brief in this case, in which appellee, Catholic Charities of the Diocese of Palm Beach, Inc. (Catholic Charities), joined. We reverse.

On November 8, 2005, the Department of Children and Families (DCF), filed a petition for appointment of plenary guardian, alleging that Betty Graham, Laurence and Luke Graham's mother, was incapacitated by mental illness. The petition alleged that Betty, a 61-year old woman, was presently located in a psychiatric facility in Fair Oaks Pavilion on the campus of Delray Medical Center. The petition alleged further that Betty had over $500,000 of real estate assets and $350,000 in a Merrill Lynch account. DCF claimed that Laurence and Luke Graham were trying to hide Betty from one another and get her assets in their respective names. However, DCF determined that Luke is the son who most has Betty's best interests in mind. Finally, the petition alleged that the situation is an emergency because DCF learned that the Merrill Lynch account was closed, and the money was suspected to be in Laurence's name.

Simultaneously, DCF filed a petition for appointment of emergency temporary guardian, raising the same allegations.

The trial court appointed Catholic Charities as Betty's emergency temporary plenary guardian. Upon Catholic Charities' petition following its discovery that $200,000.00 was transferred from Betty's joint account with her son Laurence, made payable to "Laurence Graham ITF Betty Graham," the trial court entered an order securing Betty's assets, freezing her accounts, and directing Betty's financial institutions and accountant(s) to provide information to Catholic Charities.

Shortly thereafter, Laurence Graham filed a petition for appointment as Betty's guardian. Laurence alleged he was being denied access to Betty and was denied his right to exercise health care decisions for Betty in violation of a health care advance directive ("the Directive") executed by Betty on July 22, 2006, designating Laurence as her health care surrogate. Catholic Charities filed a verified petition for an order compelling Laurence to disclose Betty's location and show cause why he should not be held in contempt of court. The trial court granted the petition and entered an order accordingly. The order mandated that Laurence appear before the trial court on a date certain, to show cause why he should not be held in indirect criminal contempt of court. Laurence filed a response to the order to show cause, motion to dismiss order and request for statement of particulars, but did not appear before the trial court. Luke Graham filed a petition to be appointed as Betty's permanent plenary guardian. The trial court granted the petition, appointing Luke Graham as temporary plenary guardian of Betty's person and property.

Thereafter, Laurence filed an emergency motion for continuance of the hearing on the petition for appointment of a permanent guardian and motion for order for rule to show cause. His counsel claimed he did not have adequate time to prepare for the hearing because he had just been retained by Laurence Graham, and there was additional evidence necessary for the court to make a meaningful determination of the issues. The trial court denied the motion for continuance. After the hearing, the trial court denied the motion to dismiss and request for statement of particulars, and entered a judgment of guilt on the order to show cause why Laurence Graham should not be held in contempt of court. Specifically, the trial court stated:

> As to the merits of the alleged contempt, the Court finds that Laurence Graham is in fact in violation of the Court's Orders, voluntarily and freely, knowing at all times

- 2 -

235

that he has been in violation, and having at all times the ability to comply with the Court's Orders. The Court is convinced beyond a reasonable doubt, based on the record before it, that Laurence Graham is in contempt of Court as described in the Order to Show Cause, i.e., his participation in the removal and disappearance of Betty Pat Graham from this jurisdiction and his subsequent failure to immediately disclose her location, in violation of this Court's Order Appointing Emergency Temporary Guardian (dated November 8, 2006) and the Letters of Emergency Temporary Guardianship (dated November 9, 2006), both of which delegated plenary emergency temporary guardianship powers to Catholic Charities of the Diocese of Palm Beach Inc.

The trial court scheduled sentencing, and ordered Laurence Graham to appear in person with Betty Graham at that time.

At the sentencing hearing, the trial court withheld sentencing for 90 days. The trial court encouraged the parties to determine what is best for Betty during that time and "revise these proceedings with the Court in its guardianship capacity rather than in its contempt capacity if necessary." This appeal followed.[1]

---

[1] Sheridan Weissenborn (Weissenborn), Betty Graham's attorney, previously filed a petition for writ of certiorari in this court, attempting to seek review of the lower court's denial of a motion to discharge an emergency, temporary guardian and to dismiss the guardianship proceedings, but the petition actually sought review of the trial court's denial of Weissenborn's *ore tenus* request to substitute counsel. *See Weissenborn v. Graham*, 963 So. 2d 275, 276 (Fla. 4th DCA Aug. 1, 2007). The trial court had found that Weissenborn had no standing to bring motions on behalf of Betty Graham. *Id.* This court denied the petition, but Weissenborn filed for rehearing, arguing that the guardianship proceedings pending below violated Betty Graham's right to due process of law. *Id.* This court denied rehearing on the basis that Weissenborn was not properly substituted as counsel and was actually working on behalf of Laurence Graham, and thus, was not permitted to represent Betty Graham. *Id.* Although this court denied rehearing, it wrote to address Weissenborn's claim that Florida's continued exercise of jurisdiction in the case violates due process because Betty Graham is living in California. It concluded that "[Laurence's] improper act of subsequently removing Betty from Florida to a 'secret location' cannot divest the Florida court of jurisdiction." *Weissenborn*, 963 So. 2d at 279.

Laurence Graham argues first that the trial court erred in finding him guilty of indirect criminal contempt on two grounds: (1) the court failed to comply with the procedural requirements of Florida Rule of Criminal Procedure 3.840; and (2) there was no evidence that he violated a court order. Because we agree with the first ground, we do not reach the second.

Failure to strictly follow the dictates of Rule 3.840, governing indirect criminal contempt, constitutes fundamental, reversible error. *Hagan v. State*, 853 So. 2d 595, 597 (Fla. 5th DCA 2003).

Laurence Graham argues that the trial court's order is based upon a statement from Catholic Charities, which is not in affidavit form and was not issued upon personal knowledge, that he did not receive notice of the contempt proceedings, and that he was not properly served. Rule 3.840(a) provides:

> The judge, on the judge's own motion or on affidavit of any person having knowledge of the facts, may issue and sign an order directed to the defendant, stating the essential facts constituting the criminal contempt charged and requiring the defendant to appear before the court to show cause why the defendant should not be held in contempt of court. The order shall specify the time and place of the hearing, with a reasonable time allowed for preparation of the defense after service of the order on the defendant.

Fla. R. Crim. P. 3.840(a). We reject without comment Laurence's arguments concerning an insufficient affidavit and lack of notice, but agree with his contention that he was not properly served.

The order indicates that copies were furnished to Laurence and his attorney; however, this is insufficient service under Rule 3.840. In *Giles v. Renew*, 639 So. 2d 701 (Fla. 2d DCA 1994), the Second District reversed an adjudication of guilt for indirect criminal contempt where the trial court and state did not strictly comply with Rule 3.840 in serving the appellant with the order to show cause. The court held: "Giles was entitled to have the order served upon him, not sent by facsimile to his attorney." *Giles*, 639 So. 2d at 702; *see also Transp. & Gen. Ins. Co., Ltd. v. Receiverships of Ins. Exch. of the Ams.*, 576 So. 2d 1351, 1352 (Fla. 1st DCA 1991) (concluding that the trial court erred in denying appellant's motion to dismiss order to show cause in the absence of proper service of process). It is undisputed here that Laurence was not personally served with the order to show cause and thus, reversal is warranted. *See Van*

- 4 -

*Hare v. Van Hare*, 870 So. 2d 125, 127 (Fla. 4th DCA 2003) (reversing order of criminal contempt for lack of compliance with Rule 3.840).

Laurence Graham contends next that, in appointing Luke Graham as Betty's temporary plenary guardian, the trial court effectively revoked Betty's valid Directive, and did so without the necessary proof under section 765.105, Florida Statutes (2007), and without notice and a hearing, in violation of section 744.3115, Florida Statutes (2007). We agree in part.

"Statutory interpretation is a question of law subject to *de novo* review." *BellSouth Telecomm. Inc., v. Meeks*, 863 So. 2d 287, 289 (Fla. 2003).

Section 744.3115, Florida Statutes (2007), governing advance directives for health care, states:

> In each proceeding in which a guardian is appointed under this chapter, the court shall determine whether the ward, prior to incapacity, has executed any valid advance directive under chapter 765. If any advance directive exists, the court shall specify in its order and letters of guardianship what authority, if any, the guardian shall exercise over the surrogate. Pursuant to the grounds listed in s. 765.105, the court, upon its own motion, may, with notice to the surrogate and any other appropriate parties, modify or revoke the authority of the surrogate to make health care decisions for the ward. For purposes of this section, the term "health care decision" has the same meaning as in s. 765.101.

In appointing Luke Graham as Betty's temporary plenary guardian, an act which effectively revoked her Directive, the trial court failed to comply with the requirements of section 744.3115. The court failed to determine whether the Directive was valid before appointing a guardian. When the trial court appointed Catholic Charities as Betty's emergency temporary guardian, it accepted the Directive as valid, when it stated in its order: "The guardian shall not exercise any authority over any health care surrogate appointed by any valid advance directive executed by the Ward pursuant to Chapter 765, Florida Statutes, nor designate a health care surrogate pursuant to Chapter 765, Florida Statutes, except upon further order of this Court." However, when the trial court issued its letters of plenary guardianship appointing Luke as Betty's temporary guardian, it stated that Luke's authority under the letters "shall exist

- 5 -

irrespective of any valid advanced [sic] directive executed by the Ward under Chapter 765 of the Florida Statutes." These letters essentially revoked Betty's Directive without expressing which grounds supported revocation and absent evidence of any of the grounds set forth in section 765.105. *See* § 744.3115, Fla. Stat. (2007).

We reject Laurence Graham's claim that he did not receive proper notice, as the letters were provided to Laurence's attorney, and there is no authority for the proposition that any specific form of notice was required.

Luke Graham argues in response that this court should interpret section 744.331(6)(b), Florida Statutes (2007), as mandating that "[a] person possessing a health care surrogate has the burden to come forward, present that instrument to the court, and permit the parties and the court to address the issue of the instrument's validity." Section 744.331(6)(b) provides:

> When an order determines that a person is incapable of exercising delegable rights, the court must consider and find whether there is an alternative to guardianship that will sufficiently address the problems of the incapacitated person. A guardian must be appointed to exercise the incapacitated person's delegable rights unless the court finds there is an alternative. A guardian may not be appointed if the court finds there is an alternative to guardianship which will sufficiently address the problems of the incapacitated person.

§ 744.331(6)(b), Fla. Stat. (2007). Nothing in this section places the burden on a health care surrogate to come forward with the instrument to prove its validity, and Luke Graham asserts no authority to that effect. Moreover, section 765.202(7), Florida Statutes (2007), provides: "A written designation of a health care surrogate executed pursuant to this section establishes a rebuttable presumption of clear and convincing evidence of the principal's designation of the surrogate." Luke Graham does not argue that the Directive was not executed properly pursuant to section 765.202 and there is no evidence of such. The Directive, as it appears in the record, complies with the dictates of section 765.202, and thus it "establishes a rebuttable presumption of clear and convincing evidence" of Betty's intent to designate Laurence as her health care surrogate. Accordingly, no authority mandates that Laurence come forward and establish the validity of the Directive.

Therefore, we reverse and remand on this issue for a determination by the trial court of whether Betty's Directive is valid, and if so, what grounds under section 765.105 require its revocation.

After finding Laurence in contempt, the trial court found that Betty's incapacity was established and appointed Luke Graham as her temporary plenary guardian. Laurence claims the trial court erred in doing so without sufficient evidence of Betty's incapacity pursuant to section 744.331, Florida Statutes. We agree.

A trial court's ruling on mental capacity cannot be disturbed "unless the evidence shows it is clearly erroneous." *Fleming v. Fleming*, 352 So. 2d 895, 898 (Fla. 1st DCA 1977) (citing *Waterman v. Higgins*, 28 Fla. 660, 10 So. 97 (1891)). "In the adjudicatory hearing on a petition alleging incapacity, the partial or total incapacity of the person must be established by clear and convincing evidence." § 744.331(5)(c), Fla. Stat. (2007). Further, section 744.331(5)(a), Florida Statutes (2007), states:

> Upon appointment of the examining committee, the court shall set the date upon which the petition will be heard. The date for the adjudicatory hearing must be set no more than 14 days after the filing of the reports of the examining committee members, unless good cause is shown. The adjudicatory hearing must be conducted at the time and place specified in the notice of hearing and in a manner consistent with due process.

Laurence Graham relies on *LeWinter v. Guardianship of LeWinter*, 606 So. 2d 387 (Fla. 3d DCA 1992), which is analogous to the instant case. In *LeWinter*, the Second District reversed a finding of incapacity and the appointment of a guardian, concluding that there was no competent evidence to support the order. The court found that although the report of the examining committee established under section 744.331(3)(a) contained findings that the ward lacked the capacity to perform the functions that served the basis for the guardianship, it was filed over six weeks before the hearing, and there was evidence that the ward's condition had improved in the meantime. *LeWinter*, 606 So. 2d at 388.

Similarly, in the instant case, two of the three examining committee reports were filed two months or more before the hearing. The hearing took place on February 8, 2007. One report was filed on November 21, 2006, and another on December 8, 2006. Further, Laurence Graham submitted a sworn affidavit dated January 20, 2007, from Dr. Clyde Rouse Jr., who was Betty's previous psychiatrist for 2 years, and again

- 7 -

240

evaluated her in January 2007, stating that Betty's condition had improved. Dr. Rouse claimed, *inter alia*: "She looks very well and shows no evidence of any psychiatric symptoms. She reviewed her health care advance directive with me and verbally acknowledged that she had named her son Larry as her surrogate in that document." He also stated that her condition improved due to medication and in his opinion she "is perfectly competent to make financial decisions, to execute any legal documents such as power of attorney, health care advance directives, etc." Notably, a report by Dr. David Trader, board certified in general psychiatry and geriatric psychiatry, dated February 14, 2007, a few days after the hearing in question, indicated that "[t]he present examination suggests that Betty Graham has sufficient mental capacity to make financial, medical, testamentary and general personal decisions at this time."

Because Dr. Rouse's report indicated an improvement in Betty's condition and the committee member reports were filed two months prior to the hearing, the record evidence failed to establish Betty's incapacity by clear and convincing evidence. Thus, we reverse and remand with directions to dismiss the guardianship proceeding. *See LeWinter*, 606 So. 2d at 388.

We need not reach Laurence's argument that the trial court erred in denying his motion to continue, as this argument is moot in light of the foregoing.

*Reversed and Remanded with Directions.*

STONE and STEVENSON, JJ., concur.

\*          \*          \*

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John L. Phillips, Judge; L.T. Case Nos. 502006GA000650XXXXSB & 502006MH002068XXXXSB.

Joseph S. Shook of Law Office of Joseph S. Shook, Coral Gables, for appellant.

Edward A. Shipe, Boca Raton, for appellee Luke Graham.

Ronald E. Crescenzo of Casey Ciklin Lubitz Martens & O'Connell, West Palm Beach, for appellee Catholic Charities of the Diocese of Palm Beach, Inc.

- 8 -

# EXHIBIT H

PO2175



**ILUKA RESOURCES INC.**

August 20, 1999

*FILED*
*99 AUG 24 AM 8: 31*
*SECRETARY OF STATE*
*TALLAHASSEE, FLORIDA*

Amendment Section
Division of Corporations
409 E. Gaines Street
Tallahassee, FL  32399

Re:   Application By Foreign Profit Corporation to File Amendment to
      Application for Authorization to Transact Business in Florida

      4000002967174--6
      -08/23/99--01126--010
      ****52.50  ****52.50

Dear Sir/Madam:

Enclosed please find the following:

1. Application to Amend Authorization to Transact Business in Florida;

2. Original Certificate of Amendment from the State of Delaware; and

3. $52.50 check to cover filing fee, Certified Copy and Certificate of Status.

If you have any questions please call me at (904) 529-5001.

Sincerely,

J. L. Scott
Administration Manager – US

JLS/cl

*N/c*

Enclosure

ILUKA RESOURCES INC.
1223 Warner Road, Green Cove Springs, Florida 32043
Tel: 1 904 284 9832  Fax: 1 904 284 4006

V. SHEPARD   AUG 3 1 1999

# PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA
### (Pursuant to s. 607.1504, F.S.)

## SECTION I
### (1-3 MUST BE COMPLETED)

1. RGC (USA) Mineral Sands Inc.
   *Name of corporation as it appears on the records of the Department of State.*

2. Delaware, USA
   *Incorporated under laws of*

3. May 24, 1984
   *Date authorized to do business in Florida*

## SECTION II
### (4-7 COMPLETE ONLY THE APPLICABLE CHANGES)

4. If the amendment changes the name of the corporation, when was the change effected under the laws of
   its jurisdiction of incorporation?   July 30, 1999

5. Iluka Resources Inc.
   *Name of corporation after the amendment, adding suffix "corporation" "company" or "incorporated," or appropriate abbreviation, if not contained in new name of the corporation.*

6. If the amendment changes the period of duration, indicate new period of duration.

   n/a
   _____
   *New Duration*

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

   n/a
   _____
   *New Jurisdiction*

   _____                    August 20, 1999
   *Signature*                                 *Date*

   Jimmie L. Scott                             Director
   *Typed or printed name*                     *Title*

244

*State of Delaware*    PAGE 1

## Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "RGC (USA) MINERAL SANDS INC.", CHANGING ITS NAME FROM "RGC (USA) MINERAL SANDS INC." TO "ILUKA RESOURCES INC.", FILED IN THIS OFFICE ON THE THIRTIETH DAY OF JULY, A.D. 1999, AT 2:30 O'CLOCK P.M.





*Edward J. Freel, Secretary of State*

2035818   8100

991341917

AUTHENTICATION:     9925154

DATE:     08-17-99

JUL-30-99(FRI) 14:15       ALSTON & BIRD LLP 24B              TEL:404 881 4777           P.003/003

## CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
## FOR
## RGC (USA) MINERAL SANDS INC.

RGC (USA) Mineral Sands Inc., a corporation organized and existing under and by virtue of the Delaware General Corporation Law (the "Corporation"), DOES HEREBY CERTIFY:

FIRST:       That on 24 June, 1999 the Board of Directors of the Corporation adopted resolutions setting forth a proposed amendment of the Certificate of Incorporation of the Corporation, declaring said amendment to be advisable and submitting the proposed amendment to the sole stockholder of the Corporation for its consideration and approval.  The proposed amendment is as follows:

NOW, THEREFORE, BE IT HEREBY RESOLVED that paragraph 1 of the Certificate of Incorporation of the Corporation is hereby amended in its entirety to read as follows:

"1.   The name of the corporation is Iluka Resources Inc."

SECOND:     That thereafter on 24 June, 1999, the stockholders of the Corporation adopted the proposed amendment by written consent in accordance with Section 228 of the Delaware Corporation Law.

THIRD:       That said amendment was duly adopted in accordance with the provisions of Section 242 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, RGC (USA) Mineral Sands Inc. has caused this certificate to be signed by a duly authorized officer this 24th day of June, 1999.

RGC (USA) Mineral Sands Inc.

Jimmie L. Scott
Secretary/Director

# 2012 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Mar 15, 2012**
**Secretary of State**

DOCUMENT# P25152

**Entity Name:** RGC (USA) MINERALS INC.

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|

12472 ST. JOHN CHURCH ROADI
STONY CREEK, VA 23882    US

| **Current Mailing Address:** | **New Mailing Address:** |
|---|---|

1301 RIVERPLACE BOULEVARD
SUITE 2601
JACKSONVILLE, FL 32207    US

**FEI Number: 59-2931722**    **FEI Number Applied For ( )**    **FEI Number Not Applicable ( )**    **Certificate of Status Desired ( )**

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|

CT CORPORATION SYSTEM
1200 S PINE ISLAND RD
PLANTATION, FL 33324    US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

                Electronic Signature of Registered Agent                           Date

## OFFICERS AND DIRECTORS:

| Title: | PD |
|---|---|
| Name: | BLACKWELL, MATTHEW B |
| Address: | 12472 ST. JOHNS CHURCH ROAD |
| City-St-Zip: | STONY CREEK, VA 23882 US |

| Title: | D |
|---|---|
| Name: | WILSON, CAMERON |
| Address: | 12472 ST. JOHN CHURCH ROAD |
| City-St-Zip: | STONY CREEK, VA 23882 US |

| Title: | VD |
|---|---|
| Name: | DARROCH, GLEN |
| Address: | 12472 ST. JOHN CHURCH ROAD |
| City-St-Zip: | STONY CREEK, VA 23882 US |

| Title: | S |
|---|---|
| Name: | MULLINS, JOSEPH D |
| Address: | 1301 RIVERPLACE BOULEVARD, SUITE 2601 |
| City-St-Zip: | JACKSONVILLE, FL 32207 US |

| Title: | D |
|---|---|
| Name: | GREEN, SIMON |
| Address: | 12472 ST. JOHN CHURCH ROAD |
| City-St-Zip: | STONY CREEK, VA 23882 US |

I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.

SIGNATURE: JOSEPH MULLINS                         S                     03/15/2012

                Electronic Signature of Signing Officer or Director                     Date

# EXHIBIT I

# Port Examiner

Supplier Name    ⌄    Search here ...                    Search

# Bill of Lading

| Shipper | Consignee | Notify Party |
|---|---|---|
| ILUKA RESOURCES LEVEL 23, 140 ST GEORGE'S TERRACE PERTH WA 6001 AUSTRALIA | CARBON RESOURCES, LLC 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES | **CARBON RESOURCES, LLC** 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES |

# Details

| Bill of Lading No. | Vessel Name | Voyage No. | Place of Receipt | Port of Loading |
|---|---|---|---|---|
| MSCUFT863328 | KOTA PELANGI | 415N | FREMANTLE | Taoranga, New Zealand |

| Port of Discharg | Place of Delivery | Number of Pieces | Gross Weight | Total Volume | Arrival Date |
|---|---|---|---|---|---|

249

e                          577 BAG      276574 KG                      2015-03-07

Long Beach,
California

# Customs Declaration

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| CARU9764353 | | | |
| | 38 PCS | | |

### Description of Cargo

268.624 MTS ACTIVATED CARBON ECO STANDARD FRE IGHT PREPAID PACKED IN BAGS
SHIPPING LINE GR ANTS 14 DAYS FREE DETENTION TIME AT PORT OF D ESTINATION
ACTIVATED CARBON NETT WEIGHT: 18.2 04MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| FCIU8836168 | | | |
| | 39 PCS | | |

### Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.091MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|

GLDU7303400          38 PCS

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.681MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8029030 | 36 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.311MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8147963 | 40 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.701MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8329802 | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.921MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8476697 | | | |
| | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.094MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8616757 | | | |
| | 40 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.943MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8783625 | | | |
| | 40 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.917MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|

MSCU7709571          39 PCS

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.953MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MSCU8117474 | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.083MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TCNU7278684 | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.591MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TGHU6178933 | 39 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 17.835MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TGHU7516763 | | | |
| | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.001MT

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TGHU8779717 | | | |
| | 38 PCS | | |

## Description of Cargo

ACTIVATED CARBON NETT WEIGHT: 18.298MT

# Container Data

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| CARU9764353 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container | Load Status | Container Dimensions |
|---|---|---|

254

| No. | Loaded | 40'00" L x 9'00" H x 8'00" W |

FCIU8836168

| Container No. | Load Status | Container Dimensions |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |

GLDU7303400

| Container No. | Load Status | Container Dimensions |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |

MEDU8029030

| Container No. | Load Status | Container Dimensions |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |

MEDU8147963

| Container No. | Load Status | Container Dimensions |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |

MEDU8329802

| Container No. | Load Status | Container Dimensions |
| | Loaded | 40'00" L x 9'00" H x 8'00" W |

MEDU8476697

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| MEDU8616757 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| MEDU8783625 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| MSCU7709571 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| MSCU8117474 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| TCNU7278684 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| TGHU6178933 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| TGHU7516763 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| TGHU8779717 | Loaded | 40'00" L x 9'00" H x 8'00" W |

US Customs Import Data from Port Examiner • Pax Mercatoria MMXXIV • Contact

# Port Examiner

Supplier Name  ⌄    Search here ...                                    Search

# Bill of Lading

| Shipper | Consignee | Notify Party |
|---|---|---|
| ILUKA RESOURCES LEVEL 23, 140 ST GEORGE'S TERRACE PERTH WA 6001 AUSTRALIA | CARBON RESOURCES, LLC 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES | **CARBON RESOURCES, LLC** 2535 JASON COURT OCEANSIDE CA 92056 UNITED STATES |

# Details

| Bill of Lading No. | | Vessel Name | Voyage No. | Place of Receipt | Port of Loading |
|---|---|---|---|---|---|
| MSCUFT849871 | | | | | |
| | | ANL BAREGA | 411N | FREMANTLE | Taoranga, New Zealand |

| Port of Discharg | Place of Delivery | Number of Pieces | Gross Weight | Total Volume | Arrival Date |
|---|---|---|---|---|---|

| e | 206 BAG | 94287 KG | 2015-01-05 |

Long Beach,
California

# Customs Declaration

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| FCIU8791422 | 41 PCS | | |

Description of Cargo

ACTIVATED CARBON STANDARD

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8267022 | 41 PCS | | |

Description of Cargo

ACTIVATED CARBON STANDARD

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MEDU8572561 | 41 PCS | | |

## Description of Cargo

91.637MTS ACTIVATED CARBON STANDARD FREIGHT P REPAIDPACKED IN BAGS
SHIPPING LINE GRANTS 14 DAYS FREE DETENTION TIME AT PORT OF DESTINATI ON
ACTIVATED CARBON STANDARD

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| MSCU9536393 | 41 PCS | | |

## Description of Cargo

ACTIVATED CARBON STANDARD

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| TRLU6855799 | 42 PCS | | |

## Description of Cargo

ACTIVATED CARBON STANDARD

# Container Data

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| FCIU8791422 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| MEDU8267022 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| MEDU8572561 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| MSCU9536393 | Loaded | 40'00" L x 9'00" H x 8'00" W |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| TRLU6855799 | Loaded | 40'00" L x 9'00" H x 8'00" W |

US Customs Import Data from Port Examiner • Pax Mercatoria MMXXIV • Contact

# Port Examiner

Supplier Name  ⌄    Search here...                    Search

# Bill of Lading

| Shipper | Consignee | Notify Party |
|---|---|---|
| TRONOX MINERAL SALES PTY LTD | M/S. CARBON RESOURCES LLC., | **UNIVERSAL SHIPPING INC** |
| 1 BRODIE HALL DRIVE | 2535 JASON COURT P. | 2855 S. RESERVOIR ST. |
| BENTLEY WA | O. BOX 4444 | POMONA CA UNITED |
| AUSTRALIA | OCEANSIDE CA | STATES |
|  | UNITED STATES |  |
| Tel: 93651333 |  |  |
|  | Tel: 6309930 |  |

# Details

| Bill of Lading No. | Vessel Name | Voyage No. | Place of Receipt | Port of Loading |
|---|---|---|---|---|
| OOLU2020474490 |  |  |  |  |
|  | OOCL MEMPHIS | 15E | FREMANTLE | Kao Hsiung, China (Taiwan) |

263

| Port of Discharge | Place of Delivery | Number of Pieces | Gross Weight | Total Volume | Arrival Date |
|---|---|---|---|---|---|
|  |  | 88 BAG | 36564 KG |  | 2014-12-15 |
| Long Beach, California |  |  |  |  |  |

# Customs Declaration

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| OOLU8494437 | 44 PCS |  |  |

| Description of Cargo |
|---|
| ACTIVATED CARBON RC830 |

| Container No. | Number of Pieces | Net Weight | Declared Value |
|---|---|---|---|
| OOLU8957721 | 44 PCS |  |  |

| Description of Cargo |
|---|
| ACTIVATED CARBON RC830 |

# Container Data

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| OOLU8494437 | | |

| Container No. | Load Status | Container Dimensions |
|---|---|---|
| | Loaded | 40'00" L x 9'00" H x 8'00" W |
| OOLU8957721 | | |

US Customs Import Data from Port Examiner • Pax Mercatoria MMXXIV • Contact

# EXHIBIT J

1

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**San Francisco Division**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

LAURENCE J. GRAHAM; and BETTY
PATRICK GRAHAM,

        *Plaintiffs*,

*v.*

DUPONT DE NEMOURS, INC.; THE DOW
CHEMICAL COMPANY; DOW, INC.;
CORTEVA, INC.; THE CHEMOURS
COMPANY; ILUKA RESOURCES, INC.;
TRONOX, LLC; TRONOX PLC;
HUNTSMAN CORPORATION; KRONOS
(US), INC.; KRONOS WORLDWIDE, INC.;
TITANIUM METALS CORPORATION;
VENATOR MATERIALS, LLC; VENATOR
MATERIALS, PLC; OCCIDENTAL
PETROLEUM CORPORATION; INEOS
PIGMENTS USA INC.; KINDER MORGAN,
INC.; AND DOES 1-25,

        *Defendants*.

CASE NO.: 3:24-CV-01551-AGT

18

19

**DECLARATION OF JOSEPH MULLINS IN SUPPORT OF ILUKA RESOURCES,**
**INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

20

21

22

23

    1.     My name is Joseph Mullins.  I am over 18 years of age, of sound mind and otherwise competent to make this Declaration, which I submit in support of the Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction and Inappropriate Venue filed in this litigation by Iluka Resources, Inc. ("Iluka").

24

25

26

    2.     The facts stated in this Declaration are based on information known to me through my work as U.S. Corporate Counsel/Secretary for Iluka.  I have served in this role since 2003.  If called as a witness, I could competently testify to these statements.

27

28

<center>1</center>

3:24-cv-01551-AGT

3.      Iluka is incorporated in Delaware. Iluka's headquarters is located at 12472 St. John Church Road, Stony Creek, Virginia 23882, which is also the site of Iluka's mineral separation plant.

4.      Iluka is in the mining business. Iluka mined surface heavy mineral sands for minerals like zircon, ilmenite, and staurolite on various properties in Sussex County and Dinwiddie County, Virginia.

5.      Iluka supplied minerals within a geographic market that almost exclusively included consumers of mineral sands products primarily in Ohio, Delaware, South Carolina, Alabama, Tennessee, New York, and New Hampshire.

6.      Iluka does not generally purchase any goods or services from within California or directly supply any goods or services into California.

7.      Iluka does not maintain an office in California or conduct any business in California.

8.      Iluka does not own, lease, or use any real property in California.

9.      Iluka does not solicit business from within California or initiate business in California. Iluka's affiliate Iluka Resources (TN) LLC, a Tennessee limited liability company, has conducted mineral sands exploration in California. Iluka Resources, Inc. is the sole member and the manager of Iluka Resources (TN) LLC. Iluka Resources (TN) LLC's exploration never led to the development of any business in California.

10.     Iluka does not employ any persons in California, and does not have any independent contractors or agents conducting business on its behalf in California.

11.     I have been at Iluka since 2002. During my tenure, to the best of my knowledge, Iluka has never supplied minerals or any other good to any entity in California.

12.     Iluka has been trying to pay royalties to Plaintiffs Betty Pat Graham and Laurence J. Graham for almost two decades.

13.     Ms. Graham's parents, G. L. Parson and Mary Elizabeth Parson (the "Parsons") were the owners of certain real property in Dinwiddie and Sussex Counties in Virginia. In the late 1980s and early 1990s, the Parsons entered into approximately ten mining leases (the "Leases"), in

1  Virginia, pursuant to which Iluka had the right to mine the Parsons' properties in Dinwiddie and

2  Sussex Counties (the "Property").

3      14.    The Parsons had three daughters, including Betty Pat Graham. On or about May 19,

4  1997, the Parsons executed a Deed of Gift in favor of their three daughters. The Parson Deed of

5  Gift conveyed to each daughter a one-third interest in the minerals on or under the Property. In

6  addition, it conveyed to the daughters the right to receive future royalty payments under the Leases.

7      15.    Pursuant to the Leases, Iluka mined the Property and processed the minerals from

8  the Property in Stony Creek, Virginia. Iluka has calculated and distributed all royalties pursuant to

9  the Leases at its offices in Virginia.

10      16.    On or about October 23, 2000, Betty Pat executed a Deed of Gift (the "Graham Deed

11  of Gift") in favor of her two sons, Luke Graham ("Luke") and Laurence J. Graham ("Larry").

12      17.    In early 2002, Betty Pat and Luke filed a Bill of Complaint against Larry seeking an

13  order rescinding and setting aside the Graham Deed of Gift on the grounds that it was executed

14  under duress. Iluka was made a defendant in that litigation so that it could be ordered to pay all

15  royalties into court pending resolution of the case.

16      18.    In 2003, Betty Pat, Luke, and Larry entered into a confidential settlement agreement

17  that resolved the rescission litigation. The terms of the 2003 Settlement Agreement were not

18  disclosed to Iluka. As part of the settlement, the Court entered an order disbursing the funds Iluka

19  had deposited into court and validating the Graham Deed of Gift.

20      19.    Notwithstanding the 2003 Settlement Agreement, Betty Pat did not direct Iluka in

21  writing or otherwise to pay her share of future royalties to her sons. In February 2004, faced with

22  conflicting demands for payment of the royalties, Iluka exercised its rights under the Leases and

23  began depositing the royalties allocable to Betty Pat into an escrow account at The Bank of

24  Southside Virginia, pending a resolution of the various parties' entitlement to the funds.

25      20.    Since 2005, Iluka has filed and served several interpleader actions in Virginia

26  successfully seeking to interplead additional royalties that had been deposited into escrow. Despite

27  being appropriately served, neither Betty Pat nor Larry entered appearances or otherwise made

28

3

3:24-cv-01551-AGT

1   claims to the funds.  Only Luke entered an appearance and made a claim to 40-50% of the royalty

2   funds.

3       21.    On September 26, 2022, after Iluka had interpled the last of the proceeds from the

4   minerals on the Graham property, the Virginia court entered a final order declaring that Larry was

5   entitled to over $2.5 million in royalties based on the 2003 Settlement Agreement.

6       22.    Although Iluka has repeatedly sought to meet with Larry to pay over the funds, he

7   has ignored those offers.  In response to Iluka's outreach efforts, Larry has asked Iluka to contact

8   him or send money to him at various P.O. boxes in Florida, Massachusetts, New York, and

9   California.

10      I declare under penalty of perjury that the foregoing is true and correct to the best of my

11  knowledge.

12  Executed this 19th day of March 2024.

13

14                                          By: _____

15                                          Joseph Mullins

16

17

18

19

20

21

22

23

24

25

26

27

28



# Americas Sales of Domestic Production - 2004

| Americas Sales of Domestic Production - 2004 (USD 96,000,000) | | |
|---|---|---|
| | Domestic | Export |
| Zircon | 65000 Mt | 30000 Mt |
| Rutile | 34000 Mt | - |
| Ilmenite | 315000 Mt | - |
| Leucoxene | 17000 Mt | - |

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Las Angeles<br>**06/02/2025**<br>David W. Slaybn , Executive Officer / Clerk of Court<br>By: _____ G. Robinson _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>25STCV15972 |

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Gail Killefer | 37 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record    David W. Slayton, Executive Officer / Clerk of Court

on 06/02/2025 _____    By G. Robinson _____, Deputy Clerk
   (Date)

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

 **Superior Court of California, County of Los Angeles**
**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**
Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

LASC CIV 271 Rev. 11/24
For Mandatory Use

•

Page 1 of 3

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Online Dispute Resolution (ODR).** Online Dispute Resolution (ODR) is a free online service provided by the Court to help small claims and unlawful detainer litigants explore settlement options before the hearing date without having to come to court. ODR guides parties through a step-by-step program. After both sides register for ODR, they may request assistance from trained mediators to help them reach a customized agreement. The program creates settlement agreements in the proper form and sends them to the Court for processing. Parties in small claims and unlawful detainer cases must carefully review the notices and other information they receive about ODR requirements that may apply to their case. *For more information, visit https://my.lacourt.org/odr.*

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

652 816